## IN THE UNITED STATES DISTRICT COURT FOR THE
## WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| SAM DOE, )<br><br>    Plaintiff, )<br><br>v. )<br><br>PENNSYLVANIA DEPARTMENT OF )<br>CORRECTIONS; JOHN WETZEL, Secretary of )<br>the Pennsylvania Department of Corrections; )<br>DR. PAUL NOEL, Chief of Clinical Services; )<br>Dr. PALUKI REDDY, Chief Psychiatrist; DR. )<br>LAWRENCE ALPERT, former Medical )<br>Director SCI Cambridge Springs; DR. )<br>ALEXANDER, former Medical Director SCI )<br>Cambridge Springs; DR. KROSS, former )<br>Medical Director SCI Cambridge Springs; DR. )<br>OBENG, Medical Director SCI Cambridge )<br>Springs; LONNIE OLIVER, Superintendent SCI )<br>Cambridge Springs; DEBRA RICH, former )<br>Deputy Superintendent SCI Cambridge Springs; )<br>MS. WAGNER, former Deputy Superintendent )<br>SCI Cambridge Springs; MS. BLAKELY, unit )<br>psych counselor; and SHANNON ANDERSON, )<br>Corrections Healthcare Administrator )<br><br>    Defendants. ) | Case No.  1:20-cv-0023<br><br>Judge Susan Paradise Baxter<br>Magistrate Judge Richard A. Lanzillo |

## AMENDED COMPLAINT

Plaintiff Sam Doe is a non-binary person currently incarcerated at the State Correctional

Institution at Cambridge Springs ("SCI Cambridge Springs").[1]  They have been diagnosed by the

Pennsylvania Department of Corrections with gender dysphoria, a serious medical condition

characterized by strong cross-gender identification, and strong and persistent discomfort about

---

[1] Mx. Doe is proceeding under a pseudonym for privacy and safety concerns.  Their name and
DOC identification number will be provided to Defendants at time of service of the Complaint.

one's assigned sex.[2]  While Mx. Doe was assigned female at birth, they currently live and present themself in a gender-neutral fashion.  As a result of gender dysphoria, Mx. Doe experiences severe despondency and anxiety resulting from incongruence between their female physical features and their non-binary gender identity.  Mx. Doe requires medically necessary care to treat their gender dysphoria.  Defendants, the Pennsylvania Department of Corrections and its staff, continue to violate the Eighth Amendment and the Americans with Disabilities Act by mismanaging, delaying, and outright ignoring Mx. Doe's serious medical needs and failing to provide reasonable accommodations.  This refusal to provide Mx. Doe with the appropriate care and accommodations recognized by the medical community has caused them severe pain and anguish and places them at substantial risk of future injury.

## JURISDICTION AND VENUE

1.    This case is brought pursuant to 42 USC § 1983, the Americans with Disabilities Act of 1990, as amended 42 U.S.C. § 12101 et seq. ("ADA"), the Rehabilitation Act of 1973, 29 U.S.C. § 701 et seq., and the Eighth and Fourteenth Amendments to the United States Constitution.

2.    This Court has jurisdiction pursuant to 28 U.S.C. §§ 1331, 1343(a)(3)-(4).

3.    This Court is the appropriate venue under 28 U.S.C. § 1391(b)(2) because the events and omissions giving rise to this action occurred in Crawford County, Pennsylvania, within the Western District.

## PARTIES

4.    Plaintiff Sam Doe is a non-binary person currently incarcerated at SCI Cambridge Springs.

5.    Defendant Pennsylvania Department of Corrections ("DOC") is an agency of the

---

[2] Mx. Doe uses the honorific "Mx." and they/them pronouns.

Commonwealth of Pennsylvania that operates SCI Cambridge Springs and receives federal funding.  The DOC is responsible for providing adequate medical health services to and creating policies that ensure appropriate medical treatment and safe housing to Mx. Doe.  The principal office for the DOC is located in Mechanicsburg, Pennsylvania.

6.      Defendant John Wetzel is, and was at all times relevant to this Complaint, the Secretary of the Pennsylvania Department of Corrections.  Defendant Wetzel is responsible for the oversight, operation, and administration of the Commonwealth's correctional system, including the implementation of training and policies regarding access to health care, accommodations for people with disabilities, and policies relating to transgender and gender nonconforming individuals.  He is being sued in his individual and official capacities.

7.      Defendant Dr. Paul Noel is, and was at all times relevant to this Complaint, an employee of the DOC serving as the Chief of Clinical Services for the DOC. Defendant Noel is responsible for the oversight, operation, and administration of healthcare within the Commonwealth's correctional system, including the implementation of training and policies regarding the provision of transgender healthcare and gender affirming surgery.  He is being sued in his individual and official capacities.

