## IN THE UNITED STATES DISTRICT COURT FOR THE
## WESTERN DISTRICT OF PENNSYLVANIA

SAM DOE,                                     )
                                             )
    Plaintiff,                          )
                                             )        Case No.  1:20-cv-0023
    v.                                  )
                                             )        Judge Susan Paradise Baxter
PENNSYLVANIA DEPARTMENT OF                   )        Magistrate Judge Richard A. Lanzillo
CORRECTIONS, *et. al.,*                      )
                                             )
    Defendants.                         )

## BRIEF IN OPPOSITION TO DOC DEFENDANTS' PARTIAL MOTION TO DISMISS

Plaintiff Sam Doe respectfully submits this Response in Opposition to the Partial Motion

to Dismiss under Rule 12(b)(6) filed by Defendants Pennsylvania Department of Corrections,

Oliver, Rich, Wagner, Blakely, and Anderson (collectively "the DOC Defendants") (ECF No. 38).

### I.    LEGAL STANDARD

In ruling on a motion to dismiss under Rule 12(b)(6), a court must accept all well-pleaded

allegations of the complaint as true, view them in the light most favorable to the plaintiff, and draw

all inferences in the plaintiff's favor. *Morrow v. Balaski*, 719 F.3d 160, 165 (3d Cir. 2013) (en

banc); *McTernan v. City of York*, 577 F.3d 521, 526 (3d Cir. 2009). The motion must be denied

unless "a court finds that plaintiff's claims lack facial plausibility." *Morrow*, 719 F.3d at 165. A

complaint need not contain "detailed factual allegations" but merely "must contain sufficient

factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v.

Iqbal*, 556 U.S. 662, 678 (2009). If the factual content of the complaint "allows the court to draw

the reasonable inference that the defendant is liable for the misconduct alleged," the plausibility

requirement is met, and the motion to dismiss must be denied. *Id.*

II.    **STATEMENT OF FACTS**

Plaintiff Sam Doe is a non-binary person currently incarcerated at the State Correctional Institution at Cambridge Springs ("SCI Cambridge Springs"). Am. Compl. ¶ 4. They[1] have been diagnosed by the Pennsylvania Department of Corrections ("DOC") with gender dysphoria, a serious medical condition characterized by strong cross-gender identification, and strong and persistent discomfort about one's assigned sex. *Id.* at ¶ 23. While Mx. Doe was assigned female at birth, they currently live and present themself in a gender-neutral fashion. *Id.* at ¶ 20. As a result of gender dysphoria, Mx. Doe experiences severe despondency and anxiety resulting from incongruence between their female physical features and their non-binary gender identity. *See id.* at ¶ 30.

In early 2018, Defendant Anderson, Corrections Healthcare Administrator at SCI Cambridge Springs, approached Mx. Doe at their cell door and loudly began discussing Mx. Doe's gender dysphoria and testosterone treatment. *Id.* at ¶ 114. Mx. Doe had not previously publicly revealed their gender identity. *Id.* at ¶ 116. Multiple incarcerated people overheard the conversation between Defendant Anderson and Mx. Doe and subsequently began tormenting and threatening Mx. Doe because of their gender identity. *Id.* at ¶¶ 117-119.

On at least two instances, Mx. Doe informed Defendant Blakely, their unit psych counselor, of their intent to cut off their nipples. *Id.* at ¶ 92. Defendant Blakely asked Mx. Doe not to hurt themself, but took no further action. *Id.* at ¶ 93. Mx. Doe self-mutilated in April 2018 by removing their nipples. *Id.* at ¶ 88. After their act of self-harm, Mx. Doe informed only Defendant Blakely. *Id.* at ¶ 128. The door to Defendant Blakely's office was closed at the time and no incarcerated people were close enough to overhear their conversation. *Id.* at ¶ 129. Shortly thereafter, rumors

_____

[1] Sam Doe uses the honorific "Mx." and they/them pronouns.

about Mx. Doe's act of self-harm spread across the prison. *Id.* at ¶ 127. Mx. Doe was repeatedly sexually harassed by multiple incarcerated people on the basis of their gender identity and act of self-harm. *Id.* at ¶¶132-139.