8.      Defendant Dr. Paluki Reddy is an employee of the DOC serving as the Chief Psychiatrist for the DOC.  Defendant Reddy is responsible for the oversight, operation, and administration of mental healthcare within the Commonwealth's correctional system, including the implementation of training and policies regarding the provision of transgender mental healthcare and gender affirming surgery.  He is being sued in his individual and official capacities.

9.      Defendant Dr. Lawrence Alpert was the medical director at SCI Cambridge Springs. As the medical director, he was responsible for overseeing all medical staff and ensuring

that adequate medical care was provided to all individuals incarcerated at SCI Cambridge Springs. He is sued in his individual capacity. At all relevant times, he acted under color of state law.

10.     Defendant Dr. Alexander was the medical director at SCI Cambridge Springs. As the medical director, he was responsible for overseeing all medical staff and ensuring that adequate medical care was provided to all individuals incarcerated at SCI Cambridge Springs.  He is sued in his individual capacity. At all relevant times, he acted under color of state law.

11.     Defendant Dr. Kross was the medical director at SCI Cambridge Springs. As the medical director, he was responsible for overseeing all medical staff and ensuring that adequate medical care was provided to all individuals incarcerated at SCI Cambridge Springs.  He is sued in his individual capacity. At all relevant times, he acted under color of state law.

12.     Defendant Dr. Obeng is the medical director at SCI Cambridge Springs. As the medical director, he is responsible for overseeing all medical staff and ensuring that adequate medical care is provided to all individuals incarcerated at SCI Cambridge Springs.  He is sued in his individual and official capacities. At all relevant times, he acted under color of state law.

13.     Defendant Lonnie Oliver is the Superintendent at SCI Cambridge Springs. Defendant Oliver is responsible for the oversight and operation of SCI Cambridge Springs. She is sued in her individual and official capacities.

14.     Defendant Debra Rich was the Deputy Superintendent for Facility Management at SCI Cambridge Springs. Defendant Rich was responsible for the oversight and operation of SCI Cambridge Springs. She is sued in her individual capacity.

15.     Defendant Wagner was Deputy Superintendent at SCI Cambridge Springs. Defendant Wagner is responsible for the oversight and operation of SCI Cambridge Springs. She is sued in her individual capacity.

16.     Defendant Blakely is a "unit psych counselor" employed by the Department of Corrections at SCI Cambridge Springs.  Defendant Blakely is responsible for ensuring the mental well-being of individuals housed on her unit. She is sued in her individual capacity.

17.     Defendant Shannon Anderson is the Corrections Healthcare Administrator at SCI Cambridge Springs.  She is responsible for the oversight of healthcare at SCI Cambridge Springs. She is sued in her individual capacity.

## STATEMENT OF FACTS

18.     Sam Doe is a non-binary person. Sam Doe uses the pronouns "they/them" and the honorific "Mx."

19.     Sam Doe is neither a man nor a woman, and does not wish to present themself as either a man or a woman.

20.     While Mx. Doe was assigned female at birth, they currently live and present themself in a gender-neutral fashion.

21.     Mx. Doe has felt uncomfortable in their body and has felt they preferred to be a boy since they were a small child.  As a child they felt more at ease in masculine attire and playing more masculine games.

22.     As an adult they have realized that they needed a more masculine body, with a deeper voice, greater musculature, no menstruation, breast reduction and other gender affirming surgery.

### Gender Dysphoria is Recognized as a Serious Medical Condition Requiring Treatment

23.     Since 2017, Mx. Doe has been diagnosed by the Pennsylvania Department of Corrections ("DOC") with gender dysphoria, a serious medical condition characterized by strong cross-gender identification, and strong and persistent discomfort about one's assigned sex.

24.     Gender Dysphoria is a diagnosable and treatable condition recognized by the American Psychiatric Association and included in the Diagnostic and Statistical Manual of Mental Disorders, Fifth Edition ("DSM-V"), as well as the International Classification of Diseases-10 (World Health Organization).

25.     Gender dysphoria is not a mental illness or disorder.  Rather, "gender dysphoria" is a diagnostic term that refers to clinically significant distress associated with an incongruence or mismatch between a person's gender identity and assigned sex.

26.     When gender dysphoria is severe, it can result in a person's inability to function in everyday life.

27.     Gender dysphoria is highly treatable.  Indeed, with appropriate treatment, individuals with gender dysphoria can be fully cured of all symptoms.

28.     When not properly treated, however, gender dysphoria is often associated with dangerous related conditions such as depression, substance abuse, self-mutilation, suicidal ideations, and ultimately suicide.