One woman told Mx. Doe that "you should have cut your neck instead of your titties and kill yourself," and told them "I'mma get you where there's no camera." *Id.* at ¶ 136. In another instance, a woman said to Mx. Doe, "Next time you should have your girlfriend cut your nipples off and suck your blood." *Id.* at ¶ 137. Another woman threatened to kill Mx. Doe as a result of their gender identity. *Id.* at ¶ 138. Mx. Doe was housed in a housing unit connected to the housing unit of the woman who threatened to kill them. *Id.* at ¶ 149. Defendants Rich, Wagner and Oliver repeatedly denied Mx. Doe's requests to be removed from that unit. *Id.* at ¶ 151. Mx. Doe has also been harassed by staff. *Id.* at ¶ 142. Mx. Doe reported each instance of harassment by corrections officers and incarcerated people to staff, including Defendants Rich, Wagner and Oliver, both verbally and in writing. *Id.* at ¶ 143. None of the reports resulted in disciplinary action being taken against either an incarcerated person or staff. *Id.* at ¶ 144. Defendants Rich, Wagner and Oliver did not take any action in response to these reports of threats and harassment. *Id.* at ¶ 145.

Staff at SCI Cambridge Springs allow transgender men to choose what roommates they are comfortable living with. *Id.* at ¶ 159. Mx. Doe fears for their safety when housed with most other incarcerated women and men. *Id.* at ¶¶ 156-161. Mx. Doe has requested access to additional gym equipment, available to people incarcerated at men's prisons, in order to further masculinize their appearance. *Id.* at ¶¶ 162-165. Mx. Doe has repeatedly sought access to men's sleeveless shirts and other commissary items available at other DOC prisons. *Id.* at ¶¶ 166-169.

III.    **ARGUMENT**

    **A. Mx. Doe Has Stated an ADA Claim and RA Claim**

To state a claim under either Title II of the Americans with Disabilities Act ("ADA") or Section 504 of the Rehabilitation Act ("RA"), a plaintiff "must allege that he is a qualified individual with a disability, who was precluded from participating in a program, service, or activity, or otherwise was subject to discrimination, by reason of his disability." *Furgess v. Pa. Dep't of Corr.*, 933 F.3d 285, 288-89 (3d Cir. 2019); 42 U.S.C. § 12132; 29 U.S.C. § 794(a).[2]

    i.    <u>Mx. Doe is an Individual With a Disability for Purposes of the ADA.</u>

The ADA defines a disability as "a physical or mental impairment that substantially limits one or more major life activities." 42 USCS § 12102(1)(A). Major life activities include, but are not limited to, sleeping, thinking, and communicating. 42 USCS § 12102(2). Under the ADA, the definition of "disability" must be "construed in favor of broad coverage of individuals," and the term "substantially limits" must be "interpreted consistently with the findings and purposes of the ADA Amendments Act of 2008 ("ADAAA")." 42 U.S.C. § 12102(4)(A) and (B). In amending the ADA to restore its broad protections, Congress stated that the "primary object of attention in [ADA] cases...should be whether entities covered under the ADA have complied with their obligations," and that "whether an individual's impairment is a disability under the ADA should not demand extensive analysis." ADAA § 2(b)(5), 122 Stat. 3553. Congress further explained that "[t]he definition of disability in this Act shall be construed in favor of broad coverage of

---

[2] The substantive standards for determining liability under the ADA and Rehabilitation Act are the same. *McDonald v. Pennsylvania*, 62 F.3d 92, 95 (3d Cir. 1995).

individuals . . . to the maximum extent permitted." 42 U.S.C. § 12102(4)(A); see H.R. Rep. No. 110-730, pt. 1 at 7 (2008); H.R. Rep. No. 110-730, pt. 2, at 5 (2008).

Mx. Doe is an individual with a disability. Since 2017, Mx. Doe has been diagnosed by the DOC with gender dysphoria, a serious medical condition characterized by strong cross-gender identification, and strong and persistent discomfort about one's assigned sex. Am. Compl. at ¶ 23. When gender dysphoria is severe, it can result in a person's inability to function in everyday life. *Id.* at ¶ 26. Mx. Doe has engaged in self-mutilation, including removing their nipples and acts of cutting. *Id.* at ¶ 30. They have considered acts of genital mutilation and have repeatedly experienced suicidal ideation. *Id.* This history reflects that Mx. Doe's gender dysphoria substantially limits their major life activities of *inter alia* interacting with others, sleeping, thinking and communicating. Therefore, Mx. Doe is an individual with disability for purpose of ADA.

Defendants argue that Mx. Doe is prevented from bringing a claim as their diagnosis of Gender Dysphoria falls under the ADA's exclusion of "transvestism, transsexualism, pedophilia, exhibitionism, voyeurism, *gender identity disorders not resulting from physical impairments*, or other sexual behavior disorders." *See* 42 U.S.C. § 12211(b)(1) (emphasis added). However, at least two federal courts have recognized that gender dysphoria is the result of a physical impairment and thus distinct from the gender identity disorders referenced by 42 U.S.C. § 12211(b)(1). *See Blatt v. Cabela's Retail, Inc.*, No. 5:14-cv-04822, 2017 U.S. Dist. LEXIS 75665, at *8-9 (E.D. Pa. May 18, 2017); *Doe v. Mass. Dep't of Corr.*, No. 17-12255-RGS, 2018 U.S. Dist. LEXIS 99925, at *17-18 (D. Mass. June 14, 2018).