29.     Without treatment, the path for those suffering from gender dysphoria can be torturous, as evidenced by alarmingly high suicide attempt rates.  For example, 40 percent of persons identifying as transgender attempt suicide, which is nearly 9 times the national average of 4.6 percent, according to the 2015 U.S. Transgender Survey.[3]

30.     Mx. Doe's history reflects such unfortunate effects from the inadequate treatment they have received while incarcerated within the Pennsylvania Department of Corrections: they

---

[3] James, S.E., Herman, J.L., Rankin, S., Keisling, M., Mottet, L., & Anafi, M. (2016). *The Report of the 2015 U.S. Transgender Survey*. Washington, DC: National Center for Transgender Equality. *Available at* https://transequality.org/sites/default/files/docs/usts/USTS-Full-Report-Dec17.pdf.

have engaged in self-mutilation, including removing their nipples and acts of cutting, repeatedly experiencing suicidal ideation, and have considered acts of genital mutilation as a response to their despair over their inability to access necessary treatment for their gender dysphoria.

### Just as With Other Medical Conditions, People with Gender Dysphoria Must be Able to Access Treatment Determined to be Medically Necessary, Including Gender Affirming Surgery

31.     The World Professional Association for Transgender Health ("WPATH") is the leading international organization focused on transgender health care. WPATH publishes the Standards of Care for the Health of Transsexual, Transgender, and Gender Nonconforming People ("Standards of Care"). The Standards of Care were first developed in 1979. The current version of the Standards of Care, Version 7,[4] was published in September 2011 following a five-year process in which eighteen gender dysphoria specialists submitted peer-reviewed papers to help identify the most effective treatments for gender dysphoria. WPATH's Standards of Care are the prevailing standards of care used by mental health providers and medical professionals treating gender dysphoria.

32.     The goals of medical treatments for gender dysphoria, as stated in the Standards of Care, are: (1) to alleviate clinically significant distress and impairment of functioning associated with gender dysphoria, and (2) to maximize overall psychological well-being.

33.     As recognized by both the DSM-V and the Standards of Care, people with gender dysphoria who do not receive appropriate medical treatment are at risk of depression, anxiety, suicide, and genital self-harm, including attempts to perform auto-castrations or auto-penectomy that can lead to serious and life-threatening injuries.

---

[4] *Available at*
https://www.wpath.org/media/cms/Documents/SOC%20v7/Standards%20of%20Care_V7%20Full%20Book_English.pdf.

34.      The Standards of Care set forth treatment options for gender dysphoria, including:

changes in gender expression and role (which may involve living part-time or full-time in another

gender role, consistent with one's gender identity); hormone therapy to feminize or masculinize

the body; surgery to change primary and/or secondary sex characteristics (e.g. breasts/chest,

external and/or internal genitalia, facial features, body contouring); and psychotherapy addressing

the negative impact of gender dysphoria and stigma on mental health, alleviating internalized

transphobia, enhancing social and peer support, improving body image, or promoting resilience.

35.      The Standards of Care also note that additional changes in gender expression such

as permanent hair removal, breast binding, and changes in name and gender markers on

identification documents can be considered to help alleviate gender dysphoria.

36.      After a diagnosis of gender dysphoria is made, the Standards of Care require that a

competent medical professional with knowledge and expertise in gender dysphoria evaluate a

patient for appropriate and necessary treatment options.  This medical treatment not only improves

a patient's quality of life, but also limits the development of mental health issues which often

accompany lack of treatment.

37.      The Standards of Care also make clear that gender confirmation surgery is not an

"elective procedure."  Gender confirmation surgery is an "essential and medically necessary"

treatment to alleviate gender dysphoria in some cases.  Hormone therapy alone for those

individuals is not sufficient.

38.      In promulgating the Standards of Care, the WPATH specifies that they "apply to

all transsexual, transgender, and gender nonconforming people, irrespective of housing situation,

including in institutional environments such as prisons."

23

39.     The Standards of Care further state that "[a]ll elements of assessment and treatment as described in the SOC can be provided to people living in institutions…If the in-house expertise of health professionals in the direct or indirect employ of the institution does not exist to assess and/or treat people with gender dysphoria, it is appropriate to obtain outside consultation from professionals who are knowledgeable about this specialized area of health care."

40.     The National Commission on Correctional Health Care ("NCCHC"), which sets standards and provides accreditation for prisons throughout the nation, recognizes that the Standards of Care should be followed by correctional institutions in providing healthcare to transgender people.[5]

41.     The NCCHC acknowledges that decisions on transgender health care must be made on an individualized case by case basis.