The *Blatt* court recognized, as this Court should, that the ADA exclusion refers "only [to] the condition of identifying with a different gender," and does not encompass "a condition like [plaintiff's] gender dysphoria, which goes beyond merely identifying with a different gender and

5

is characterized by clinically significant distress and other impairments that may be disabling." *Blatt*, 2017 U.S. Dist. LEXIS 75665 at *6; s*ee also, Doe*, 2018 U.S. Dist. LEXIS 99925 at *6 (opining that there may be a physical etiology underlying gender dysphoria sufficient to take it out of "not resulting from physical impairments" category).

In 2013, the American Psychiatric Association revised the Diagnostic and Statistical Manual of Mental Disorders ("DSM") to remove the diagnosis of "Gender Identity Disorder" and introduce the diagnosis of "Gender Dysphoria." Gender Dysphoria references scientific evidence of the physiological etiology of the diagnosis. DSM-V at 451-59. "In contrast to DSM-IV, which had defined 'gender identity disorder' as characterized by a 'strong and persistent cross gender-identification' and a 'persistent discomfort' with one's sex or 'sense of inappropriateness' in a given gender role, the diagnosis of GD in DSM-V requires attendant disabling physical symptoms, in addition to manifestations of clinically significant emotional distress." *Doe,* 2018 U.S. Dist. LEXIS 99925 at *17-18. Replacing "Gender Identity Disorder" with "Gender Dysphoria" "reflects an evolving re-evaluation by the medical community of transgender issues and the recognition that [Gender Dysphoria] involves far more than a person's gender identification." *Id.* at *16. This revision to the DSM recognizes that Gender Dysphoria likely results from a "physical impairment" as that term is broadly defined within the ADA. *See id.* at *17 ("While medical research in this area remains in its initial phases, Doe points to recent studies demonstrating that [Gender Dysphoria] diagnoses have a physical etiology, namely hormonal and genetic drivers contributing to the in utero development of dysphoria."). As such, it is not part of the ADA's narrow exclusion for "gender identity disorders not resulting from a physical impairment."

The *Blatt* and *Doe* courts' holdings that Gender Dysphoria does not fall under the ADA's exclusion are also consistent with the U.S. Supreme Court's admonition that "remedial legislation

should be construed broadly to effectuate its purposes." *Tcherepnin v. Knight*, 389 US. 322, 336 (1967); *see also Consol. Rail Corp. v. Darrone,* 465 U.S. 624, 634, (1984) (recognizing that Rehabilitation Act has "remedial purpose"); *Disabled in Action v. SEPTA*, 539 F.3d 199, 208 (3d Cir. 2008) ("The ADA is a remedial statute, designed to eliminate discrimination against the disabled in all facets of society, and as such, it must be broadly construed to effectuate its purposes."); *Henrietta D. v. Bloomberg*, 331 F.3d 261, 279 (2d Cir. 2003) (construing ADA broadly); *Barden v. City of Sacramento*, 292 F.3d 1073, 1077 (9th Cir. 2002) ("In fact, the ADA must be construed "broadly in order to effectively implement the ADA's fundamental purpose of providing a clear and comprehensive national mandate for the elimination of discrimination against individuals with disabilities."); *Castellano v. City of New York*, 142 F.3d 58, 69 (2d Cir. 1998) (noting "ADA's broad remedial purpose"); *Arnold v. United Parcel Serv., Inc.*, 136 F.3d 854, 861 (1st Cir. 1998) (observing that ADA is a remedial statute and so should be construed broadly); *Heilweil v. Mount Sinai Hosp.*, 32 F.3d 718, 722 (2d Cir. 1994) ("Because the [Rehabilitation] Act is a remedial statute, it and the regulations promulgated under it are to be construed broadly.").