42.     The NCCHC recommends that correctional health staff be trained in transgender heath care and notes that in the alternative, incarcerated people should "have access to other professionals with expertise in transgender health care to help determine appropriate management."

### DOC's Policy Regarding the Treatment of Gender Dysphoria is Constitutionally Inadequate and Discriminatory

43.     DOC Policy Statement 13.2.1, Access to Health Care, is Defendant DOC's policy that establishes the procedures by which the Department of Corrections and medical vendor staff provide access to health care.

---

[5] NCCHC Position Statement: Transgender, Transsexual and Gender Nonconforming Health Care in Correctional Settings (2015) *available at* https://www.ncchc.org/transgender-transsexual-and-gender-nonconforming-health-care.

44.     Section 19 of Policy 13.2.1 specifically addresses the treatment of gender dysphoria and "establishes procedures to appropriately diagnose, treat, and manage [people] with Gender Dysphoria (GD) consistent with the core values and mission of the Pennsylvania Department of Corrections."

45.     According to Section 19, Defendant Noel, as the Chief of Clinical Services, has the "overall responsibility for the medical treatment of inmates diagnosed with [Gender Dysphoria]."

46.     Likewise, Defendant Reddy, as the Chief Psychiatrist, has the "overall responsibility for the mental health diagnosis and treatment of inmates diagnosed with [Gender Dysphoria]."

47.     Pursuant to Section 19, the contracted medical and mental health vendors must provide training to their practitioners on "evaluation, treatment and management of patients with [Gender Dysphoria]" with annual refresher training.

48.     Defendants Noel and Reddy must pre-approve this training.

49.     Section 19 establishes a "[Gender Dysphoria] Treatment Review Committee" which *inter alia*, establishes DOC policy, reviews and approves every individual treatment plan, and reviews all requests for gender affirming surgery.

50.     This Committee is composed of at least six people, none of whom are the actual doctors or psychiatrists on site interacting directly with or treating people with gender dysphoria.

51.     As the Chief of Clinical Services and Chief Psychiatrist, Defendants Noel and Reddy are required members of this Committee.

52.     Section 19 recognizes that the Standards of Care "will serve as guidelines for the overall health care of identified inmates."

53.     Psychology staff and the prison's psychiatrist can develop a Gender Dysphoria Individual Recovery Plan for each person with Gender Dysphoria, but Section 19 requires that the Gender Dysphoria Treatment Review Committee unanimously sign off on the treatment plan.

54.     Hormone therapy may be a part of the Individual Recovery Plan, with the approval of the prison's medical director.

55.     All additional treatment for gender dysphoria outside of the initial Individual Recovery Plan must be approved by the Gender Dysphoria Treatment Review Committee.

56.     Section 19 specifically provides that the Committee, and not any staff actually providing medical or mental health care to a person with gender dysphoria, renders the decision as to whether a person can be referred to an outside specialist for evaluation for gender affirming surgery.

57.     If the outside specialist recommends gender affirming surgery, the case is then referred to the separate "larger" Department Central Office Gender Review Committee ("GRC").

58.     Pursuant to DOC Policy, the final decision as to whether or not a person with gender dysphoria can receive gender affirming surgery, that has been deemed medically necessary by a specialist, is determined solely by the GRC.

59.     Upon information and belief the GRC consists solely of individuals who work in the DOC's central office in Mechanicsburg, PA.

60.     Upon information and belief, the GRC includes non-medical staff, such as administrative and security personnel.

61.     Upon information and belief, medical and mental health staff that have actually interacted with and treated the person being evaluated for surgery do not sit on or have a vote in the Gender Review Committee.

62.    There is no medical justification for a policy that necessary medical care be approved by administrative committees, particularly committees consisting of non-medical staff and individuals not directly involved in treatment of the person in need of care.

63.    Upon information and belief, in the approximately three years since the creation of these committees, no individual has been approved for gender affirming surgery.

64.    People with gender dysphoria are the only people subjected by the DOC to a policy requiring an extensive committee process to determine, and ultimately deny, their necessary medical care.

65.    As the Secretary of the Department of Corrections, Defendant Wetzel reviews and approves all DOC policies, including DOC Policy Statement 13.2.1.

66.    Defendant Wetzel has the ability to suggest and implement changes and revisions to DOC policies.

67.    Defendant Wetzel was involved in the development and implementation of DOC policies relating to the safety and care of transgender people in DOC custody, including several one-on-one meetings with Commonwealth and DOC officials.

**Defendants' Failure to Provide Necessary Treatment and Discrimination Against Mx. Doe**

68.    SCI Cambridge Springs lacks on-site medical staff and/or specialists familiar with transgender healthcare.

69.    SCI Cambridge Springs' medical staff are not familiar with many areas of transitioning, including the Standards of Care, appropriate testosterone levels, monitoring of levels, permanent hair removal, and gender affirming surgeries.