"Thus, any exceptions to the statute, such as those listed in §12211, should be read narrowly in order to permit the statute to achieve a broad reach." *Blatt*, 2017 U.S. Dist. LEXIS 75665 at *8 (quoting *Bonkowski v. Oberg Indus.*, 787 F.3d 190, 195 (3d Cir. 2015)). The ADA excludes "transvestism . . . gender identity disorders not resulting from physical impairments, or other sexual behavior disorders." 42 U.S.C. § 12211(b)(1). The use of the word "other" indicates that the previously referenced excluded conditions are similarly sexual behavior disorders. DSM-V makes it clear that gender dysphoria is not a kind of sexual behavior disorder. "It is virtually impossible to square the exclusion of otherwise bona fide disabilities with the remedial purpose of

the ADA, which is to redress discrimination against individuals with disabilities based on antiquated or prejudicial conceptions of how they came to their station in life." *Doe*, 2018 U.S. Dist. LEXIS 99925 at *20-21.  Thus, this exclusion to the ADA should be interpreted narrowly such that individuals with gender dysphoria such as Mx. Doe are not barred from the expansive protections of the ADA.

Defendants did not contend in their motion that Mx. Doe's Gender Dysphoria is not a disabling condition that substantially limits their major life activities, and, even if they had, this is a question of fact that must be developed through discovery. It is therefore inappropriate to resolve it at the motion to dismiss phase. *See, e.g., Tay v. Dennison*, No. 19-cv-00501-NJR, 2020 U.S. Dist. LEXIS 76921, at *8-9 (S.D. Ill. May 1, 2020) (allowing the ADA claim to proceed because the "court cannot categorically say that gender dysphoria falls within the ADA's exclusionary language"); *Shorter v. Barr*, No. 4:19cv108-WS/CAS, 2020 U.S. Dist. LEXIS 71453, at *27-28 (N.D. Fla. Mar. 13, 2020) (erring on the side of caution and denying the motion to dismiss on the basis of ADA's exclusion of gender identity disorders); *Iglesias v. True*, 403 F. Supp. 3d 680, 687 (S.D. Ill. 2019) ("[T]he Court cannot categorically say that gender dysphoria falls within the RA's exclusionary language and will err on the side of caution to allow Plaintiff's claim to proceed"); *Edmo v. Idaho Dep't of Corr.*, No. 1:17-cv-00151-BLW, 2018 U.S. Dist. LEXIS 97090, at *20 (D. Idaho June 7, 2018) (declining to dismiss the claim because the issue of whether Edmo's gender dysphoria "falls under a specific exclusion of the ADA presents a genuine dispute of material fact in this case.").  This Court should likewise refuse to dismiss Mx. Doe's ADA claim.

> ii.    Mx. Doe has Adequately Pleaded the Remaining Elements of an ADA Claim.

Title II of the ADA "has been interpreted as all-encompassing, and without any exception." *Schorr v. Borough of Lemoyne,* 243 F. Supp. 2d 232, 237 (M.D. Pa. 2003) (quotations omitted).

ADA protections apply to the activities of correctional institutions. *Pa. Dep't of Corr. v. Yeskey,* 524 U.S. 206, 209-10 (1998). The ADA "was cast in terms…of eliminating a form of discrimination that Congress considered unfair and even odious. The Act assimilates the disabled to groups that by reason of sex, age, race, religion, nationality, or ethnic origin are believed to be victims of discrimination." *Crawford v. Indiana Dep't of Corr.*, 115 F.3d 481, 486 (7th Cir. 1997).

Importantly, the ADA's text "demonstrates a recognition by Congress that discrimination against persons with disabilities differs from discrimination on the basis of, for example, gender, or race…. [A] person with a disability may be the victim of discrimination precisely because [he] did not receive disparate treatment when [he] needed accommodation." *Presta v. Peninsula Corridor Joint Powers Bd,* 16 F. Supp. 2d 1134, 1136 (N.D. Cal. 1998). The implementing regulations of the ADA "make clear" that discrimination "occurs when disabled persons, because of their disability, cannot derive a benefit from the state's services…even though [they] are given the exact same services or benefits as those afforded" to the non-disabled. *Belton v. Erickson,* Civ. Action No. 1:10-cv-0583, 2012 U.S. Dist. LEXIS 44681, *26 (N.D. Ga. March 20, 2012) (citing 28 C.F.R. § 35.130(b)(1)(ii)-(iii)). In other words, a public entity violates the ADA by failing to provide a reasonable accommodation that would enable disabled persons equal access or benefits. *Taylor v. Phoenixville Sch. Dist.*, 184 F.3d 296, 306 (3d Cir. 1999) ("Discrimination under the ADA encompasses not only adverse actions motivated by prejudice and fear of disabilities, but also includes failing to make reasonable accommodations for a plaintiff's disabilities."). "In the context of disability, therefore, equal treatment may not beget equality, and facially neutral policies may be, in fact, discriminatory." *Presta*, 16 F. Supp. 2d at 1136.