70.    The lack of transgender healthcare knowledge deeply concerns Mx. Doe and they are worried for their physical health.

23

71.    Mx. Doe requested to see a gender specialist in order to obtain necessary medical advice and appropriate treatment.

72.    Mx. Doe needs access to a gender specialist to *inter alia*, discuss appropriate next steps for their transition and determine what type of surgery would best suit their medical needs.

73.    Defendants refused to allow Mx. Doe access to a gender specialist.

74.    Mx. Doe has had to repeatedly educate the medical staff, including the doctors controlling their medical treatment, about the Standards of Care.

75.    They have printed out the Standards of Care, and brought it to medical appointments to walk their own nurses and doctors through what treatment needs to be available to them, including appropriate dosages of testosterone and when blood tests should be drawn.

76.    These nurses and doctors have included Defendants Alpert, Alexander, Kross and Obeng,

77.    Staff at SCI Cambridge Springs are frequently unable to answer Mx. Doe's questions relating to treatment for their Gender Dysphoria.

78.    For example, in June and July 2018, medical staff had to email Mx. Doe's questions relating to treatment for their gender dysphoria to a doctor at DOC's central office, forcing Mx. Doe to wait weeks for a response to their concerns.

79.    Mx. Doe is currently taking testosterone, which masculinizes their appearance and helps their gender dysphoria.

80.    In April 2018, Mx. Doe was not receiving an appropriately therapeutic dose of testosterone.

81.     Throughout their incarceration at SCI Cambridge Springs, medical staff, including Defendants Alpert, Alexander and Kross, repeatedly changed Mx. Doe's testosterone dosage and/or withheld the medication entirely.

82.     Medical staff frequently checked Mx. Doe's testosterone levels at the wrong time in the cycle on the orders of Defendants Alpert, Alexander and Kross, resulting in incorrect levels and the lowering of their testosterone dosage.

83.     These inaccurate blood draws were taken despite Mx. Doe's constant efforts to correct the timing of when levels were drawn by showing staff the Standards of Care.

84.     Defendant Alexander threatened to stop providing Mx. Doe with any testosterone if they did not submit to blood draws at the incorrect times.

85.     Defendant Alexander ultimately transferred all of the transgender patients at SCI Cambridge Springs to a Physician's Assistant for care, as he was uncomfortable treating the transgender population.

86.     Due to the fluctuations and inadequate dosages of testosterone, Mx. Doe's gender dysphoria worsened, and they became depressed, suicidal, and were fixated on self-harm.

87.     Under Section 19, Defendants Alpert, Alexander, Kross and Obeng, as the Medical Directors at SCI Cambridge Springs, were responsible for determining the dosages of testosterone prescribed to Mx. Doe.

88.     As a result of the anguish of their gender dysphoria, which was exacerbated by their fluctuating testosterone levels and discriminatory medical care, they self-mutilated in April 2018 by removing their nipples.

89.     Defendant Kross again lowered Mx. Doe's testosterone dosage after this act of self-harm.

90.     This change in testosterone dosage caused Mx. Doe additional anxiety and anguish as they feared the effects of an even lower dosage.

91.     Prior to this act of self-harm, Mx. Doe expressed to Defendant Blakely the psychological torment they were experiencing due to the failure to receive adequate care on multiple occasions.

92.     On at least two instances, Mx. Doe informed Defendant Blakely of their intent to cut off their nipples.

93.     Defendant Blaklely asked Mx. Doe not to hurt themself, but took no further action.

94.     Mx. Doe only began receiving relatively consistent therapeutic testosterone dosages in the summer of 2018 after a letter from their attorney threatened litigation on the issue.

95.     As a result of testosterone use, Mx. Doe is experiencing hair growth that causes severe psychological discomfort.

96.     Mx. Doe has requested permanent hair removal, a common element of transgender healthcare, on multiple occasions including in June 2018.

97.     These requests were denied because the DOC deems permanent hair removal treatment to be "elective treatment," which it does not provide.

98.     As part of their transition, Mx. Doe began requesting permission to have gender affirming surgery in 2017.

99.     In July and October 2017, Defendant Alpert documented Mx. Doe's requests for less facial and body hair and gender affirming surgery.

100.     Defendant Alpert did not take any action in response to these requests or Mx. Doe's gender dysphoria related anxiety.

101.     Mx. Doe raised this request again multiple times in 2018 and 2019.

102.    Defendants Alpert, Alexander, Kross, and Obeng, as well as other medical staff at SCI Cambridge Springs, repeatedly denied Mx. Doe's requests because additional treatment for Mx. Doe's gender dysphoria has not been approved by the Committees in Mechanicsburg.