Mx. Doe was excluded from participating in programs and services at SCI Cambridge Springs due to their disability. The Supreme Court has observed that "modern prisons provide

inmates with many recreational activities, medical services, and educational and vocational programs," all of which are covered by the ADA. *Yeskey,* 524 U.S. at 210 (quotations omitted). "[U]nder a common understanding of the terms, the prison and all of its facilities (i.e., the phone, the library, the yard, and meals) constitute services and programs…to which the ADA applies." *Owens v. Chester Cty,* CIVIL A. No. 97-1344, 2000 U.S. Dist. LEXIS 710, at *32-33 (E.D. Pa. Jan. 28, 2000). The Third Circuit has recently reaffirmed in the prison context that the terms "service, program or activity" must be interpreted "quite broadly to include *all* of the operations" of the state agency. *Furgess*, 933 F.3d at 289 (quotations omitted; emphasis original). "Virtually every interaction between prison officials and disabled inmates potentially exposes the [institution] to liability…unless the [institution] promptly provide[s] reasonable accommodation." *Chase v. Baskerville*, 508 F. Supp. 2d 492, 505 (E.D. Va. 2007).

Mx. Doe has alleged that Defendant DOC has failed to provide them with the reasonable accommodations necessary to equally access the programs, services and activities at SCI Cambridge Springs in at least three ways. First, Mx. Doe is entitled to the same access to safe housing as all others incarcerated at SCI Cambridge Springs. Staff at SCI Cambridge Springs have recognized that transgender individuals may require special accommodations to ensure safe housing by allowing transgender men to choose what roommates they are comfortable living with. *See* Am. Compl. ¶ 159. As a nonbinary person, Mx. Doe similarly fears for their safety when housed with incarcerated women and men they are not familiar with and seeks the same accommodation. *Id.* at ¶¶ 156-161. Mx. Doe also requested access to additional gym equipment, a program or service made available to people incarcerated at men's prisons, in order to further masculinize their appearance. *Id.* at ¶¶ 162-165. Lastly, Mx. Doe has repeatedly sought access to men's sleeveless shirts and other commissary items available at other DOC prisons. *Id.* at ¶¶ 166-

169.  Given the "all encompassing" definition of the terms "service, program or activity," these requests unambiguously fall under the ambit of the ADA's protections. *See Furgess*, 933 F.3d at 289.

Furthermore, Title II's prohibition of disability discrimination includes "a catch-all phrase that prohibits all discrimination by a public entity, regardless of the context." *Innovative Health Sys., Inc. v. City of White Plains*, 117 F.3d 37, 45 (2d Cir. 1997). A public entity can violate the ADA even when they have not denied an individual access to a program or service. *Chisholm v. McManimon,* 275 F.3d 315, 330 (3d Cir. 2001) (finding that Title II "proscribes discrimination on the basis of disability without requiring exclusion per se.") (emphasis omitted); *see also Innovative Health Sys., Inc.*, 117 F.3d at 44-45 (finding that "the language of Title II's anti-discrimination provision does not limit the ADA's coverage to conduct that occurs in the 'programs, services, or activities'" of the public entity) (citation omitted).  The facts alleged by Mx. Doe in the Amended Complaint demonstrate a pattern of discriminatory conduct by Defendant DOC staff towards Mx. Doe including differential treatment of Mx. Doe's requests for assistance and harassing conduct by staff.  Therefore, Mx. Doe has adequately stated an ADA claim, and Defendants' Motion to Dismiss should be denied.

### B. The Amended Complaint Raises the Inference that Defendant Blakely was Personally Involved in the Violation of Mx. Doe's Fourteenth Amendment Right to Privacy

A plaintiff in a Section 1983 action must show that each defendant "individually participated in the alleged constitutional violation or approved of it." *C.N. v. Ridgewood Bd. of Educ.*, 430 F.3d 159, 173 (3d Cir. 2005).  Sufficient personal involvement can be established through allegations of "actual knowledge and acquiescence." *Rode v. Dellarciprete*, 845 F.2d

1195, 1207 (3d Cir. 1988). Crucially, "actual knowledge can be inferred from circumstances other than actual sight." *Baker v. Monroe Twp.*, 50 F.3d 1186, 1194 (3d Cir. 1995).

Courts within the Third Circuit have repeatedly refused to grant motions to dismiss for insufficient personal involvement, even where personal involvement is unclear, where the complaint allows for the inference that the Defendant was involved in the unconstitutional activity. *See e.g., Fennell v. Wetzel*, No. 4:17-cv-1520, 2019 U.S. Dist. LEXIS 10078, at *25-26 (M.D. Pa. Jan. 18, 2019) (denying motion to dismiss on personal involvement grounds when Court could draw an inference that defendant corrections officer may have been involved in larger pattern of harassment and retaliation based on a single intimidating conversation); *Naviglia v. Borough of Springdale*, Civil Action No. 15-1029, 2016 U.S. Dist. LEXIS 107980, at *15 (W.D. Pa. Aug. 16, 2016) (allowing a Section 1983 claim to proceed to discovery where personal involvement was unclear because the complaint allowed for the inference that "discovery will uncover proof of the personal involvement of each of these Defendants").