103.    Mx. Doe's requests for additional treatment, including permanent hair removal, top surgery and bottom surgery, were again denied by Defendant Noel and the Committees in Mechanicsburg in October 2019.

104.    Mx. Doe was not provided with any rationale for these denials.

105.    Mx. Doe has never been allowed to meet with an outside specialist to discuss their need for gender affirming surgery or other transgender healthcare needs.

106.    Defendants refuse to allow Mx. Doe gender affirming surgery.

107.    Defendants Wetzel, Noel, Reddy, Alpert, Alexander, Kross, and Obeng are responsible for the denials of Mx. Does' requests for access to a gender specialist, permanent hair removal, and gender affirming surgery.

108.    As a result of Defendants' continued refusal to provide Mx. Doe with medically necessary care for their gender dysphoria, Mx. Doe continues to suffer tremendous psychological torment.

109.    Mx. Doe has repeatedly expressed this continued psychological torment directly to medical staff, including Defendants Alpert, Alexander, Kross, and Obeng.

110.    Mx. Doe has repeatedly considered and planned self-genital mutilation and has regularly experienced suicidal ideations.

111.    They have expressed these concerns and ideations to psychological and medical staff at SCI Cambridge Springs on multiple occasions.

112.    Despite this, Defendants continue to deny all of Mx. Doe's requests for further transition healthcare.

113.    Defendants knew of and disregarded Mx. Doe's serious medical needs, which resulted in Mx. Doe's serious act of self-mutilation, continued psychological trauma, and continues to present a serious risk to Mx. Doe's continued health and safety on a daily basis.

### Harassment Experienced by Mx. Doe as a Result of Staff Intentionally Violating Their Privacy

114.    In early 2018, Defendant Anderson approached Mx. Doe at their cell door and loudly began discussing Mx. Doe's gender dysphoria and testosterone treatment.

115.    Defendant Anderson could have had this discussion in a private location rather than at Mx. Doe's cell door.

116.    Mx. Doe had not previously publicly revealed their gender identity.

117.    Multiple incarcerated women overheard the conversation between Defendant Anderson and Mx. Doe.

118.    Afterwards, one of Mx. Doe's roommates asked Mx. Doe, "Should I call you an it now?" and talked about how "freaky" women with facial hair are.

119.    Many other incarcerated women and staff soon learned that Mx. Doe was transgender and began harassing them as a result.

120.    After reporting their act of self-mutilation, Mx. Doe was moved to administrative custody and then housed on the Residential Treatment Unit.

121.    While housed in administrative custody, Mx. Doe was forced to endure strip searches on a daily basis, and frequently multiple times per day.

122.    During these searches, guards would force Mx. Doe to remove the bandaids on their chest.

123.    Mx. Doe was humiliated by these strip searches and the unnecessary act of removing the bandaids from the area where they removed their nipples.

124.    During this period, Defendant Rich refused to allow Mx. Doe to leave the unit to go to work, resulting in Mx. Doe losing their institutional job.

125.    Upon information and belief, the DOC Psychiatrist, Dr. Rehnberg, was on call at the time of the self-harm incident and informed Defendants Rich, Wagner and Oliver that Mx. Doe did not pose an additional threat to themself or others and should be removed from secure housing.

126.    Defendants Wagner, Rich, and Oliver forced Mx. Doe to remain housed on these secure units for several months, despite Dr. Rehnberg's recommendations.

127.    After their act of self-mutilation, rumors about Mx. Doe's gender identity and their act of self-harm spread across the prison.

128.    After their act of self-harm, Mx. Doe informed only their unit psych counselor, Defendant Blakely.

129.    The door to Defendant Blakely's office was closed when Mx. Doe informed her of their act of self-harm and no incarcerated people were close enough to overhear their conversation.

130.    Defendant Blakely informed Captain Deal and then had Mx. Doe escorted to the medical department.

131.    Mx. Doe did not inform anyone other than staff of their act of self-harm.

132.    Mx. Doe was repeatedly sexually harassed by multiple incarcerated women on the basis of their gender identity and act of self-harm.

133.  Multiple women have tried to coerce Mx. Doe to have sex with them in their shared housing unit.

134.  Mx. Doe once woke up to another woman on top of them.

135.  Women called Mx. Doe "the devil," "evil," and a "freak."

136.  One woman told Mx. Doe that "you should have cut your neck instead of your titties and kill yourself," and told them "I'mma get you where there's no camera."

137.  In another instance, a woman said to Mx. Doe, "Next time you should have your girlfriend cut your nipples off and suck your blood."