The need to allow claims to proceed to discovery where the plaintiff has incomplete information relating to the involvement of individual defendants is particularly salient in the context of prison conditions cases. The information gap between defendant prison staff and others is intentionally wide, frequently leaving incarcerated plaintiffs "not in the requisite position to present the factual details to fully plead [their] claim[s]." *Sloan v. Pa. Dep't of Corr.*, Civil Action No. 2: 16-cv-1182, 2017 U.S. Dist. LEXIS 131563, at *17 (W.D. Pa. Aug. 16, 2017). In *Sloan,* the incarcerated plaintiff was unable to identify which defendant was responsible for the unconstitutional actions, instead arguing that any of the named defendants could have been involved. *Id.* at *16-17. The court held that although the plaintiff could not cite the exact particulars of how various prison employees were personally involved in the wrongdoing, he was

still entitled to proceed to discovery.  *Id.* at *17.  The court inferred personal involvement based on alleged facts such as the prison employees' roles and responsibilities.  *Id.* at *15-16.

A court could reasonably infer that Defendant Blakely had personal involvement in violating Mx. Doe's right to privacy through the dissemination of private medical information. After their act of self-harm, Mx. Doe informed only Defendant Blakely.  Am. Compl. ¶¶ 128, 131. Mx. Doe shared that information privately in Defendant Blakely's closed office, and no incarcerated person was close enough to overhear their conversation.  *Id.* at ¶ 129.  Soon after Mx. Doe disclosed that information to Defendant Blakely, rumors of Mx. Doe's act of self-harm spread throughout the prison.  *Id.* at ¶¶ 127-128.  It is thus reasonable to infer that Defendant Blakely was personally involved in disseminating Mx. Doe's private medical information. Although Mx. Doe was not in a position to witness Defendant Blakely's disclosure of this private information, the disclosure can be reasonably inferred from the facts. *See id.* at ¶ 127-132.  Drawing all reasonable inferences in favor of the non-moving party as required at the motion to dismiss stage, Mx. Doe has plead sufficient facts that Defendant Blakely violated Mx. Doe's Fourteenth Amendment right to privacy and this claim should be allowed to proceed to discovery.

### C.  **Defendants' Motion to Dismiss the IIED Claim Should be Denied**

i.  <u>Mx. Doe has Adequately Stated an IIED claim.</u>

To state a claim for intentional infliction of emotional distress, a plaintiff must allege that: (1) Defendant's conduct was extreme and outrageous; (2) his conduct caused the plaintiff severe emotional distress; and (3) he acted intending to cause that person such distress or with knowledge that such distress was substantially certain to occur.  *Brown v. Muhlenberg Twp.*, 269 F.3d 205, 218 (3d Cir. 2001); *see also Chuy v. Philadelphia Eagles Football Club*, 595 F.2d 1265, 1273 (3d Cir. 1979).  What is prohibited is conduct that is so outrageous in character, and so extreme in

degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community. *Hoy v. Angelone*, 554 Pa. 134, 151 (Pa. 1998); *Kazatsky v. King David Mem'l Park*, 527 A.2d 988, 991, 994 (Pa. 1987) ("Generally, the case is one in which the recitation of the facts to an average member of the community would arouse his resentment against the actor, and lead him to exclaim, "Outrageous!").

While Pennsylvania courts are cautious in permitting recovery on intentional infliction of emotional distress claims, they are more amenable when they involve a special relationship, such as landlord and a tenant, or a parent and a child. *See e.g., Williams v. Guzzardi*, 875 F.2d 46, 52 (3d Cir. 1989) (upholding a jury verdict for plaintiff where defendant landlord, in an attempt to evict plaintiff, *inter alia* publicly announced that he was evicted for running a house of prostitution). Here, Defendants were the Superintendent, Deputy Superintendents and other prison staff, trusted with the responsibility of care, custody, and control of Mx. Doe, such that a special relationship exists here.