138.  One woman threatened to kill Mx. Doe as a result of their gender identity.

139.  During these incidents of harassment, the women were frequently aggressive and threatening, causing Mx. Doe to fear for their safety.

140.  Corrections officers were present during each of these incidents, overheard the comments, and did nothing to intervene.

141.  As far as Mx Doe is aware, no action has been taken against any of the individuals who have threatened or harassed them.

142.  Mx. Doe has also been harassed by staff.

143.  Each of the above instances of harassment were reported to staff, including Defendants Rich, Wagner and Oliver, both verbally and in writing.

144.  None of the reports resulted in disciplinary action being taken against either an incarcerated person or staff.

145.  Defendants Rich, Wagner and Oliver did not take any action in response to these reports of threats and harassment.

146.    None of these incidents of harassment would have happened if SCI Cambridge Springs staff had kept Mx. Doe's medical history confidential.

147.    As a result of this harassment, Mx. Doe is in a great deal of terror. They were afraid to travel alone throughout the prison.

148.    For a number of months Mx. Doe stopped going to meals because of the harassment and lost 10 lbs as a consequence.

149.    Mx. Doe was housed in a housing unit connected to the housing unit of a woman who threatened to kill Mx. Doe.

150.    The doors between these units were frequently unlocked, allowing incarcerated people access to the connected unit.

151.    Defendants Rich, Wagner and Oliver repeatedly denied Mx. Doe's requests to be removed from that unit.

152.    Mx. Doe fears additional harassment and retaliation from filing this lawsuit, including a transfer to a housing unit where they feel unsafe or a transfer to SCI Muncy.

**Additional Accommodations for Mx. Doe Denied by the DOC**

153.    The medical condition of gender dysphoria is a disability within the meaning of the ADA and the Rehabilitation Act in that it substantially impairs one or more of Mx. Doe's major life activities, including, but not limited to, interacting with others, sleeping, thinking and communicating.

154.    Discrimination against people diagnosed with gender dysphoria or regarded as having gender dysphoria constitutes discrimination based on disability within the meaning of the ADA and the Rehabilitation Act.

155.    Mx. Doe needs privacy when using the restroom, and the lack of a door on the restroom in most units makes it impossible for them to use the restroom in private.

156.    Mx. Doe has additional concerns for their safety in housing, due to fears of harassment and abuse from potential cellmates while changing and sleeping.

157.    Mx. Doe informed corrections officers and Defendant Rich that living in a double cell made them uncomfortable and fear for their safety.

158.    When Defendant Rich required Mx. Doe to live in a double cell, they requested to be placed with their roommate of the past two and a half years.  Their prior roommate is one of the few people that they know and trust.

159.    Defendant Rich denied this request, despite allowing other individuals, such as some transgender men at SCI Cambridge Springs, to choose the roommates they are most comfortable with.

160.    After nearly two years, Mx. Doe was finally placed in a room with people with which they currently feel safe.

161.    Given the frequency of changes in housing assignments, Mx. Doe fears that they will be removed from their current housing assignment, or new people will be assigned to that room, and they will again be placed with individuals with whom they do not feel safe.

162.    Despite the hormone therapy Mx. Doe is currently undergoing, it is insufficient and they need to outwardly appear more masculine.

163.    To outwardly appear more masculine, Mx. Doe needs more frequent access to the gym and a better equipped gym with sufficient weights that will allow them to physically gain muscle.

164.    The exercise facility at SCI Cambridge Springs does not provide the type of weights that Mx. Doe needs to outwardly appear more masculine.

165.    Upon information and belief, as SCI Cambridge Springs is a women's prison, the gym there is not equipped with the same weight equipment that is available at male prisons.

166.    Mx. Doe has repeatedly requested access to men's sleeveless undershirts and other items available on the men's commissary list in order to assist with their social transition.

167.    Upon information and belief, all of these items are available for purchase to transgender and gender nonconforming individuals at SCI Muncy, the other women's prison operated by the Department of Corrections.

168.    These requests have been repeatedly denied by Defendants Wagner and Oliver.

169.    Upon information and belief, Defendant Wagner refused to allow transgender men and gender nonconforming people to purchase men's sleeveless undershirts because she feared they would expose themselves.

## CAUSES OF ACTION

### Count I: Violation of the Americans with Disabilities Act
(Against Defendant Pennsylvania Department of Corrections)

170.    Plaintiff hereby incorporates by reference the allegations contained in each and every preceding paragraph, as if fully set forth herein.

171.    Mx. Doe is a qualified individual with a disability, gender dysphoria, which, *inter alia,* substantially limits the major life activities of interacting with others, sleeping, thinking and communicating.