Courts have found valid claims for intentional infliction of emotional distress for plaintiffs who allege poor prison conditions or mistreatment by prison officials. *See e.g., Ponzini v. Monroe County*, 3:11-cv-0413, 2012 U.S. Dist. LEXIS 134136, *19-21 (M.D. Pa. Sept. 19, 2012) (denying summary judgment on a claim by a prisoner denied prescribed medication for his mental illness, resulting in withdrawal symptoms); *Peters v. Cmty. Educ. Ctrs., Inc.,* Civil Action No. 11-850, 2011 U.S. Dist. LEXIS 121190, *12-13 (E.D. Pa. Oct. 19, 2011) (denying motion to dismiss where a prison refused to house plaintiff on a lower bunk, resulting in plaintiff's fall and subsequent broken bones); *Monroe v. Mulloley*, No. 10-1208, 2011 U.S. Dist. LEXIS 10627, *9-10 (W.D. Pa. Feb. 3, 2011) (denying defendant's motion to dismiss, where the plaintiff alleged that a defendant corrections officer wrote a false affidavit and punched the plaintiff in the face while naked);

*Zimmerman v. Schaeffer*, 654 F. Supp. 2d 226, 257 (M.D. Pa. 2009) (denying summary judgment on claim regarding use of excessive force).

Mx. Doe has adequately alleged conduct by Defendants that was extreme or outrageous. Defendants Blakely and Anderson revealed Mx. Doe's private health information and gender identity despite Mx. Doe's desire to keep this sensitive information confidential.  Disclosure of Mx. Doe's mental health concerns and medical information that essentially "outed" Mx. Doe's gender identity to both staff and other incarcerated individuals is a horrifying act that not only traumatized Mx. Doe, but put their safety at great risk. Such actions are undoubtedly outrageous. *See e.g., Hernandez v. Quinn*, 193 A.3d 1118 (Pa. Super. Ct. 2018) (finding allegations that Appellees distributed psychiatric and medical information without Appellant's knowledge or consent to be "atrocious and utterly intolerable" and reinstating the Appellant's IIED claim); *see also Minor v. Dilks,* No. 19-18261 (RMB), 2020 U.S. Dist. LEXIS 5218, at *24-25 (D.N.J. Jan. 13, 2020) (allowing the IIED claim to proceed where defendants revealed incarcerated plaintiff's sexual orientation to prison staff and other incarcerated individuals).

Similarly, Mx. Doe has pleaded an IIED claim against Defendants Oliver, Wagner and Rich for their failure to take action when staff and incarcerated people harassed and threatened Mx. Doe on the basis of their act of self-harm and gender identity and as well as for their decision to force Mx. Doe to remain in a housing unit with an individual threating to kill them. "Few would disagree that such conduct, if it occurred, could be characterized as 'outrageous!'" *Scott v. Carette*, No. 10-5368, 2013 U.S. Dist. LEXIS 156124, at *28 (E.D. Pa. Oct. 31, 2013) (citing *Kazatsky*, 527 A.2d at 991) (denying motion to dismiss allegation of pattern of harassment by Defendant corrections officer based on plaintiff's criminal conviction).

Moreover, several courts have held that it is premature to dismiss an intentional infliction of emotional distress claim at the motion to dismiss stage, even in cases that may ultimately be difficult to prove. *See, e.g. Ponzini*, 2012 U.S. Dist. LEXIS 134136, at *19-20 (finding that "it would be premature to dismiss the IIED claim at this time, and it is appropriate to permit Plaintiffs to engage in discovery on this issue"); *Monroe*, 2011 U.S. Dist. LEXIS 10627 at *9-10. It is similarly premature to dismiss Mx. Doe's intentional infliction of emotional distress claim at this time. Accordingly, Defendants' motion to dismiss should be denied.

      ii.      <u>The IIED Claim is Not Barred by Sovereign Immunity.</u>

Mx. Doe's intentional infliction of emotional distress claim should not be dismissed on the grounds of sovereign immunity because Defendants were acting beyond the scope of their employment when they disseminated Mx. Doe's private health information and gender identity, failed to punish individuals for subsequent harassment and threats, and forced Mx. Doe to remain in a housing unit with an individual threating to kill them. Defendants have failed to establish based on the facts alleged in the Amended Complaint that they were acting within the scope of their duties, thus they are not entitled to dismissal on sovereign immunity grounds.

Under Pennsylvania law, Commonwealth employees are not entitled to sovereign immunity for intentional torts when they are acting beyond the scope of their employment duties.[3] *See* 1 Pa. C.S. § 2310 ("[The Commonwealth's] officials and employees *acting within the scope of their duties* [] shall continue to enjoy sovereign immunity . . . and remain immune from suit except as the General Assembly shall specifically waive the immunity.") (emphasis added); *Justice v. Lombardo*, 208 A.3d 1057, 1066-67 (Pa. 2019). Merely being an employee of the DOC does

---

[3] There are also ten statutory exceptions to the sovereign immunity of Commonwealth employees. 42 Pa. C.S. § 8522. Plaintiff does not presently argue that any of these exceptions apply here.

not mean that Defendants were acting within the scope of their employment when they performed the acts outlined in the Amended Complaint. An employee's conduct that is "different in kind from that authorized, far beyond the authorized time or space limits, or too little actuated by a purpose to serve the master" is outside the scope of employment. *Id.* at 1067 (quoting Restatement (Second) of Agency § 228(2)).