172.    Defendant Pennsylvania Department of Corrections discriminated against and caused Mx. Doe to be excluded from participation in programs and denied them access to services at SCI Cambridge Springs, due to their disabilities in violation of Title II of the Americans with

Disabilities Act.

## Count II: Violation of the Rehabilitation Act
(Against Defendant Pennsylvania Department of Corrections)

173.    Plaintiff hereby incorporates by reference the allegations contained in each and every preceding paragraph, as if fully set forth herein.

174.    Mx. Doe is a qualified individual with a disability, gender dysphoria, which, *inter alia,* substantially limits the major life activities of interacting with others, sleeping, thinking and communicating.

175.    Defendant Pennsylvania Department of Corrections discriminated against and caused Mx. Doe to be excluded from participation in programs and denied them access to services at SCI Cambridge Springs, due to their disabilities in violation of Section 504 of the Rehabilitation Act.

## Count III: Deprivation of Eighth Amendment Right to Be Free from Cruel and Unusual Punishment
(Against Defendants Wetzel, Noel, Reddy, Alpert, Alexander, Kross, and Obeng)

176.    Plaintiff hereby incorporates by reference the allegations contained in each and every preceding paragraph, as if fully set forth herein.

177.    Defendants violated Mx. Doe's right to be free from cruel and unusual punishment under the Eighth Amendment to the United States Constitution through their deliberate indifference to Mx. Doe's serious medical needs, including but not limited to their failure to provide them access to a transgender health specialist, gender affirming surgery and other necessary medical care.

## Count IV: Intentional Infliction of Emotional Distress
(Against Defendants Rich, Wagner, Oliver, Blakely, and Anderson)

178.    Plaintiff hereby incorporates by reference the allegations contained in each and

every preceding paragraph, as if fully set forth herein.

179.    Defendants' intentional acts of allowing the dissemination of Mx. Doe's private health information, failing to punish individuals for subsequent harassment and threats, and forcing Mx. Doe to remain in a housing unit with an individual threating to kill them, was so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as utterly intolerable in a civilized society, resulting in Mx. Doe suffering severe emotional distress.

### Count V: Violation of Fourteenth Amendment Right to Privacy of Medical Information
(Against Defendants Blakely, and Anderson)

180.    Plaintiff hereby incorporates by reference the allegations contained in each and every preceding paragraph, as if fully set forth herein.

181.    Defendants' actions in disclosing and failing to take adequate measures to protect against disclosure of information relating to Mx. Doe's gender identity and mental health infringed on Mx. Doe's right to privacy for no legitimate penological purpose.

### RELIEF DEMANDED

WHEREFORE, Mx. Doe requests that the Court grant the following relief:

A.    A declaratory judgment that Defendants violated Mx. Doe's rights under the Americans with Disabilities Act, the Rehabilitation Act, and the Eighth and Fourteenth Amendments.

B.    Injunctive relief requiring Defendants allow Mx. Doe access to an outside transgender healthcare specialist;

C.    Injunctive relief requiring Defendants provide Mx. Doe with necessary medical care for their gender dysphoria including but not limited to permanent hair removal, and gender

affirming surgery after consultation with a transgender healthcare specialist;

D.    Injunctive relief requiring Defendants provide adequate training on the Standards of Care to all staff providing medical or mental health treatment to transgender individuals;

E.    Injunctive relief requiring that all discussions or conversations relating to Mx. Doe's hormone therapy, other transgender accommodations or healthcare, or any incidents involving their mental health, only occur in situations that preserve the confidentiality of this information from non-medical staff and other incarcerated persons;

F.    Injunctive relief requiring Defendants provide Mx. Doe with reasonable accommodations for their gender dysphoria including, *inter alia*, permanent hair removal, ability to meaningfully participate in decision-making regarding safe housing assignments, ability to purchase all items on the men's commissary list, and access to additional gym equipment and time in the gym;

G.    An award of appropriate compensatory and punitive damages against Defendants in favor of Mx. Doe in an amount to be determined by the finder of fact;

H.    Reasonable attorneys' fees and costs;

I.    Such other relief as the Court deems just and proper.


Respectfully submitted,

/s/ Alexandra Morgan-Kurtz
Attorney I.D. No. 312631
PA INSTITUTIONAL LAW PROJECT
100 Fifth Ave, Ste 900
Pittsburgh, Pa 15222
T: (412) 434-6175
amorgan-kurtz@pailp.org

Su Ming Yeh
Attorney I.D. No. 95111
PA INSTITUTIONAL LAW PROJECT
718 Arch Street, Suite 304S
Philadelphia, PA 19106
T: (215) 925-2966
smyeh@pailp.org

*Counsel for Plaintiff*

DATE:  June 20, 2020