Alleged intentional torts by prison staff that are "unprovoked, unnecessary or unjustified by security concerns or penological goals . . . do[ ] not, as a matter of law, fall within the scope of employment." *Wesley v. Hollis*, No. 03-3130, 2007 U.S. Dist. LEXIS 41562, at *50-51 (E.D. Pa. June 6, 2007); *see also Justice*, 208 A.3d at 1073 ("[T]he fact that an act is done in an outrageous or abnormal manner has value in indicating that the servant is not actuated by an intent to perform the employer's business.") (quoting *Potter Title & Trust Co. v. Knox*, 113 A.2d 549, 553 (Pa. 1955)); *Hickenbottom v. Nassan*, Civil Action No. 03-223, 2007 U.S. Dist. LEXIS 24336, at *141 (W.D. Pa. Mar. 30, 2007) (denying summary judgment on sovereign immunity grounds because an officer's firing a gun at someone who posed no threat could be considered outrageous and, thus, unexpected by an employer). Here, the actions of Defendants were utterly unjustified by any legitimate penological goals and thus, Defendants are not entitled to sovereign immunity. *See Johnson v. Townsend*, Civ. A. No. 3:03-CV-2277, 2005 U.S. Dist. LEXIS 31043, at *11 (M.D. Pa. Nov. 8, 2005) *aff'd*, *Johnson v. Townsend*, 314 Fed. Appx. 436, 443 (3d Cir. 2008) (denying sovereign immunity where corrections officer spread rumors that incited violence).

Because sovereign immunity is an affirmative defense under Pennsylvania law, *see Justice*, 208 A.3d at 1068, and it was asserted here in a Rule 12(b)(6) motion, dismissal is inappropriate unless it is "apparent on the face of the complaint" that the Defendant was acting within the scope of his employment. *See DiMucci v. Pa. Convention Center Auth.*, No. 08-4810, 2009 U.S. Dist.

LEXIS 88829, at *18-19 (E.D. Pa. Sept. 24, 2009) (citing *Rycoline Prods v. C & W Unlimited*, 109 F.3d 883, 886 (3d Cir. 1997)). Unless it is clear that the alleged acts were, as a matter of law, within the scope of the defendant's employment duties, a motion to dismiss on the grounds of sovereign immunity should be denied. *See Savage v. Judge*, No. 05-2551, 2006 U.S. Dist. LEXIS 94236, at *16 (E.D. Pa. Jan. 2, 2006); *see also Rhodes v. Hauser*, No. 2:14-CV-1669, 2015 U.S. Dist. LEXIS 52866, at *14-15 (W.D. Pa. April 22, 2015) ("[A] court may deny a motion to dismiss on the basis of state sovereign immunity where it is unclear from the facts of the case whether the Commonwealth employees were actually acting within the scope of their employment."); *Mobley v. Lantz*, No. 1:13-CV-01804, 2014 U.S. Dist. LEXIS 105809, at *65 (M.D. Pa. July 31, 2014) ("[W]e cannot say, as a matter of law, at this early stage of the proceedings that the conduct of [the defendants] was consistent with the duties they were employed to perform."); *cf. Clark v. Conahan*, 737 F. Supp. 2d 239, 258 (M.D. Pa. 2010) (denying a motion to dismiss on the grounds of sovereign immunity because, as a matter of law, the alleged conduct fell outside the scope of a probation officer's statutory duties). Consequently, Defendants' Motion to Dismiss should be denied.

## IV.    CONCLUSION

For the foregoing reasons, the DOC Defendants' Partial Motion to Dismiss should be denied.

Respectfully submitted,

/s/ Alexandra Morgan-Kurtz
Attorney I.D. No. 312631
PA Institutional Law Project
100 Fifth Ave, Ste 900

Pittsburgh, Pa 15222
T: (412) 434-6175
amorgan-kurtz@pailp.org

Su Ming Yeh
Attorney I.D. No. 95111
PA INSTITUTIONAL LAW PROJECT
718 Arch Street, Suite 304S
Philadelphia, PA 19106
T: (215) 925-2966
smyeh@pailp.org

*Counsel for Plaintiff*