IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

SAM DOE,                                    )
                                            )
        Plaintiff                           )        Case No. 1:20-cv-00023-SPB-RAL
                                            )
vs.                                         )
                                            )        RICHARD A. LANZILLO
PENNSYLVANIA DEPARTMENT                      )        UNITED STATES MAGISTRATE JUDGE
OF CORRECTIONS, et al.                      )
                                            )        ECF Nos. 37 and 40
        Defendants                          )
                                            )

REPORT & RECOMMENDATION

I.      Recommendation

        Plaintiff Sam Doe is a prisoner in the custody of the Pennsylvania Department of

Corrections (DOC) at its State Correctional Institution at Cambridge Springs (SCI-Cambridge

Springs).[1]  Doe's Amended Complaint asserts constitutional, statutory, and common law claims

against the DOC and twelve individuals who are current or former DOC employees or who

provided medical or psychiatric services at SCI-Cambridge Springs.[2]  Seven of the defendants—

---

[1] Doe is a gender-nonbinary person and is proceeding under a pseudonym for privacy and safety reasons.  The Amended Complaint refers to Doe using the pronouns "they," "them," and "their."  The Court will do the same.  These pronouns are commonly used for gender-nonbinary people and recognized by Merriam-Webster dictionary and the American Psychological Association (APA) in 2019, among others.  *See* Anna North, "The past, present, and future of the singular 'they'," VOX(Dec. 13, 2019) https://www.vox.com/2019/12/13/21011537/they-merriam-webster-pronouns-nonbinary-word-year (last accessed Feb. 18, 2021).  Doe also "uses the honorific 'Mx.'" throughout their Amendment Complaint.  Mx. is "[a] gender-neutral title of courtesy prefixed to a person's surname, sometimes with first name(s) interposed." Mx, *n.*  OXFORD ENGLISH DICTIONARY (2021),

[2] The following current or former DOC personnel are sued in both their individual and official capacities: John Wetzel, Secretary of the DOC; Dr. Paul Noel, the DOC's Chief of Clinical Services; Dr. Paluki Reddy, the DOC's Chief Psychiatrist; Dr. Obeng, the current medical director at SCI-Cambridge Springs; Lonnie Oliver, the current Superintendent at SCI-Cambridge Springs; and Wagner, former Deputy Superintendent at SCI-Cambridge Springs.  ECF No. 33, pp. 3-4.  The following Defendants are sued in their individual capacities only: Dr. Lawrence Alpert, a former medical director at SCI-Cambridge Springs; Dr. Alexander, a former medical director at SCI-Cambridge Spring; Dr. Kross, a former medical director at SCI-Cambridge Springs; Debra Rich, the former Deputy Superintendent for Facility Management at SCI-Cambridge Springs; Blakely, a "unit psych counselor" at SCI-Cambridge Springs; and Shannon Anderson, the Corrections Healthcare Administrator (CHCA) at SCI-Cambridge Springs.  *Id.*, pp. 3–5.

Anderson, Blakely, Oliver, Rich, Wagner, Wetzel and the DOC (collectively, the "DOC Defendants")—have moved to dismiss certain claims against them pursuant to Federal Rule of Civil Procedure 12(b)(6).  ECF No. 37.   Two of the medical defendants, Dr. Kross and Dr. Alexander, have filed a motion to dismiss or, in the alternative, motion for summary Judgment as to the claims against them.   ECF No. 40.  Both motions are on referral to the undersigned for Report and Recommendation pursuant to the Magistrate Judges Act, 28 U.S.C. § 636(b)(1).  For the following reasons, it is respectfully recommended that the Court (1) grant in part, and deny in part, the DOC Defendants' motion, and (2) deny the motion filed on behalf of Defendants Kross and Alexander.

II.     Report

A.  Procedural History

Doe filed their original civil rights Complaint on January 28, 2020.  ECF No. 1, p. 2.  The DOC Defendants moved to dismiss the claims against them pursuant to Fed. R. Civ. P. 12(b)(6), and Defendants Alexander and Kross filed a motion to dismiss or, in the alternative, for summary judgment.  ECF Nos. 20, 21, 30, 31.  The two other Defendants, Dr. Alpert and Dr. Obeng, filed an Answer to the Complaint.  ECF No. 29.  On June 20, 2020, Doe filed an Amended Complaint. ECF No. 33.  Count I of the Amended Complaint asserts a claim under the Americans with Disabilities Act against the DOC alone.  Count II, alleging violations of the federal Rehabilitation Act, is also against the DOC alone.  Count III alleges violations of Doe's Eighth Amendment right to be free from cruel and unusual punishment; Doe asserts this claim against Defendants Wetzel, Noel, Reddy, Alpert, Alexander, Kross, and Obeng.  Count IV asserts intentional infliction of emotional distress (IIED) claims against Defendants Rich, Wagner, Oliver, Blakely, and Anderson. Finally, Count V asserts violations of Doe's Fourteenth Amendment right to privacy in medical information against Defendants Blakely and Anderson.

Dr. Albert and Dr. Obeng again filed an Answer.  ECF No. 43.  The DOC Defendants and Alexander and Kross renewed their respective motions as to the Amended Complaint.  ECF Nos. 37, 40.  The DOC Defendants' motion attacks the legal sufficiency of Doe's ADA, Rehabilitation Act, and IIED claims.  ECF No. 38.  The DOC Defendants also contend that the Fourteenth Amendment claim against Blakely should be dismissed due to her lack of personal involvement in the asserted disclosure of Doe's private medical information.[3]  *Id.*  Alexander and Kross's motion challenges the legal sufficiency of Doe's Eighth Amendment claim.  Kross also seeks summary judgment on all claims against him based on Doe's failure to exhaust administrative remedies.  ECF No. 41.  Both motions have been fully briefed and are ripe for disposition.  *See* ECF Nos. 38, 41, 44, 45, 46.

B. Factual Summary

The following factual allegations of the Amended Complaint are taken as true for purposes of the pending motion to dismiss.  *See US Express Lines Ltd. v. Higgins*, 281 F.3d 383, 388 (3d Cir. 2002).

1. Doe's Gender Dysphoria Condition

Doe is a non-binary person currently incarcerated at SCI Cambridge Springs.  Although Doe was assigned female at birth, Doe currently lives and presents in a gender-neutral fashion.  *Id.*, ¶ 20.  Since Doe was a small child, they have felt uncomfortable in their body and preferred to be a boy.  *Id.*, ¶ 21. As an adult, Doe realized that they needed a more masculine body, with a deeper voice, greater musculature, no menstruation, breast reduction and gender affirming surgery.  *Id.*, ¶ 22

---

[3] The Corrections Defendants do not challenge the sufficiency of Doe's allegations to state an Eighth Amendment violation against Wetzel, Anderson, and Noel.  Nor do they challenge Doe's Fourteenth Amendment claim against Anderson at the pleading stage of this action.

In 2017, the Pennsylvania Department of Corrections diagnosed Doe with gender dysphoria, a serious medical condition characterized by strong cross-gender identification and persistent discomfort about one's assigned sex. *Id.*, ¶ 23. Gender dysphoria is a diagnosable and treatable condition recognized by the American Psychiatric Association and included in the Diagnostic and Statistical Manual of Mental Disorders, Fifth Edition ("DSM-V"), as well as the International Classification of Diseases-10 (World Health Organization). *Id.*, ¶ 24. It refers to clinically significant distress associated with an incongruence or mismatch between a person's gender identity and assigned sex. *Id.*, ¶ 25. Severe cases of gender dysphoria can result in a person's inability to function in everyday life. Left untreated, gender dysphoria is often associated with dangerous related conditions such as depression, substance abuse, self-mutilation, suicidal ideation, and ultimately suicide. *Id.*, ¶ 28. With appropriate treatment, however, individuals with gender dysphoria can be fully cured of all symptoms. *Id.*, ¶ 27

The World Professional Association for Transgender Health (WPATH), the leading international organization focused on transgender health care, publishes "Standards of Care for the Health of Transsexual, Transgender, and Gender Nonconforming People." *Id.*, ¶ 31. Medically accepted treatment options for gender dysphoria, as recognized by WAPTH include: social transition with changes in gender expression and role (which may involve living part-time or full-time in another gender role, consistent with one's gender identity); hormone therapy to feminize or masculinize the body; surgery to change primary and/or secondary sex characteristics (e.g., breasts/chest, external and/or internal genitalia, facial features, body contouring); and psychotherapy addressing the negative impact of gender dysphoria on mental health and related stigmatization, alleviating internalized transphobia, enhancing social and peer support, improving body image, or promoting resilience. *Id.*, ¶ 34. In some cases, gender confirmation surgery is an "essential and medically necessary" treatment to alleviate gender dysphoria. *Id.*, ¶ 37.

The WPATH Standards of Care for gender dysphoria apply to institutionalized persons to the same extent as noninstitutionalized individuals.  *Id.*, ¶ 38.  Regarding the treatment of gender dysphoria, the WPATH Standards of Care state, in part, "[i]f the in-house expertise of health professionals in the direct or indirect employ of the institution does not exist to assess and/or treat people with gender dysphoria, it is appropriate to obtain outside consultation from professionals who are knowledgeable about this specialized area of health care."  *Id.*, ¶ 39  The National Commission on Correctional Health Care, which sets standards and provides accreditation for prisons throughout the nation, recognizes that the WPATH Standards of Care should be followed by correctional institutions in providing healthcare to transgender people, acknowledges that decisions on transgender health care must be made on an individualized case by case basis, and recommends that correctional health staff be trained in transgender heath care and notes that in the alternative, incarcerated people should "have access to other professionals with expertise in transgender health care to help determine appropriate management."  *Id.*, ¶¶ 40-42.

2.   The DOC's Policies and Practices Concerning Treatment of Gender Dysphoria

DOC Policy Statement 13.2.1, Access to Health Care, is Defendant DOC's policy that establishes the procedures by which the Department of Corrections and medical vendor staff provide access to health care.  *Id.*, ¶ 43.  Section 19 of Policy 13.2.1 specifically addresses the treatment of gender dysphoria and "establishes procedures to appropriately diagnose, treat, and manage [people] with Gender Dysphoria (GD) consistent with the core values and mission of the Pennsylvania Department of Corrections."  *Id.*, ¶ 44.  According to Section 19, Defendant Noel, as the Chief of Clinical Services, has the "overall responsibility for the medical treatment of inmates diagnosed with [Gender Dysphoria]."  *Id.*, ¶ 45.  Likewise, Defendant Reddy, as the Chief Psychiatrist, has the "overall responsibility for the mental health diagnosis and treatment of inmates

diagnosed with [Gender Dysphoria]."  *Id.*, ¶ 46.  Pursuant to Section 19, the contracted medical and mental health vendors must provide training to their practitioners on "evaluation, treatment and management of patients with [Gender Dysphoria]" with annual refresher training, which Noel and Reddy are required to pre-approve.  *Id.*, ¶¶ 47-48.  Section 19 also establishes a "[Gender Dysphoria] Treatment Review Committee" which, inter alia, establishes DOC policy, reviews and approves every individual treatment plan, and reviews all requests for gender affirming surgery.  *Id.*, ¶ 49.  This Committee is composed of at least six people, none of whom are the actual doctors or psychiatrists on site interacting directly with or treating people with gender dysphoria.  *Id.*, ¶ 50.  As the Chief of Clinical Services and Chief Psychiatrist, Noel and Reddy are required members of this Committee. *Id.*, ¶ 51.  Section 19 further provides that the WPATH Standards of Care "will serve as guidelines for the overall health care of identified inmates."  *Id.*, ¶ 52.

Psychology staff and the prison's psychiatrist can develop a Gender Dysphoria Individual Recovery Plan for each person with Gender Dysphoria, but Section 19 requires that the Gender Dysphoria Treatment Review Committee unanimously sign off on the treatment plan.  *Id.*, ¶ 53. Hormone therapy may be a part of the Individual Recovery Plan, with the approval of the prison's medical director.  *Id.*, ¶ 54.  All additional treatment for gender dysphoria outside of the initial Individual Recovery Plan must be approved by the Gender Dysphoria Treatment Review Committee.  *Id.*, ¶ 55.  Section 19 specifically provides that the Committee, and not any staff actually providing medical or mental health care to a person with gender dysphoria, renders the decision as to whether a person can be referred to an outside specialist for evaluation for gender affirming surgery.  *Id.*, ¶ 56.  If an outside specialist recommends gender affirming surgery, the case is then referred to the separate, "larger" Department Central Office Gender Review Committee ("GRC"). *Id.*, ¶ 57.  Pursuant to DOC Policy, the final decision as to whether a person with gender dysphoria can receive gender affirming surgery, that has been deemed medically necessary by a specialist, is

determined solely by the GRC.  *Id.*, ¶ 58.  Doe believes that the GRC consists solely of individuals

who work in the DOC's central office in Mechanicsburg, Pennsylvania, and includes non-medical

staff, such as administrative and security personnel.  *Id.*, ¶¶ 59-60.  Doe also believes that medical

and mental health staff who have interacted with and treated the person being evaluated for surgery

do not sit on or have a vote in the Gender Review Committee.  *Id.*, ¶ 61.  In the approximately three

years since the creation of these committees, no individual has been approved for gender affirming

surgery.  *Id.*, ¶ 63.  People with gender dysphoria are the only people subjected by the DOC to a

policy requiring such an extensive committee review process to determine whether medical

treatment is necessary.  *Id.*, ¶ 64. As the Secretary of the DOC, Wetzel reviews and approves all

DOC policies, including DOC Policy Statement 13.2.1.  *Id.*, ¶ 65.  Wetzel was involved in the

development and implementation of DOC policies relating to the safety and care of transgender

people in DOC custody, including several one-on-one meetings with Commonwealth and DOC

officials.  *Id.*, ¶ 67.

   3.  Doe's Treatment at SCI-Cambridge Springs

   SCI Cambridge Springs does not have on-site medical staff or specialists familiar with

transgender healthcare or with many areas of transitioning, including the WPATH Standards of

Care, appropriate testosterone levels, monitoring of levels, permanent hair removal, and gender

affirming surgeries.  *Id.*, ¶¶ 68-69.   Doe requested to see a gender specialist to obtain necessary

medical care regarding appropriate next steps for Doe's transition and to determine what type of

surgery would best suit Doe's medical needs.  The Defendants denied Doe's request.  *Id.*, ¶ 73.

   Doe has repeatedly had to educate SCI Cambridge Springs medical staff, including Alpert,

Alexander, Kross, and Obeng, about the Standards of Care and appropriate treatment, such as

appropriate dosages of testosterone and when blood tests should be drawn.  *Id.*, ¶¶ 74-76.  Doe is

currently taking testosterone, which masculinizes Doe's appearance and helps Doe's gender

dysphoria. *Id.*, ¶ 79. In April 2018, Doe was not receiving an appropriately therapeutic dose of

testosterone. *Id.*, ¶ 80. Throughout Doe's incarceration at SCI Cambridge Springs, medical staff,

including Alpert, Alexander and Kross, repeatedly changed Doe's testosterone dosage and/or

withheld the medication entirely. *Id.*, ¶ 81. Medical staff frequently checked Doe's testosterone

levels at the wrong time in the cycle on the orders of Alpert, Alexander and Kross, resulting in

incorrect levels and the lowering of Doe's testosterone dosage. *Id.*, ¶ 82. These inaccurate blood

draws were taken despite Doe's constant efforts to correct the timing of when levels were drawn by

showing staff the Standards of Care. *Id.*, ¶ 83. Alexander threatened to stop providing Doe with

any testosterone if Doe did not submit to blood draws at the incorrect times. *Id.*, ¶ 84. Alexander

ultimately transferred all transgender patients at SCI Cambridge Springs to a Physician's Assistant

for care, as he was uncomfortable treating the transgender population. *Id.*, ¶ 85. Due to the

fluctuations and inadequate dosages of testosterone, Doe's gender dysphoria worsened, and Doe

became depressed, suicidal, and fixated on self-harm. *Id.*, ¶ 86. Under Section 19 of Policy 13.2.1,

Alpert, Alexander, Kross and Obeng, as the Medical Directors at SCI Cambridge Springs, were

responsible for determining the dosages of testosterone prescribed to Doe. *Id.*, ¶ 87.

    4. Doe's Self-Mutilation and Subsequent Treatment

    As a result of Doe's gender dysphoria, which was exacerbated by Doe's fluctuating

testosterone levels and deficiencies in Defendants' medical care, Doe self-mutilated in April 2018 by

removing their nipples. *Id.*, ¶ 88. Kross again lowered Doe's testosterone dosage after this act of

self-harm, which added to Doe's anxiety and fears. *Id.*, ¶¶ 89-90. On multiple occasions prior to

Doe's act of self-harm, Doe expressed to Blakely the psychological torment Doe was experiencing

due to the failure to receive adequate care and, on at least two occasions, Doe informed Blakely of

their intent to cut off their nipples.  *Id.*, ¶¶ 91-92.  Blakely asked Doe not to hurt themself but took no further action.  *Id.*, ¶ 93.

Doe only began receiving relatively consistent therapeutic testosterone dosages in the summer of 2018 after a letter from Doe's attorney threatened litigation on the issue.  *Id.*, ¶ 94.  As a result of testosterone use, Doe is experiencing hair growth that causes severe psychological discomfort.  *Id.*, ¶ 95.  On multiple occasions—including in June 2018—Doe requested permanent hair removal, a common element of transgender healthcare.  *Id.*, ¶ 96.  These requests were denied because the DOC deems permanent hair removal treatment to be "elective treatment," which it does not provide.  *Id.*, ¶ 97.  Doe began requesting permission to have gender affirming surgery in 2017.  *Id.*, ¶ 98.  In July and October 2017, Alpert documented Doe's requests for less facial and body hair and gender affirming surgery.  Alpert did not take any action in response to these requests.  *Id.*, ¶ 100.  Doe raised this request again multiple times in 2018 and 2019.  *Id.*, ¶ 101.  Alpert, Alexander, Kross, and Obeng, as well as other medical staff at SCI Cambridge Springs, repeatedly denied Doe's requests because additional treatment for Doe's gender dysphoria has not been approved by the Committees in Mechanicsburg.  *Id.*, ¶ 102.  Doe's requests for additional treatment, including permanent hair removal, top surgery and bottom surgery, were again denied by Noel and the Committees in Mechanicsburg in October 2019; no one offered Doe a rationale.  *Id.*, ¶ 103-104.  Doe has never been allowed to meet with an outside specialist to discuss Doe's transgender healthcare needs.  *Id.*, ¶ 105.  As a result of Defendants' continued refusal to provide Doe with medically necessary care for Doe's gender dysphoria, Mx. Doe continues to suffer serious psychological torment, which Doe has repeatedly expressed directly to medical staff, including Alpert, Alexander, Kross, and Obeng. *Id.*, ¶ 107-111.

5.   Disclosure of Doe's Gender Dysphoria to Other Inmates and Resulting Harassment

In early 2018, Corrections Healthcare Administrator (CHCA) Anderson approached Doe at Doe's cell door and loudly began discussing Doe's gender dysphoria and testosterone treatment. *Id.*, ¶ 114. Anderson could have had this discussion in a private location rather than at Doe's cell door. *Id.*, ¶ 115. Doe had not previously publicly revealed their gender identity. *Id.*, ¶ 116. Multiple incarcerated women overheard the conversation between Anderson and Doe. *Id.*, ¶ 117. Afterwards, one of Doe's roommates asked Doe, "Should I call you an it now?" and talked about how "freaky" women with facial hair are. *Id.*, ¶ 118. Many other incarcerated women and staff soon learned that Doe was transgender and began harassing Doe as a result. *Id.*, ¶ 119. After reporting their act of self-mutilation, Doe was moved to administrative custody and then housed on the Residential Treatment Unit. *Id.*, ¶ 120. While housed in administrative custody, Doe was strip-searched daily, and frequently multiple times per day, during which they were forced to remove the bandages covering their chest wounds. *Id.*, ¶¶ 121-22.

During this period, Rich refused to allow Doe to leave the unit to go to work, resulting in Doe losing their institutional job. *Id.*, ¶ 124. The DOC Psychiatrist, Dr. Rehnberg, was on call at the time of the self-harm incident and informed Rich, Wagner and Oliver that Doe did not pose an additional threat to themself or others and should be removed from secure housing. *Id.*, ¶ 125. Nevertheless, Rich, Wagner, and Oliver maintained Doe in these secure units for several months. *Id.*, ¶ 125.

After Doe's act of self-mutilation, Doe informed only Blakely, the unit psych counselor. Doe disclosed this information to Blakely in her office, with the door closed, and with no other inmates close enough to overhear their conversation. Blakely then informed Captain Deal of this information, and then had Doe escorted to the medical department. Following the disclosure to

Blakely, Deal and the medical department, rumors about Doe's gender identity and act of self-harm spread across the prison. *Id.*, ¶¶ 127-130.

Multiple incarcerated women repeatedly sexually harassed and physically threatened Doe based on Doe's gender identity and act of self-harm. *Id.*, ¶¶ 132-139. Corrections officers were present during each of the incidents of harassment and threats, overheard the comments, and did nothing to intervene or discipline the other inmates. *Id.*, ¶¶ 140-141. Doe also experienced harassment by staff. *Id.*, ¶ 142. Defendants Rich, Wagner and Oliver were notified verbally and in writing of the inmate and staff harassment against Doe, but they took no action and none of the reports resulted in disciplinary action. *Id.*, ¶¶ 143-145. Because of this, Doe is also afraid in their housing unit. Doe's housing unit is connected to the housing unit of a woman who threatened to kill them. *Id.*, ¶ 149. The doors between these units were frequently unlocked, allowing incarcerated people access to the connected unit. Rich, Wagner, and Oliver repeatedly denied Doe's requests to be removed from that unit. *Id.*, ¶¶ 149-151.

C.  Standard of Review

1.  Motions to Dismiss

A motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6) tests the legal sufficiency of the complaint. *Kost v. Kozakiewicz*, 1 F.3d 176, 183 (3d Cir. 1993). In deciding a motion to dismiss, the court is not opining on whether the plaintiff is likely to prevail on the merits; rather, the plaintiff must only present factual allegations sufficient "to raise a right to relief above the speculative level." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 556, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007) (citing 5 C. Wright & A. Miller, FEDERAL PRACTICE AND PROCEDURE § 1216, pp. 235-36 (3d ed. 2004)). *See also Ashcroft v. Iqbal*, 556 U.S. 662, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009). A complaint should only be dismissed pursuant to Rule 12 (b)(6) if it fails to allege "enough facts to

state a claim to relief that is plausible on its face." *Twombly*, 550 U.S. at 570, 127 S.Ct. 1955 (rejecting

the traditional Rule 12 (b)(6) standard established in *Conley v. Gibson*, 355 U.S. 41, 78 S.Ct. 99, 2

L.Ed.2d 80 (1957)).  In making this determination, the court must accept as true all well-pled factual

allegations in the complaint and views them in a light most favorable to the plaintiff.  *U.S. Express

Lines Ltd. v. Higgins*, 281 F.3d 383, 388 (3d Cir. 2002).

While a complaint does not need detailed factual allegations to survive a motion to dismiss,

it must provide more than labels and conclusions.  *Twombly*, 550 U.S. at 555, 127 S.Ct. 1955.  A

"formulaic recitation of the elements of a cause of action will not do."  *Id.* (citing *Papasan v. Allain*,

478 U.S. 265, 286, 106 S.Ct. 2932, 92 L.Ed.2d 209 (1986)).  Moreover, a court need not accept

inferences drawn by a plaintiff if they are unsupported by the facts as set forth in the complaint.  *See

California Pub. Employee Ret. Sys. v. The Chubb Corp.*, 394 F.3d 126, 143 (3d Cir. 2004) (citing *Morse v.

Lower Merion Sch. Dist.*, 132 F.3d 902, 906 (3d Cir. 1997)).  Nor must the Court accept legal

conclusions disguised as factual allegations.  *Twombly*, 550 U.S. at 555, 127 S.Ct. 1955.  *See also

McTernan v. City of York, Pennsylvania*, 577 F.3d 521, 531 (3d Cir. 2009) ("The tenet that a court must

accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions.").

2.  Motions for Summary Judgment

As alternative relief, Alexander and Kross's motion requests summary judgment in Kross's

favor on the grounds that Doe did not exhaust their administrative remedies against him as required

by the Prison Litigation Reform Act.   In support of this complete defense, Alexander and Kross

have included Doe's lengthy grievance record in their appendix.  ECF No. 41-1.  To establish the

plaintiff's failure to exhaust administrative remedies at the summary judgment stage, the moving

party must produce a record demonstrating his entitlement to judgment on the defense as a matter

of law.[4]  Fed. R. Civ. P. 56(c)(1)(A).  The most efficacious means to do so is for the defendant to produce the plaintiff's entire grievance record.  *See, e.g., Green v. Maxa*, 2019 WL 1207535, at \*6 (W.D. Pa. Mar. 14, 2019); *Jackson v. Superintendent Greene SCI*, 671 Fed. Appx. 23, 24 (3d Cir. 2016).  Defendants may also provide an affidavit from a person with knowledge who affirms factually that the plaintiff failed to properly exhaust.  *See* Fed. R. Civ. Pro. 56(c)(4).  This is often an affidavit from a records custodian.  *See Wiggins v. Correct Care Solutions, LLC*, 2017 WL 11550519, at \*5, \*7-8 (E.D. Pa. May 9, 2017); *Muhammad v. Sec'y Pa. Dep't of Corrs.*, 621 Fed. Appx. 725, 727 (3d Cir. 2015) (affidavit attesting plaintiff failed to appeal to SOIGA); *accord Martin v. Pa. Dep't of Corrs.*, 395 Fed. Appx. 885, 886 (3d Cir. 2010) (affidavit stating plaintiff "never sought final review").

In any case, the moving defendant has the burden of demonstrating the absence of any genuine dispute as to any material fact concerning the exhaustion defense and the defendant's entitlement to judgment as a matter of law.  Fed. R. Civ. P. 56(a).  A fact is "material" only if it might affect the outcome of the case.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A dispute is "genuine" if the evidence "is such that a reasonable jury could return a verdict for the non-moving party."  *Anderson*, 477 U.S. at 248.  In deciding a summary judgment motion, all inferences "should be drawn in the light most favorable to the non-moving party, and where the non-moving party's evidence contradicts the movant's, then the non-movant's must be taken as true."  *Pastore v. Bell Tel. Co. of Pa.*, 24 F.3d 508, 512 (3d Cir. 1994).

---

[4] The defense of "failure to exhaust" is typically presented as a motion for summary judgment or as a motion to dismiss that invites review of matters outside of the record.  Rule 12(d) of the Federal Rules of Civil Procedure authorizes the Court to treat a motion under Rule12(b)(6) as a motion for summary judgment where "matters outside the pleadings are presented to and not excluded by the court," and all parties are "given a reasonable opportunity to present all the material that is pertinent to the motion."  Fed. R. Civ. P. 12(d); *see also Rose v. Bartle*, 871 F.2d 331, 340 (3d Cir. 1989).  Further, where a defendant moves to dismiss based on a failure-to-exhaust defense and "the exhaustion issue turns on [ ] indisputably authentic documents related to [the inmate's] grievances," the Court may consider those documents "without converting [a motion to dismiss] to a motion for summary judgment."  *Spruill v. Gillis*, 372 F.3d 218, 223 (3d Cir. 2004).  Regardless of how the defense is raised, it is always the defendant's burden to demonstrate the absence of any genuine dispute as to any material fact and the defendant's entitlement to judgment as a matter of law.

D.  Analysis:  The DOC Defendants' Motion

1.  The Court should deny the DOC's motion to dismiss Doe's ADA and Rehab Act claims.

a.  Determining the status of gender dysphoria as a "disability under the ADA and Rehab Act

In Count I of the Amended Complaint, Doe asserts a disability discrimination claim pursuant to Title II of the ADA, 42 U.S.C. § 12132.  In Count II, Doe raises a parallel claim under Section 504 of the Rehab Act, 29 U.S.C. § 794(a).  Both statutes "have the same standard for determination of liability" and "are all to be interpreted consistently." *Macfarlan v. Ivy Hill SNF, LLC,* 675 F.3d 266, 274 (3d Cir. 2012) (citing *McDonald v. Pennsylvania,* 62 F.3d 92, 95 (3d Cir. 1995) and *Donahue v. Consol. Rail Corp.,* 224 F.3d 226 (3d Cir. 2000)).  To state a claim under either statute, a plaintiff "must allege that [plaintiff] is a qualified individual with a disability, who was precluded from participating in a program, service, or activity, or otherwise was subject to discrimination, by reason of his disability." *Furgess v. Pa. Dep't of Corr.,* 933 F.3d 285, 288-89 (3d Cir. 2019).  Unless otherwise noted, defined terms are the same for both statutes and judicial treatment applies equally to each.

The ADA defines a "disability" as "a physical or mental impairment that substantially limits one or more major life activities."  42 U.S.C. § 12102(1)(A).  Major life activities include, but are not limited to, sleeping, thinking, and communicating.  42 U.S.C. § 12102(2).  Under the ADA Amendments Act (ADAAA), which became effective on January 1, 2009, employers and courts are required to construe the definition of "disability" "in favor of broad coverage of individuals…to the maximum extent permitted by the terms of this Act." *Miller v. Coca-Cola Refreshments USA, Inc.,* 2018 WL 1456502, at *10 (W.D. Pa. Mar. 23, 2018); Pub. L. No. 110-325, § 4(a), 122 Stat. 3553, 3555. Although the ADAAA did not change the statutory definition of disability, it favors a broad construction of the term. *Miller,* 2018 WL 1456502, at *10 (citing 42 U.S.C. § 12102(4)(A)).  Because

this case's events occurred after January 1, 2009, the standard set forth in the ADAAA governs Doe's claims.

The DOC does not dispute that Doe's gender dysphoria "substantially limits" Doe's major life activities as described by the ADA's general definition of "disability." Instead, the DOC argues that Doe's condition and limitations are expressly excluded from the definition of "disability" by another provision of the statute. ECF No. 38, p. 7. The relevant exclusionary clause of the ADA states:

> (b) Certain conditions
>
> Under this chapter, the term "disability" shall not include--
>
> (1) transvestism, transsexualism, pedophilia, exhibitionism, voyeurism, gender identity disorders not resulting from physical impairments, or other sexual behavior disorders;
>
> …

42 U.S.C. § 12211(b)(1). The DOC argues that Doe's gender dysphoria is a "gender identity disorders not resulting from physical impairments" and, therefore, expressly excluded from the protections of the ADA. ECF No. 38, p. 7. They raise the same argument as a defense to the Rehab Act claim, as the Rehab Act likewise excludes from its coverage "transvestism, transsexualism…[and] gender identity disorders not resulting from physical impairments." 29 U.S.C. § 705(20)(E)-(F).[5]

"[S]ignificant disagreement" exists among the courts that have addressed "whether gender dysphoria falls into the ADA's categorical exclusions." *London v. Evans*, 2019 WL 5726983 at 6, n. 3 (D. Del. November 5, 2019). Essentially, three approaches to the issue can be gleaned from the case law. The first, and apparently the majority approach, views the text's language as expressing

---

[5] "The exemptions in the ADA and in the Rehab Act for gender identity disorder are identical. *See* 42 U.S.C. § 12211(b)(1) and 29 U.S.C. § 705(20)(F)." *Shorter v. Barr*, 2020 WL 1942785, at *9, n. 4 (N.D. Fl. Mar. 13, 2020). Thus, any discussion of the ADA's exception in this section applies equally to the Rehab Act's exception.

Congress's intent "to exclude from the ADA's protection both disabling and non-disabling gender identity disorders that do not result from a physical impairment." *Parker v. Strawser Constr., Inc.*, 307 F. Supp. 3d 744, 753-54 (S.D. Ohio 2018) (gender dysphoria not resulting from physical impairment is within the ADA's exclusionary language). *See also Michaels v. Akal Sec., Inc.*, 2010 WL 2573988, at *6 (D. Colo. June 24, 2010) (gender dysphoria is a gender identity disorder and therefore excluded); *Gulley–Fernandez v. Wis. Dep't of Corr.*, 2015 WL 7777997, at *2 (E.D. Wis. Dec. 1, 2015) (gender dysphoria is a gender identity disorder and, therefore, is not a "disability" under the Americans with Disabilities Act or the Rehabilitation Act); *Mitchell v. Wall*, 2015 WL 10936775, at *1 (W.D. Wis. Aug. 6, 2015) (gender identity disorders expressly excluded from coverage under the ADA); *Diamond v. Allen*, 2014 WL 6461730, at *4 (M.D. Ga. Nov. 17, 2014) (same); *Kastl v. Maricopa Cty. Cmty. Coll. Dist.*, 2004 WL 2008954, at *4, *4 n. 2 (D. Ariz. June 3, 2004) (equating "gender identity disorder" and "gender dysphoria" and holding them to be expressly excluded from definition of "disability"). Courts following this approach have tended to presume that the plaintiff's gender dysphoria or other gender identity disorders do not result from any condition that could be considered a "physical impairment."

The second approach stands in sharp contrast.  In *Blatt v. Cabela's Retail, Inc.,* the district court held that gender dysphoria falls outside of the ADA exclusion so long as the condition substantially limits the plaintiff's major life activities.  2017 WL 2178123, at *4 (E.D. Pa. May 18, 2017).  *See also Doe v. Triangle Doughnuts, LLC*, 472 F. Supp. 3d 115, 134-35 (E.D. Pa. 2020) (applying the same reasoning as *Blatt* in an ADA hostile work environment claim).  The *Blatt* court reasoned that in enacting the ADA's exclusion for gender identity disorders, Congress was truly concerned with making sure that "non-disabling conditions that concern sexual orientation or identity" were not covered.  *Id.* at 3.  Because the plaintiff alleged her gender dysphoria substantially limited her major life activities of "interacting with others, reproducing, and social and occupational

functioning," the court determined that the plaintiff's gender dysphoria was disabling, and therefore the plaintiff's gender dysphoria was not encompassed by the § 12111(b)(1) exclusion.  *Id.* at *4.

Other courts have criticized the *Blatt* court's interpretation of the exclusion as lacking any textual or other support.  *See, e.g., Parker v. Strawser Constr., Inc.*, 307 F. Supp. 3d 744, 754 (S.D. Ohio 2018).  In *Parker*, the court observed that "[t]he exclusion plainly applies to all "gender identity disorders not resulting from physical impairments," without any regard to whether the gender identity disorder is disabling.  The *Parker* court concluded that the *Blatt* interpretation would render the exclusionary language superfluous.  *Parker* observed that, according to the *Blatt*,

> whether a condition is "disabling," … depends on whether the condition substantially limits one or more major life activities.  But limitation of major life activities is a requirement for all conditions qualifying as a "disability" under the ADA. 42 U.S.C. § 12101(1).  Thus, gender identity disorders that do not substantially limit a major life activity are already excluded from coverage, and an additional exclusion for any non-disabling condition would be superfluous.

*Parker,* 307 F. Supp. 3d at 754 (citing *Daniel v. Cantrell*, 375 F.3d 377, 383 (6th Cir. 2004) (holding that courts may not ignore any part of a statute's text)).

A third approach recognizes that a physical etiology underlying gender dysphoria may exist to place the condition outside of the exclusion for gender identity disorders "not resulting from physical impairments."  *Doe v. Massachusetts Dep't of Corr.*, 2018 WL 2994403, at *6 (D. Mass. June 14, 2018).  *See also Tay v. Dennison*, 2020 WL 2100761, at *3 (S.D. Ill. May 1, 2020) (slip copy) (allowing the ADA claim to proceed because the "court cannot categorically say that gender dysphoria falls within the ADA's exclusionary language"); *Shorter v. Barr*, 2020 WL 1942785, at *9 (N.D. Fla. Mar. 13, 2020) *report and recommendation adopted*, 2020 WL 1942300 (Apr. 22, 2020) (the Rehab "Act exempts from the definition of disability not all gender identity disorders but only those 'gender

17

identity disorders not resulting from physical impairments.'"). This third approach acknowledges that courts typically lack sufficient expertise in physiology, etiology, psychiatry, and other potentially relevant disciplines to determine the cause or causes of gender dysphoria. Indeed, the court in *Doe* wrote that it would not be confident identifying the cause of gender dysphoria "without the aid of expert testimony." *Doe*, 2018 WL 2994403, at *7. Under this view, therefore, courts should rarely hold as a matter of law, based on a plaintiff's complaint alone, that a plaintiff's gender dysphoria is or is not the result of a physical impairment.

This approach also remains faithful to the plain meaning of the statute, which expressly contemplates that only gender disorders that result from physical impairments are considered a disability under the ADA and the Rehab Act. Similarly, it avoids reading relevant language out of the exclusion. In matters of statutory construction, the Supreme Court has directed that courts "are obliged to give effect, if possible, to every word Congress used." *Lowe v. SEC*, 472 U.S. 181, 207 n. 53, 105 S.Ct. 2557, 86 L.Ed.2d 130 (1985). Justice Scalia and Garner refer to this as the "Surplusage Canon." *See* Antonin Scalia & Bryan A. Garner, READING LAW: THE INTERPRETATION OF LEGAL TEXTS, 174 (2012) ("If possible, every word and every provision is to be given effect (*verba cum effectu sunt accipienda*)"). While giving meaning to every word in the exclusion, this interpretation allows room for medical, scientific, and expert input regarding the application of the language of the statute to conditions such as gender dysphoria.

The merit of this third approach is illustrated by the district court's analysis in *Doe v. Massachusetts Department of Corrections*, a case that presented claims directly analogous to Doe's in this case. The Massachusetts Department of Corrections moved to dismiss the plaintiff's complaint based on the "gender identity disorder" exclusion of § 12211(b)(1). The district court denied the motion, reasoning that factual issues exist regarding whether gender dysphoria "may result from

18

physical causes." 2018 WL 2994403, at *6.  Acknowledging that "[w]hile medical research in this area remains in its initial phases, … recent studies demonstrat[e] that [gender dysphoria] diagnoses have a physical etiology, namely hormonal and genetic drivers contributing to the in utero development of dysphoria." *Id.* (citing Plaintiff's Brief and Christine Michelle Duffy, *The Americans With Disabilities Act of 1990 and the Rehabilitation Act of 1973, in* GENDER IDENTITY AND SEXUAL ORIENTATION DISCRIMINATION IN THE WORKPLACE: A PRACTICAL GUIDE (Christine Michelle Duffy ed., Bloomberg BNA 2014)).  The court also noted that a "further distinction can be made between the definition given in DSM-IV of 'gender identity disorders,' and that now given in DSM-V of 'gender dysphoria.'"  *Id.*  "In contrast to DSM-IV, which had defined "gender identity disorder" as characterized by a "strong and persistent cross gender-identification" and a "persistent discomfort" with one's sex or "sense of inappropriateness" in a given gender role, the diagnosis of [gender dysphoria] in DSM-V requires attendant disabling physical symptoms, in addition to manifestations of clinically significant emotional distress."  *Id.* Ultimately, the district court denied the Department of Corrections' motion to dismiss, holding that "the continuing re-evaluation of [gender dysphoria] underway in the relevant sectors of the medical community is sufficient, for present purposes, to raise a dispute of fact as to whether Doe's [gender dysphoria] falls outside the ADA's exclusion of gender identity-based disorders as they were understood by Congress twenty-eight years ago." *Id.* at *7.  *See also Iglesias v. True*, 403 F. Supp. 3d 680, 687-88 (S.D. Ill. 2019) (allowing claim to proceed at screening pursuant to 28 U.S.C. § 1915A because the court could not "categorically say that gender dysphoria falls within the [Rehab Act's] exclusionary language and will err on the side of caution").  This same analysis supports denial of the DOC's motion to dismiss Doe's ADA and Rehab Act claims in this case.

This interpretation of the "gender identity disorder" exclusion is also supported by federal regulations implementing § 504 of the Rehab Act.  In May 1977, the Department of Health,

Education, and Welfare[6] promulgated a regulation implementing § 504, which defined "physical or mental impairment" as "(A) any physiological disorder or condition, cosmetic disfigurement, or anatomical loss affecting one or more of the following body systems: neurological; musculoskeletal; special sense organs; respiratory, including speech organs; cardiovascular; reproductive, digestive; genito-urinary; hemic and lymphatic; skin; and endocrine; or (B) any mental or psychological disorder, such as mental retardation, organic brain syndrome, emotional or mental illness, and specific learning disabilities." 42 Fed. Reg. 22676, 22678 (May 4, 1977). This regulation—in effect when Congress was considering and eventually passed the ADA in 1990—emphasized the disability definition's broad coverage, adding that the regulation "made explicit the inclusion of any condition which is mental or physical but whose precise nature is not at present known." *Id.*, 22686. This left room for new scientific developments. Congress in the ADA required courts "to construe the ADA to grant at least as much protection as provided by the regulations implementing the Rehabilitation Act." *Bragdon v. Abbott*, 524 U.S. 624, 631-32, 118 S.Ct. 2196, 141 L.Ed.2d 540 (1998) (citing 42 U.S.C. § 12201(a)).[7]

Accordingly, it is reasonable to read this broad definition of physical impairment into the ADA. "When administrative and judicial interpretations have settled the meaning of an existing statutory provision, repetition of the same language in a new statute indicates, as a general matter, the intent to incorporate its administrative and judicial interpretations as well." *Bragdon*, 524 U.S. at

---

[6] This agency became the Department of Health and Human Services (HHS) on May 4, 1980, when the Department of Education became a separate administrative agency. *See* U.S. Dep't of Hlth. & Human Serv., "HHS Historical Highlights," (Jan. 21, 2021) available at: https://www.hhs.gov/about/historical-highlights/index.html#:~:text=The%20Department%20of%20Health%2C%20Education,)%20on%20May%204%2C%20201980.&text=The%20Health%20Care%20Financing%20Administration%20was%20created%20to%20manage%20Medicare,from%20the%20Social%20Security%20Administration. (last accessed Feb. 15, 2021).

[7] The Supreme Court reasoned that this is because "[t]he ADA's definition of disability is drawn almost verbatim from the definition of 'handicapped individual' included in the Rehabilitation Act…Congress' repetition of a well-established term carries the implication that Congress intended the term to be construed in accordance with pre-existing regulatory interpretations." *Id.*, at 631 (citing *FDIC v. Philadelphia Gear Corp.*, 476 U.S. 426, 437-38, 106 S.Ct. 1931, 90 L.Ed.2d 428 (1986)) (other citations removed).

645.  Similarly, Justice Scalia and Garner wrote, "when a statute uses the very same terminology as an earlier statute—especially in the very same field, such as securities law or *civil-rights law*—it is reasonable to believe that the terminology bears a consistent meaning."  Scalia & Garner, READING LAW, 323 (emphasis added).  The Prior Construction Canon also applies to well-established agency interpretations.  *See, e.g., FDIC v. Philadelphia Gear Corp.*, 476 U.S. 426, 437, 106 S.Ct. 1931, 90 L.Ed.2d 428 (1986); *NLRB v. Bell Aerospace*, 416 U.S. 267, 275, 94 S.Ct. 1757, 40 L.Ed.2d 134 (1974).  In this case, it is appropriate to conclude that Congress intended that a physical impairment for purposes of § 12211(b) should be read broadly and consistent with Rehab Act regulations.

Denial of the DOC's motion on the foregoing grounds is also prudent given the constitutional issues that would arise if the Court were to adopt the DOC's categorical approach to the exclusion.  As the district court in *Doe v. Massachusetts Department of Corrections* noted, reading the ADA's exclusionary provision to bar the plaintiff's claim in that case would have raised serious constitutional concerns under the Equal Protection Clause of the Fourteenth Amendment.  The court explained:

> It has long been recognized that where the government draws a distinction "against a historically disadvantaged group and [where that distinction] has no other basis, Supreme Court precedent marks this as a reason undermining rather than bolstering the distinction." *Massachusetts v. U.S. Dep't of Health & Human Servs.*, 682 F.3d 1, 14 (1st Cir. 2012) (citing *Plyler v. Doe*, 457 U.S. 202, 227 (1982), and *Romer v. Evans*, 517 U.S. 620, 635 (1996)).  The reason for heightened judicial sensitivity in this context lies in the painful lessons taught by our history, that "discrete and insular minorities" have often been unable to rely upon the political process to provide them with protection, *see United States v. Carolene Prods Co.*, 304 U.S. 144, 152 n. 4 (1938); see generally JOHN HART ELY, DEMOCRACY AND DISTRUST: A THEORY OF JUDICIAL REVIEW (1980).

*Id.*

Because these same constitutional concerns are potentially presented by this case, the Court should proceed according to the prudential doctrine of constitutional avoidance.  Under this doctrine, a court has a duty where "a serious doubt of constitutionality is raised" with respect to a statutory provision to "first ascertain whether a construction of the statute is fairly possible by which [a constitutional] question may be avoided."  *Ashwander v. Tenn. Valley Auth.*, 297 U.S. 288, 348 (1936) (Brandeis, J., concurring) (quoting *Crowell v. Benson*, 285 U.S. 22, 62 (1932)).  This doctrine does not compel a court to "adopt[ ] implausible constructions" of a statute or to otherwise "rewrite it."  *Jennings v. Rodriguez*, 138 S. Ct. 830, 836 (2018).  Here, however, in light of the recommended holding that a plausible inference exists that Doe's gender dysphoria arises from physical impairments and is not merely another term for "gender identity disorder," the constitutional avoidance doctrine "permits a court to 'choos[e] between competing plausible interpretations of a statutory text.'"  *Id.* at 843 (quoting *Clark v. Martinez*, 543 U.S. 371, 381 (2005)).  "[W]hen faced with two plausible constructions of a statute—one constitutional and the other unconstitutional—" courts are "to choose the constitutional reading."  *Voisine v. United States*, -- U.S. --, 136 S.Ct. 2272, 2290, 195 L.Ed.2d 736 (2016).  *See also United States v. Dwinells*, 508 F.3d 63, 70 (1st Cir. 2007) (as between two plausible constructions of a statute, an inquiring court should avoid a constitutionally suspect one in favor of a constitutionally uncontroversial alternative.").  In accordance with the doctrine of constitutional avoidance, the interpretation of § 12211(b)(1) recommended herein obviates the need for the Court to reach the equal protection issue that would arise from a different approach.

> b.  Doe's Amended Complaint sufficiently alleges that a physical impairment causes their gender dysphoria.

Although Doe's Amended Complaint does not specifically allege that their gender dysphoria is rooted in some physical component, the Amended Complaint does explain that Doe's diagnosis is

based on the DSM-V.  ECF No. 33, ¶ 24.  Doe's brief argues that the DSM-V provides evidence of a physical source, noting the American Psychiatric Association's 2013 revisions from the DSM-IV to DSM-V which "introduce[d] the diagnosis of 'Gender Dysphoria.'"  ECF No. 44, p. 6 (citing DSM-V, pp. 451–59 for scientific evidence of a physiological etiology).

As the *Doe v. Massachusetts Department of Corrections* court noted, "the continuing re-evaluation of [gender dysphoria] underway in the relevant sectors of the medical community" raises factual disputes over § 12211(b)'s application to the condition.  2018 WL 2994403, at *7.  This Court also finds that Doe has plausibly alleged facts that may place their gender dysphoria outside of the statutory exclusion.

c.   Doe sufficiently pleads the remaining elements of their ADA and Rehab Act claims.

The DOC argues that even if Doe's gender dysphoria qualifies as a disability, Doe's ADA and Rehab Act "claims fail on the merits" because they have not alleged that they were "excluded from a DOC program or service *because* of a disability."  ECF No. 38, pp. 10-11 (emphasis in original).  The DOC also challenges Doe's pleading of the ADA's causation element.  The Court disagrees on both points.  The facts alleged in the Amended Complaint support a reasonable inference that Doe was "precluded from participating in a program, service, or activity, or otherwise was subject to discrimination, by reason of [their] disability"—Doe's gender dysphoria.  *See Furgess v. Pa. Dep't of Corr.*, 933 F.3d 285, 288-89 (3d Cir. 2019); 42 U.S.C. § 12132; 29 U.S.C. § 794(a).

The ADA provides that,

> Subject to the provisions of this subchapter, no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity.

42 U.S.C. § 12132.

23

"State prisons fall squarely within the statutory definition of 'public entity,'" and thus, must provide "services, programs, or activities" in accordance with the ADA's requirements. *See Pa. Dep't of Corr. v. Yeskey*, 524 U.S. 206, 210 (1998). Modern prisons provide "recreational 'activities,' medical 'services,' and educational and vocational 'programs.'" *Id.* The phrase "service, program, or activity" under Title II of the ADA, like "program or activity" under Section 504 of the Rehab Act, is "extremely broad in scope and includes anything a public entity does." *Disability Rights N.J., Inc. v. Comm'r, N.J. Dep't of Human Servs.*, 796 F.3d 293, 301 (3d Cir. 2015). In the present case, necessary medical services, housing, restroom facilities, exercise equipment and access, and commissary products all qualify as services, programs, or activities, under the broad statutory definition. 42 U.S.C. § 12132. *See, e.g., Furgess*, 933 F.3d at 291 (holding that prison showers fall within scope of definition of program).

The DOC also argues that the allegations of the Amended Complaint do not support an inference that Doe was discriminated against "because of a disability." ECF No. 38, pp. 10-11 (emphasis in original). "Causation standards are different under the ADA and [Rehab Act]—under the [Rehab Act], the disability must be the sole cause of the discriminatory action, while the ADA only requires but-for causation." *Furgess*, 933 F.3d at 291 n. 25 (citing *CG v. Pa. Dep't of Educ.*, 734 F.3d 229, 236 n. 11 (3d Cir. 2013)). "An inmate's failure to allege facts showing that the exclusion or denial of benefits was 'by reason of his disability' warrants dismissal upon a defendant's Rule 12(b)(6) motion." *Desalis v. Pennsylvania Dep't of Corr.*, 2013 WL 2458346, at *2 (E.D. Pa. June 6, 2013). *See also Ali v. Governor of Dela.*, 777 Fed. Appx. 584, 588-89 (3d Cir. 2019) (affirming district court's grant of summary judgment on ADA claim when prisoner plaintiff failed to show how, even assuming bathrooms in law library buildings were inaccessible to him, that excluded him from a program, service, or activity, or how this was discrimination because of his disability). The ADA provides that disability discrimination can take the form of denial or unequal equal provision of

services to the disabled because of a disability or a failure to accommodate.  *Taylor v. Phoenixville School Dist.*, 184 F.3d 296, 306 (3d Cir. 1999).  "Discrimination under the ADA encompasses not only adverse actions motivated by prejudice and fear of disabilities, but also includes failing to make reasonable accommodations for a plaintiff's disabilities."  *Id. See also* 28 C.F.R. § 35.130(b)(1)(i)-(iv).

The Amended Complaint alleges facts to support an inference that the DOC denied Doe necessary medical services because of Doe's disability.  The facts alleged also support an inference that the DOC denied Doe reasonable accommodations, such as housing accommodations.  The Amended Complaint alleges that the DOC allows "other individuals," including "some transgender men at SCI-Cambridge Springs" to choose their own roommates.  ECF No. 33, ¶ 160.  A public entity may not "[p]rovide different or separate aids, benefits, or services to individuals with disabilities or to any class of individuals with disabilities than is provided to others."  28 C.F.R. § 35.130(b)(1)(iv).  At the pleadings stage, this differential treatment is enough to state a claim.  *See Olson v. Meyers*, 2004 WL 1280353, at *2 (N.D. Ill. June 8, 2004) (granting summary judgment when prisoner plaintiff "offered no evidence that he received any differential treatment or that he was denied any reasonable accommodation because of his diabetes.").

The DOC also asks that the Court parse the various accommodations Doe has requested and determine whether each is "reasonable."  ECF No. 38, pp. 11-12.  The ADA does not require that accommodations to a disability be "optimal" or "finely tuned to [the inmate's] preferences."  *Nunes v. Mass. Dep't of Corr.*, 766 F.3d 136, at 146 (1st Cir. 2014).  But a plaintiff "need only show that an 'accommodation' seems reasonable on its face, i.e., ordinarily or in the run of cases."  *See U.S. Airways, Inc. v. Barnett*, 535 U.S. 391, 401, 122 S.Ct. 1516, 152 L.Ed.2d 589 (2002).  A wide range of considerations inform the decision whether a requested accommodation is "reasonable."  *Id.* at 400-401, 122 S.Ct. 1516 ("an effective accommodation could prove unreasonable because of its

impact").  This analysis is fact-based and more appropriately undertaken on a developed factual record rather than at the motion to dismiss stage.  A developed record will allow the Court to analyze of the reasonableness and effectiveness of each accommodation sought by Doe.  *See Baxter v. Pa. Dep't of Corr.*, 661 Fed. Appx. 754, 757 (3d Cir. 2016) (affirming district court holding that previously provided accommodation was reasonable on summary judgment record).  For now, the Amended Complaint adequately supports both ADA and Rehab Act claims against the DOC.

For the foregoing reasons, the DOC's motion to dismiss Doe's ADA and Rehab Act claims should be denied.

2.   The motion to dismiss Count V of the Amended Complaint against Defendant Blakely should be granted.

Count V of the Amended Complaint asserts that Blakely and Anderson violated Doe's Fourteenth Amendment right to privacy by "disclosing and failing to take adequate measures to protect against disclosure of information relating to Mx. Doe's gender identity and mental health [and] infringed on Mx. Doe's right to privacy for no legitimate penological purpose."  ECF No. 33, ¶ 181.  The factual allegations upon which Doe bases this claim against Anderson focus on an exchange between Doe and Anderson in 2018 when Anderson was present outside of Doe's cell door.  The Amended Complaint alleges that on that occasion, Anderson "loudly began discussing Mx. Doe's gender dysphoria and testosterone treatment" despite Doe not being publicly "out" as gender nonbinary at the time.  *Id.*, ¶¶ 114, 116.  Other inmates and staff overheard Anderson's statements concerning Doe's private medical information and, in response to this information, began to harass Doe.  *Id.* at ¶ 117,119.

The factual allegations upon which Doe bases this claim against Blakely are materially different.  The Amended Complaint alleges that Doe went to Blakely's office and informed her of

Doe's self-mutilation, all behind closed doors with "no incarcerated people…close enough to overhear their conversation." *Id.* at ¶ 128-29.  Blakely then informed Captain Deal, and Doe was transferred to the medical department.  *Id.* at ¶ 130.  Soon after, Doe experienced serious sexual harassment by other inmates "on the basis of their gender identity and act of self-harm."  *Id.* at ¶ 131-32.

The DOC Defendant's motion to dismiss does *not* challenge the legal sufficiency of the Fourteenth Amendment right to privacy claim against Anderson.  This claim will proceed against Anderson.  However, the DOC Defendants contend that this claim should be dismissed against Blakely because the facts alleged in the Amended Complaint do not support her "personal involvement" in any improper disclosure.   ECF No. 38, p. 14.  They argue that Doe has not presented "any facts to indicate Defendant Blakely personally disseminated or otherwise failed to properly safeguard their medical information." *Id.*, p. 15.  The only disclosure by Blakely alleged in the Amended Complaint occurred when she notified Security Captain Deal of Doe's self-injury. This disclosure, however, was necessary to facilitate Doe's transportation to the Medical Department.  The allegations of the Amended Complaint also make clear that medical personnel at the prison also necessarily learned of Doe's self-inflicted injuries when they treated those injuries. Whether medical personnel learned this information from Blakely, Captain Deal, or from their own examination of or interaction with Doe, the disclosure to medical personnel cannot be regarded as improper.  The issue is whether the facts alleged in the Amended Complaint support a reasonable inference that Blakely disclosed Doe's private medical information to other inmates or personnel who did not have a legitimate need to know that information.  They do not.

A defendant in a § 1983 action "must have personal involvement in the alleged wrongs to be liable and cannot be held responsible for a constitutional violation which he or she neither

participated in nor approved." *Saisi v. Murray*, 822 Fed. Appx. 47, 48 (3d Cir. 2020) *petition for cert.*
*filed*, (Dec. 31, 2020) (No. 20-7011) (quoting *Baraka v. McGreevey*, 481 F.3d 187, 210 (3d Cir. 2007)
(citations removed).   It is the plaintiff's burden to "show that each and every defendant was
'personal[ly] involve[d]' in depriving him of his rights."   *Kirk v. Roan*, 2006 WL 2645154, at *3 (M.D.
Pa. Sept. 14, 2006) (quoting *Evancho v. Fischer*, 423 F.3d 347, 353 (3d Cir. 2006)).   Allegations that
broadly implicate multiple defendants without delineating individual conduct are legally insufficient.
See *Van Tassel v. Piccione*, 608 Fed. Appx. 66, 69-70 (3d Cir. 2015).

Determining whether Blakely was personally involved requires that the Court examine the
legal elements of this claim.   Two types of privacy rights are traditionally protected under the
Fourteenth Amendment: "confidentiality rights"—i.e., "the individual interest in avoiding disclosure
of personal matters," and "autonomy rights"—"the interest in independence in making certain kinds
of important decisions.'" *Malleus v. George,* 641 F.3d 560, 564 (3d Cir. 2011) (citing *Whalen v. Roe*, 429
U.S. 589, 599–600 (1977); *C.N. v. Ridgewood Bd. of Educ.*, 430 F.3d 159, 178 (3d Cir. 2005)).   In this
case, Doe alleges a violation of their confidentiality rights.   The touchstone of the analysis is
"whether [the disclosure is] within an individual's reasonable expectations of confidentiality.   The
more intimate or personal the information, the more justified is the expectation that it will not be
subject to public scrutiny."   *Id.* (quoting *Fraternal Order of Police v. City of Philadelphia*, 812 F.2d 105,
112–13 (3d Cir.1987)).   While not an exhaustive list, the Third Circuit has defined six categories of
protected information: (1) a private employee's medical information when sought by the
government, (2) medical, financial and behavioral information relevant to a police investigator's
ability to work in dangerous and stressful situations, (3) prescription records of a public employee,
(4) a minor's pregnancy status, (5) sexual orientation, and (6) an inmate's HIV status.   *Id.* at 564-65
(citing *United States v. Westinghouse Elec. Corp.*, 638 F.2d 570, 577 (3d Cir. 1980); *Fraternal Order of Police
v. City of Philadelphia*, 812 F.2d 105, 113-16 (3d Cir. 1987); *Doe v. Southeastern Pa. Trans. Auth.*, 72 F.3d

1133, 1138 (3d Cir. 1995); *Gruenke v. Seip*, 225 F.3d 290, 301 (3d Cir. 2000); *Sterling v. Borough of Minersville*, 232 F.3d 190, 196 (3d Cir. 2000); *Doe v. Delie*, 257 F.3d at 309, 317, 323 (3d Cir. 2001)).

Inmates retain a substantive due process right to privacy in medical information. *Delie*, 257 F.3d at 323. Gender nonconforming individuals in prison face uniquely sensitive concerns regarding the privacy of their medical information. *See Powell v. Schriver*, 175 F.3d 107, 109 (2d Cir. 1999).[8] Nevertheless, this right is not absolute; it is "subject to substantial restrictions and limitations in order for correctional officials to achieve legitimate correctional goals and maintain institutional security." *Id.* at 317. "Specifically, an inmate's constitutional right may be curtailed by a policy or regulation that is shown to be 'reasonably related to legitimate penological interests.'" *Id.* (citing *Turner v. Safley*, 482 U.S. 78, 89 (1987); *DeHart v. Horn*, 227 F.3d 47, 51 (3d Cir. 2000)).

As noted, the Amended Complaint alleges only one instance when Blakely disclosed Doe's confidential information. This was Blakely's informing Captain Deal regarding Doe's self-mutilation, which although not apparently pursuant to a particular DOC policy, served a clear penological interest—ensuring that Doe receive care in the medical department—and only minimally intruded on Doe's privacy interest. Indeed, it is difficult to conceive of how a correctional institution could properly function if internal communications of relevant medical information such as occurred between Blakely and Deal are treated as violations of a prisoner's Fourteenth Amendment rights. In any event, the disclosure to Deal is not the basis for Doe's claim against Blakely.

Instead, Doe posits that the information about their act of self-harm could not have become known among the prison population without Blakely's personal involvement. However, even

---

[8] Though *Powell v. Schriver* is a Second Circuit case, it has been cited by the Third Circuit for the separate and related conclusion that one's sexual orientation is intrinsically private. *See Sterling v. Borough of Minersville*, 232 F.3d 190, 200 (3d Cir. 2000).

construing the facts alleged in the Amended Complaint in the light most favorable to Doe, the inference of Blakely's improper disclosure that Doe suggests is not reasonable.  Indeed, it is pure speculation and undermined by Doe's own allegations.  The Amended Complaint alleges that Blakely, upon being told about Doe's self-harm, immediately informed Captain Deal, and Doe was transferred to the medical department.  These factual allegations in no way infer that Blakely disclosed Doe's confidential information to other inmates or otherwise mishandled the information. Doe's own allegations acknowledge that their confidential information immediately and necessarily became known to other prison personnel who had a legitimate need to know about their injuries and the condition that caused or precipitated those injuries.  Thus, Doe's speculation that the disclosure "must" have been by Blakely is not supported by the facts Doe alleges.  Countless other plausible explanations exist to explain how the information found its way to other inmates.  The Amended Complaint does not allege facts to support that Blakely personally participated in any improper disclosure or mishandling of Doe's information.  Accordingly, Doe's Fourteenth Amendment claim against Blakey should be dismissed.

3. Although Doe's allegations are sufficient to state an IIED claim against certain of the DOC Defendants, the claim is barred by sovereign immunity as to all DOC Defendants.

Count IV of Doe's Amended Complaint asserts a state law claim for intentional infliction of emotional distress (IIED) against Defendants Rich, Wagner, Oliver, Blakely, and Anderson.[9]  In their motion, the DOC Defendants argue that Doe's allegations are legally insufficient to support this claim and, alternatively, that the claim is barred by sovereign immunity.  ECF No. 38, pp. 11–13. Three categories of conduct are alleged in support of this claim.  First, the Amended Complaint alleges that Anderson and Blakely intentionally disclosed Doe's confidential medical information to inmates.  Second, the Amended Complaint alleges that Rich, Wagner, and Oliver placed Doe at risk

---

[9] The Court has supplemental jurisdiction over Doe's state law claim pursuant to 28 U.S.C. § 1367.

of serious harm by refusing to move their housing assignment after being notified that inmates who had threatened to harm or kill Doe had access to that unit.  Finally, Doe bases this claim upon the failure of Rich, Wagner, and Oliver "to punish individuals for subsequent harassment and threats." ECF No. 33, ¶ 179.  The Court will separately analyze each category of conduct according to the elements of an IIED claim before addressing the DOC Defendants' sovereign immunity defense.

  a. The allegations of the Amended Complaint state an IIED claim as to some but not all Defendants.

  The Pennsylvania Supreme Court has never explicitly recognized the tort of IIED under Pennsylvania law.  *See, e.g., Taylor v. Albert Einstein Med. Ctr.*, 562 Pa. 176, 754 A.2d 650, 652 (Pa. 2000).  The Third Circuit, however, has predicted that the Supreme Court of Pennsylvania would adopt IIED as a cause of action as set forth in Section 46 of the Restatement (Second) of Torts. *Williams v. Guzzardi*, 875 F.2d 46, 50–51 (3d Cir.1989) (discussing *Chuy v. Phila. Eagles Football Club*, 595 F.2d 1265, 1273 (3d Cir. 1979) (en banc)).  Applying Section 46, the Third Circuit identified the following elements a plaintiff must demonstrate to prevail on an IIED claim: (1) the Defendant's conduct was extreme and outrageous; (2) his conduct caused the plaintiff severe emotional distress; and (3) he acted intending to cause that person such distress or with knowledge that such distress was substantially certain to occur.  *Brown v. Muhlenberg Twp.*, 269 F.3d 205, 217-18 (3d Cir. 2001) (citing Restatement (Second) of Torts § 46 (1965)).

  Liability on an IIED claim "has been found only where the [defendant's] conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community."  *Field v. Phila. Elec. Co.*, 388 Pa. Super. 400, 565 A.2d 1170, 1184 (1989).  "It is the court's responsibility to determine if the conduct alleged in a cause of action reaches the requisite level of outrageousness." *Andrews v. City of Philadelphia*, 895 F.2d 1469, 1487 (3d Cir. 1990).  While the "outrageous" and

"extreme" conduct bar is high, Doe's allegations state a plausible IIED claim against Anderson based on her disclosure of Doe's gender dysphoria and private medical information to other inmates at SCI-Cambridge Springs. The allegations of the Amended Complaint support inferences that Anderson, as the Corrections Healthcare Administrator, understood the sensitivity of Doe's medical information and that she knowingly discussed this information in a setting where it would be overheard by other inmates. It is also reasonable to infer from the facts alleged in the Amended Complaint that Anderson knew that Doe's gender dysphoria would make Doe a target for harassment. And, as further alleged in the Amended Complaint, Doe experienced gender identity-based harassment and threats by inmates soon after Anderson's alleged disclosure. ECF No. 33, ¶¶ 117–119, 133–38.

Disclosure of a plaintiff's sexual orientation and transgender identity status has previously been found to constitute conduct sufficiently outrageous and extreme to support an IIED claim. In *Grimes v. County of Cook*, for example, the district court found that the plaintiff stated an IIED claim based on allegations that the plaintiff's supervisor disclosed to his coworkers and others that he was a transgender man. 455 F. Supp. 3d 630, 640-41 (N.D. Ill. Apr. 23, 2020). Although *Grimes* was decided under Illinois law, the district court's discussion reflected elements of an IIED claim identical under Illinois law and Pennsylvania law. *See id.* The plaintiff in *Grimes* alleged that the disclosure was made with reckless disregard for the consequences, and that the plaintiff suffered severe emotional distress, fears for his safety, and other health concerns. *Id.*, at 641.

In *Minor v. Dilks*, the district court denied a motion to dismiss an IIED claim when two corrections officer defendants revealed that a prisoner was gay and there was specific evidence that this was done "for the purpose of causing his harassment in a hostile environment." 2020 WL 133278, at *9 (D.N.J. Jan. 13, 2020) (slip copy) (applying New Jersey law). There, the complaint

alleged that one corrections officer "disclosed Plaintiff's sexual orientation to other unit officers in hopes of provoking an incident" and the plaintiff was in fact harassed by other officers. *Id.*, at *3. Another corrections officer had the plaintiff placed in a cell with a Muslim inmate and members of the Bloods street gang because he believed this would cause a conflict. *Id.*, at *4.  Doe cites this case for the proposition that disclosing an inmate's sexual orientation alone is extreme and outrageous, but the better reading is that the defendants' disclosure that the inmate plaintiff was gay plus specific evidence that the defendants took actions to use that information to provoke conflicts within the prison stated an IIED claim.  *See also Hernandez v. Quinn*, 2018 WL 3135302 at *1-2, *29-30 (Pa. Super. Ct. 2018) (unpublished) (reinstating IIED claim alleging that the defendant, an attorney, had distributed the plaintiff's private medical and psychiatric records, a naked photograph, and civil deposition to other lawyers, the press, and the public).

While the circumstances of Anderson's alleged disclosure of Doe's private information differ in many respects from those analyzed in the cited cases, the principles recognized in those cases are sufficiently applicable to sustain the IIED claim against Anderson at the pleading stage of this action.  This, however, is not the case for the allegations against Unit Psych Counselor Blakely.  As previously explained, the facts alleged do not support a reasonable inference that Blakley disclosed Doe's self-mutilation or other private medical information to other inmates or personnel who did not have a legitimate need to know the information.  *See supra*, Section D(2).  Accordingly, Doe's IIED claim against Blakey fails for the same reasons as Doe's privacy claim against Blakely.

The DOC Defendants' motion to dismiss also should be granted to the extent that Doe's Amended Complaint bases the IIED claim against Rich, Wagner, and Oliver on their "fail[ure] to punish individuals for subsequent harassment and threats" regarding Doe's gender identity and medical condition.  ECF No. 33, ¶ 179.  While the alleged failure of these three Defendants to

discipline subordinates may represent negligent supervision, it does not rise to the level of extreme or outrageous conduct necessary to support an IIED claim. The facts alleged do not support a reasonable inference that these Defendants failed to supervise subordinates with the intent to allow Doe to be harassed or attacked or to cause Doe emotional distress or with knowledge that such distress was substantially certain to occur. This alleged failure to act also falls well short of the outrageous and extreme conduct necessary to state an IIED claim. Indeed, the extreme and outrageous requirement of an IIED claim is a higher standard than "deliberate indifference." *Bryan v. Erie Cty. Office of Children & Youth*, 861 F. Supp. 2d 553, 587 (W.D. Pa. 2012). The facts alleged regarding the Defendants' failure to properly supervise their subordinates do not meet this standard; these facts simply would not cause "an average member of the community" to "arouse his resentment against the actor[s], and lead him to exclaim, 'Outrageous!'" *Kazatsky v. King David Mem'l Park*, 527 A.2d 988, 991, 994 (Pa. 1987). Accordingly, this category of alleged conduct does not support an IIED claim

The legal sufficiency of Doe's other IIED claim against Rich, Wagner, and Oliver based on their refusal to reassign Doe to more secure housing is a much closer call. The Amended Complaint alleges that "Defendants Rich, Wagner, and Oliver repeatedly denied Mx. Doe's requests to be removed from" the housing unit even though Doe feared for their life because their housing was "connected to the housing unit of a woman who threatened to kill" them, and the doors between those units "were frequently unlocked" and people "could move between them." ECF No. 33, ¶¶ 149, 150-51, 179. Accepting these facts as true, as the Court must at this stage of the litigation, a factfinder may reasonably infer that these Defendants knowingly exposed Doe to a significant risk of harm at the hands of an inmate who had threatened to kill Doe. The Court is mindful that corrections officials are to be afforded significant discretion in areas of internal prison management such as housing decisions. *See Moody v. Daggett,* 429 U.S. 78, 88 n. 9, 97 S.Ct. 274, 50 L.Ed.2d 236

(1976) ("Congress has given federal prison officials full discretion to control [prisoner classification and corresponding housing assignments]"); *Jones v. Sorbu*, 2021 WL 398494, at *5 (E.D. Pa. Feb. 4, 2021).  The Court also notes that the Amended Complaint does not allege that Doe suffered a physical assault as a result of the Defendants' refusal to move Doe's housing assignment.  Nevertheless, case law supports that what Doe does allege is enough to sustain this claim at the pleading stage of the action.

In *Mattis v. Department of Corrections*, the district court denied a motion to dismiss an IIED claim against two Unit Managers, a counselor, and a Sergeant when "despite his numerous warnings that he would turn violent if placed with a cellmate, Defendants placed an inmate in his cell…resulting in a violent confrontation that caused Plaintiff to suffer injuries to his head, right wrist, left knee, and lower back."  2017 WL 6406884, at *16 (W.D. Pa. Dec. 15, 2017).  The Court allowed his IIED claim to proceed even though it was only "arguable."  *Id.*  Unlike in *Mattis*, the Amended Complaint in this case does not allege that Doe suffered a physical assault because of the Defendants' refusal to adjust housing assignments.  But the Amended Complaint does allege that the Defendants knowingly exposed Doe to identified threats to their safety and that Doe sustained severe emotional distress due to Defendants' conduct.  Therefore, the facts alleged are minimally sufficient to state an IIED claim against Rich, Wagner, and Oliver.

The DOC Defendants also argue that Doe's IIED claim fails against all Defendants because the Amended Complaint does not allege that Doe suffered physical harm due to the Defendants' actions.  ECF No. 38, pp. 13-14.  The weight of authority supports the DOC Defendants' position regarding this requirement of an IIED claim.  Numerous courts have held that, in addition to the three elements discussed above, a plaintiff must also allege "some type of resulting physical harm due to the defendant's outrageous conduct" in order to state an IIED claim under Pennsylvania law.

*Reedy v. Evanson*, 615 F.3d 197, 232 (3d Cir. 2010) (holding that resulting physical harm is an essential element of the claim) (citing *Swisher v. Pitz*, 868 A.2d 1228, 1230 (Pa. Super. Ct. 2005)); *Clark v. Conahan*, 737 F. Supp. 2d 239, 273 (M.D. Pa. 2010) (holding that "in order to state a claim under which relief can be granted for the tort of intentional infliction of emotional distress, the plaintiffs must allege physical injury"); *Rudas v. Nationwide Mut. Ins. Co.*, 1997 WL 11302, at *6 (E.D. Pa. Jan. 10, 1997) (dismissing claim for intentional infliction of emotional distress where the plaintiff had not alleged physical injury); *Hart v. O'Malley*, 436 Pa. Super. 151, 647 A.2d 542 (Pa. Super. 1994) ("it is clear that in Pennsylvania, in order to state a claim under which relief can be granted for the tort of intentional infliction of emotional distress, the plaintiff must allege a physical injury"); *Fewell v. Besner*, 444 Pa. Super. 559, 664 A.2d 577 (Pa. Super. 1995) (affirming the grant of preliminary objections as to plaintiff's claim of intentional infliction of emotional distress where plaintiff failed to allege physical injury). However, this Court and others have interpreted this element as requiring only that the plaintiff suffer some "physical manifestation" of emotional distress to support the claim. *See, e.g., Buttermore v. Loans*, 2016 WL 308875, at *7 (W.D. Pa. Jan. 25, 2016). Here, however, any lack of clarity regarding this element is immaterial to the disposition of the DOC Defendants' motion. Whether the cause of action requires "physical injury," "physical harm," or "physical manifestation," Doe's allegations of weight-loss due to the emotional distress caused by the Defendants' alleged conduct is sufficient to support the claim at the pleading stage. *See* ECF No. 33, ¶ 148.

      b.  Although the facts alleged state an IIED claim against certain of the Defendants, the claim is nevertheless barred by sovereign immunity under Pennsylvania law.

Even assuming the Amended Complaint states an IIED claim against Rich, Wagner, Oliver, or Anderson, the DOC Defendants argue, in the alternative, that each is shielded from liability by state sovereign immunity. ECF No. 38, pp. 11–13. The DOC Defendants are correct.

Sovereign immunity under Pennsylvania law provides state officials and employees with broad immunity from most state-law tort claims when "acting within the scope of their duties…except as the General Assembly shall specifically waive the immunity." 1 Pa. C.S. § 2310. Sovereign immunity "applies to Commonwealth employees in both their official and individual capacities, so long as the employees are 'acting within the scope of their duties.'" *Sears v. McCoy*, 2021 WL 254067, at *7 (M.D. Pa. Jan. 26, 2021). In addition, "sovereign immunity applies even to intentional torts committed by Commonwealth defendants acting in their individual capacities." *Id.* (citing *Story v. Mechling*, 412 F. Supp. 2d 509, 518 (W.D. Pa. 2006), aff'd, 214 Fed. Appx. 161 (3d Cir. 2007)). *See also Mitchell v. Luckenbill*, 680 F. Supp. 2d 672, 682 (M.D. Pa. 2010) ("Unlike employees of municipal agencies who remain liable for intentional torts, employees of Commonwealth agencies are immune from liability even for intentional torts."). The Pennsylvania General Assembly has waived immunity for eight categories of claims, none of which encompass Doe's IIED claim in this case.[10] Thus, so long as Rich, Wagner, Oliver, and Anderson were acting within the scope of their employment at the time of their challenged conduct, each will be immune from liability on Doe's IIED claim.

Whether the Defendants in this case acted within the scope of their employment is determined according to Pennsylvania law. *See Chin v. Chrysler* LLC, 538 F.3d 272, 278 (3d Cir. 2008). On this issue, Pennsylvania follows the Restatement (Second) of Agency §§ 228-235 (Restatement) (1958). *Justice v. Lombardo*, 208 A.3d 1057, 1066-67 (Pa. 2019). Section 228 of the Restatement provides:

---

[10] Sovereign immunity has been waived for cases involving damages caused by: 1) vehicle liability; 2) medical-professional liability; 3) care, custody, or control of personal property; 4) Commonwealth real estate, highways and sidewalks; 5) potholes and other dangerous conditions; 6) care, custody or control of animals; 7) liquor store sales; 8) National Guard activities; and 9) toxoids and vaccines. 42 Pa. Const. Stat. Ann. § 8522.

(1) Conduct of [an employee] is within the scope of employment if, but
  only if:

(a) it is of the kind he is employed to perform;

(b) it occurs substantially within the authorized time and space limits;

(c) it is actuated, at least in part, by a purpose to serve the [employer],
  and

(d) if force is intentionally used by the [employee] against another, the
  use of force is not unexpectable by the [employer].

Restatement (Second) of Agency § 228(1) (1958).  "On the other hand, an employee's conduct 'is

not within the scope of employment if it is different in kind from that authorized, far beyond the

authorized time or space limits, or too little actuated by a purpose to serve the master.'"  *Justice*, 208

A.3d at 1067 (citing Restatement (Second) of Agency 228(2)).

Where more than one inference may be drawn from the facts, the issue of whether an

employee was acting within the scope of employment is for the jury.  *Justice*, 208 A.3d at 1068 (citing

*Iandiorio v. Kriss & Senko Enterprises, Inc.*, 512 Pa. 392, 517 A.2d 530, 534 (1986)).  In this case,

however, Doe's allegations place the conduct of each of the Defendants squarely within the scope of

their employment.  Because the facts and inferences are not in dispute, this means the Court may

decide the question as a matter of law.  *See Justice*, 208 A.3d at 1068 (citing *Orr v. William J. Burns

Intern. Detective Agency*, 337 Pa. 587, 12 A.2d 25, 27 (1940)).

When Anderson discussed Doe's sensitive medical information, allegedly in earshot of other

inmates, she did so within the prison itself and during normal hours of employment.  Doe does not

allege that Anderson engaged in this discussion outside of authorized time or space limitations.

And, given her position as the Corrections Healthcare Administrator, Anderson's discussion with

Doe is interaction she would be expected to perform as part of her job; this is a function that, at

least in part, serves her employer.  Where "the servant…does the kind of act which he is authorized

to perform within working hours and at an authorized place, there is an inference that he is acting

38

within the scope of employment." Restatement (Second) of Agency § 235 (1958) cmt. A. The same is true for Rich, Wagner, and Oliver regarding their refusal to reassign Doe to a different housing unit of the prison. Indeed, as previously noted, such decisions fall within the core functions of the prison and the discretion of prison officials. *See Moody,* 429 U.S. at 88 n. 9, 97 S.Ct. 274 ("Congress has given federal prison officials full discretion to control [prisoner classification and corresponding housing assignments]"); *Jones*, 2021 WL 398494, at *5. Accordingly, state sovereign immunity under Pennsylvania law shields Anderson, Rich, Wagner, and Oliver from liability for Doe's IIED claims.[11]

E. Analysis: Kross and Alexander's Motion

1. Kross's alternative motion for summary judgment based on the "exhaustion" defense should be denied because Doe's grievances sufficiently identified Kross by position; additionally, prison personnel excused the asserted procedural default when they identified Kross in their grievance responses.

As a threshold matter, the Court will first address Kross's request for summary judgment based on Doe's failure to exhaust their administrative remedies as required by the PLRA, 42 U.S.C. § 1997e(a). ECF No. 41, p. 6. *See Downey v. Pennsylvania Dep't of Corr.*, 968 F.3d 299, 304-05 (3d Cir. 2020) (explaining that once a defendant properly raises exhaustion, the district court must consider it as a threshold matter).

The PLRA mandates that prisoners exhaust all available administrative remedies before bringing a lawsuit concerning conditions of their confinement. 42 U.S.C. § 1997e(a). This requirement applies to all claims relating to prison life that do not implicate the duration of the prisoner's sentence. *Porter v. Nussle*, 534 U.S. 516, 532, 122 S. Ct. 983, 152 L Ed.2d 12 (2002). The plaintiff's failure to exhaust available administrative remedies is an affirmative defense that the defendant must plead and prove. *Jones v. Bock*, 549 U.S. 199, 216, 127 S.Ct. 910, 166 L.Ed.2d 798

---

[11] The IIED claim against Blakely is recommended for dismissal due to the facial insufficiency of Doe's allegations to sustain it. However, for the same reasons discussed herein, the claim against Blakely also would be subject to dismissal based on sovereign immunity.

(2007); *Rinaldi v. United States*, 904 F.3d 257, 268 (3d Cir. 2018) (citing *Ray v. Kertes*, 285 F.3d 287, 295 (3d Cir. 2002)).

Proper exhaustion under the PLRA requires that an inmate "complete the administrative review process in accordance with the applicable procedural rules." *Downey v. Pennsylvania Dep't of Corr.*, 968 F.3d 299, 305 (3d Cir. 2020) (citing *Woodford*, 548 U.S. at 88, 126 S. Ct. 2378). These procedural rules are supplied by the individual prisons. *Jones*, 549 U.S. at 218, 127 S. Ct. 910; *Spruill v. Gillis*, 372 F.3d 218, 222 (3d Cir. 2004) (determining whether "a prisoner has 'properly' exhausted a claim … is made by evaluating the prisoner's compliance with the prison's administrative regulations governing inmate grievances"). Thus, whether a plaintiff has properly exhausted administrative remedies is determined according to the procedures and rules adopted by the plaintiff's correctional institution. As the Supreme Court has explained:

> Compliance with prison grievance procedures, therefore, is all that is required by the PLRA to "properly exhaust." The level of detail necessary in a grievance to comply with the grievance procedures will vary from system to system and claim to claim, but it is the prison's requirements, and not the PLRA, that define the boundaries of proper exhaustion.

*Jones*, 107 U.S. at 217, 127 S.Ct. 910.

For inmates in the custody of the Pennsylvania Department of Corrections, DC-ADM 804 provides the relevant grievance procedures. The DC-ADM 804 grievance system consists of three separate stages. First, within fifteen days of the incident, the prisoner is required to submit a written grievance for review by the facility manager or the regional grievance coordinator, who responds in writing within ten business days. Second, if the grievance is denied, the inmate must submit a written appeal to intermediate review within ten working days, and again the inmate receives a written response within ten working days. Finally, if the inmate remains dissatisfied following this second level outcome, he must submit an appeal to the Central Office Review Committee within

fifteen working days, and the inmate will receive a final determination in writing within thirty days. *See Booth v. Churner*, 206 F.3d 289, 293 n. 2 (3d Cir. 1997), *aff'd* 532 U.S. 731 (2001).

In this case, Kross asserts that Doe failed to properly exhaust their administrative remedies because they "did not file any grievances identifying Dr. Kross as treating, or failing to treat, Plaintiff's gender dysphoria." ECF No. 41, pp. 9-10.   In support of this assertion, Kross has submitted Doe's entire 156-page grievance record from the DOC Secretary's Office of Inmate Grievances and Appeals (SOIGA).   ECF No. 41-1.   Kross points out that only two of the grievances Doe submitted to SOIGA for final review mention him by name—Grievance Nos. 767360 and 797249—and that neither of these grievances relates in any manner to the allegations that Plaintiff asserts against Dr. Kross in the Amended Complaint.".   ECF No. 41, p. 8.   One of these grievances complains about Doe's razorblades being used by another inmate and the other grieves Kross's denial of Doe's request to see a gastroenterologist. *Id.*, at 8-9; ECF No. 41-1, pp. 124, 143.

In response, Doe argues that "Dr. Kross was repeatedly identified by position or title in Mx. Doe's grievances and grievance responses related to inadequate care for their gender dysphoria." ECF No. 45, p. 11.   In the alternative, Doe argues that "the DOC excused Mx. Doe's potential procedural default when the Facility Grievance Coordinator repeatedly identified SCI Cambridge Springs' Medical Director, at the time Dr. Kross, as being involved in the medical care at issue." *Id.* The Court agrees with Doe on both points.

The PLRA itself does not have a "name all defendants" requirement. *Byrd v. Shannon*, 715 F.3d 117, 127 (3d Cir. 2013) (citing *Jones*, 549 U.S. at 217, 127 S. Ct. 910).   But Section 11(d) of the DOC's grievance policy states that the inmate "shall identify individuals directly involved in the events." *See Green v. Maxa*, 2020 WL 1249205, at *5 (W.D. Pa. Mar. 16, 2020); *Jackson v. Carter*, 813 Fed. Appx. 820, 823 (3d Cir. 2020).   Regarding this requirement, the Court of Appeals for the Third Circuit has held that, "in the absence of any justifiable excuse, a Pennsylvania inmate's failure to

properly identify a defendant constitute[s] a failure to properly exhaust his administrative remedies under the PLRA." *Williams v. Pa. Dep't of Corr.*, 146 Fed. Appx. 554, 557 (3d Cir. 2005).  Such a procedural default can be excused, however, if prison administrators respond to the grievance "by identifying the unidentified persons and acknowledging that they were fairly within the compass of the prisoner's grievance." *Spruill*, 372 F.3d at 234-35.  Applying *Spruill*, Third Circuit has repeatedly found prison officials to have excused an identification default when their grievance responses acknowledge involvement of the defendants.  *See Williams v. Beard*, 482 F.3d 637, 639-40 (3d Cir. 2007); *Robinson v. Johnson*, 343 Fed. Appx. 778, 782 (3d Cir. 2009); *Tenon v. Dreibelbis*, 606 Fed. Appx. 681, 687 n. 5 (3d Cir. 2015).  This is because "[t]he primary purpose of a grievance is to alert prison officials to a problem, not to provide personal notice to a particular official that he may be sued." *Williams v. Beard*, 482 F.3d 637, 640 (3d Cir. 2007) (quoting *Jones*, 549 U.S. at 219, 127 S. Ct. 910).  But where the inmate does not identify a defendant in the grievance and there is no indication in the record that prison administrators knew that the defendant was involved in the conduct challenged in the grievance, the prisoner has failed to exhaust administrative remedies.  *Byrd*, 715 F.3d at 127; *Johnson v. Townsend*, 314 Fed. Appx. 436, 442-43 (3d Cir. 2008).

Here, Doe sufficiently identified Kross in compliance with Section 11(d) of the DOC's grievance policy by providing a description of his position and naming the SCI-Cambridge Springs "medical department" and staff in the grievances.  Courts have frequently refused to dismiss claims for failure to identify a defendant by name "where it was clear that prison officials knew of defendant's involvement from the context of the grievance." *Sanders v. Beard*, 2013 WL 1703582, at *7 (M.D. Pa. Apr. 19, 2013) (excusing plaintiff's failure to name prison maintenance personnel by name because he identified them by position and it was not practicable that he would be aware of their identities) (citing *Williams v. Beard*, 482 F.3d 637, 640 (3d Cir. 2007)).  *See also Martin v. Secretary of Corrections*, 2018 WL 1158250, at *4 (W.D. Pa. Mar. 5, 2018) ("Because it was not practicable for

Martin to identify the Defendants, he has not [failed to exhaust] his claims."); *Robinson v. Johnson*, 343 Fed. Appx. 778 (3d Cir. 2009) (holding that inmate did not fail to exhaust a claim challenging a policy where the defendants did not meet their burden of demonstrating that it was practicable for the inmate to identify them as the relevant policymakers).

Additionally, grievances that identify specific prison departments have been held to satisfy exhaustion requirements as to an individual defendant when the context provided the prison with notice of the individual's involvement.  *See Gregory v. Santos*, 2010 WL 750047, at *5 (S.D. Ill. Jan. 19, 2010) (grievances naming the "medical department" sufficiently exhausted claim against the prison's medical director); *Austin v. Correctional Medical Services, Inc.*, 2008 WL 4426342, at *5 (W.D. Mich., Sept. 26, 2008) (grievance against "the Medical Services Department" held "more than sufficient to put on notice any and all individuals and entities involved with providing health care to prisoners at MCF"); *Downing v. Correction Medical Services Inc.*, 2009 WL 511849, at *7 (W.D. Mich. Feb. 26, 2009) (naming some individuals plus all Bureau of Health Care personnel who had treated plaintiff over the last six months sufficed).  Courts in this district have agreed that prisoners may substantially comply with administrative procedures when they bring grievances against particular prison departments rather than specific individuals within those departments.  *See e.g., Young v. Good*, 2008 WL 4816474, at *4 (W.D. Pa. Nov. 4, 2008) (grievance identifying "food services" sufficiently identified food services supervisors later named as defendants); *Chmiel v. Pa. Dep't of Corr.*, 2020 WL 1332830, at *5 (W.D. Pa. Mar. 23, 2020) (denying motion to dismiss, noting material issues of fact on exhaustion grounds, where plaintiff "nam[ed] only the 'Medical Department' and not individual physicians").

Doe's grievances about their gender dysphoria referenced SCI-Cambridge Spring's "Medical Department," "Medical," "on-site providers," the "Central Office," the "Transgender Support Group," and the "Medical Director" at SCI-Cambridge Springs. Grievances.  *See* ECF Nos. 41-1, p.

3, 5, 51, 54, 59 68, 81.  Grievance No. 706257 identified the entire "medical department" and

"whatever physician [is] attending at Cambridge Springs" as responsible for Doe's inadequate

medical treatment for "the past year."  ECF No. 41-1, p. 68.  At this stage of the proceeding, the

Court cannot say as a matter of law that these references did not alert prison officials to a problem

regarding care provided by Kross.  *See Chmiel,* 2020 WL 1332830, at *5; *Sanders*, 2013 WL 1703582,

at *7.

Moreover, even if there was procedural default due to Doe's failure to identify Kross by

name, prison officials excused this default by acknowledging that he "[was] fairly within the compass

of the prisoner's grievance."  *Spruill*, 372 F.3d at 234-35.  In response to Grievance No. 689582—in

which Doe raised concerns about treatment of their gender dysphoria, the grievance officer stated

that Doe had "access to the Medical Director" regarding their health care.  ECF No. 41-1, p. 53.

The SCI-Cambridge Springs Facility Manager's response to Doe's appeal of Grievance No. 706257

discussed the "on-site Medical Director['s]" involvement in conversations regarding "surgical

options" for gender transition and other treatment by a specialist.  *Id.*, p. 64.  In response to

Grievance No. 706257, which complained about the medical knowledge of the "on-site doctor," the

grievance officer discussed the ability of "the Medical Director" to consult with outside specialists in

transgender healthcare.  *Id.*, p. 66.  Kross was SCI-Cambridge Springs' Medical Director when Doe

filed these grievances.   Thus, the responses of prison officials acknowledge that Kross was directly

involved in the care that Doe was challenging in their grievances.  This is sufficient to excuse any

procedural default associated with Doe's failure to identify him by name.  *Sides v. Cherry*, 2007 WL

1411841, at *3 (W.D. Pa., May 10, 2007) (procedural default excused where grievance response said

"[a]ll staff involved were interviewed regarding your claims" and the defendants were specifically

named in the response); *Lee v. Corizon Health, Inc.*, 2020 WL 4003603, at *3 (M.D. Pa. July 15, 2020)

(excusing default when prison officials identified the unnamed defendant in subsequent grievance

responses).  Kross has not established the affirmative defense of failure to exhaust.  Accordingly, his

motion for summary judgment based on that defense should be denied.

      2.    Kross and Alexander's motion to dismiss Doe's Eighth Amendment Claim should
           be denied.

Doe brings their Eighth Amendment claim against Kross and Alexander pursuant to 42

U.S.C. § 1983.  Rather than conferring any substantive rights, § 1983 "provides a method for

vindicating federal rights elsewhere conferred."  *Hildebrand v. Allegheny Cnty.*, 757 F.3d 99, 104 (3d

Cir. 2014) (citing *Albright v. Oliver*, 510 U.S. 266, 271 (1994)) (internal quotation marks and citations

omitted).  To prevail on a claim for relief under § 1983, a plaintiff must show that he, she, or they

were (1) deprived of a federal right (2) by a person acting under color of state law.  *Gomez v. Toledo*,

446 U.S. 635, 640 (1980).  There is no dispute that Kross and Alexander are "persons acting under

color of state law."  *See Johnson v. Stempler*, 373 Fed. Appx. 151, 153-54 (3d Cir. 2010) (private prison

doctors working under contract with the government act "under color of state law" for purposes of

§ 1983 and may be sued under that statute) (citing *West v. Atkins*, 487 U.S. 42, 54-57 (1988)).  The

question is, therefore, whether the facts alleged in the Amended Complaint support a plausible claim

that these Defendants deprived Doe of their rights under the Eighth Amendment.  *See, e.g.*,

*Baskerville v. Young*, 2018 WL 3343235, at *2 (3d Cir. 2018) (citing *Helling v. McKinney*, 509 U.S. 25, 32

(1993)).

    "The Eighth Amendment, through its prohibition on cruel and unusual punishment,

prohibits the imposition of 'unnecessary and wanton infliction of pain contrary to contemporary

standards of decency.'"  *Pearson v. Prison Health Serv.*, 850 F.3d 526, 534 (3d Cir. 2017) (quoting

*Helling v. McKinney*, 509 U.S. 25, 32, 113 S.Ct. 2475, 125 L.Ed.2d 22 (1993)).  In the context of an

adequacy of care claim under the Eighth Amendment, an inmate must allege facts that support an

inference that the defendant was "deliberately indifferent" to the inmate's serious medical needs to

survive a motion to dismiss.  *See Estelle v. Gamble*, 429 U.S. 97, 104, 97 S.Ct. 285, 50 L.Ed.2d 251

(1976). "[A] medical need is 'serious' for the purposes of a denial of medical care claim if it is either

'one that has been diagnosed by a physician as requiring treatment or one that is so obvious that a

lay person would easily recognize the necessity for a doctor's attention.'" *Mattern v. City of Sea Isle*,

657 Fed. Appx. 134, 139 (3d Cir. 2016) (quoting *Monmouth Cty. Corr. Inst. Inmates v. Lanzaro*, 834 F.2d

326, 347 (3d Cir. 1987)).  Here, Doe's gender dysphoria satisfies the "serious medical need" element

of an Eighth Amendment claim.  *See Soneeya v. Spencer*, 851 F. Supp. 2d 228, 244 (D. Mass. 2012)

(recognizing "that [gender identity disorder] may constitute a serious medical need"); *De'Lonta v.

Angelone*, 330 F.3d 630, 634 (4th Cir. 2003) (holding that an inmate's "need for protection against

continued self-mutilation constitutes a serious medical need to which prison officials may not be

deliberately indifferent").  Indeed, Kross and Alexander do not dispute that Doe's allegations

support this element of the claim.

Next, the facts alleged must be sufficient to support an inference that Kross and Alexander

acted with deliberate indifference to Doe's serious medical needs.  Importantly, when it comes to

claims of deliberate indifference, there is a "critical distinction" between allegations of a delay or

denial of a recognized need for medical care and allegations of inadequate medical treatment.

*Pearson.*, 850 F.3d at 535 (quoting *United States ex rel. Walker v. Fayette Cty.*, 599 F.2d 573, 575 n. 2 (3d

Cir. 1979)).  A claim alleging the delay or denial of medical treatment requires inquiry into the

subjective state of mind of the defendant and the reasons for the delay, which like other forms of

scienter can be proven through circumstantial evidence and witness testimony.  *Id.*  But "[w]here a

prisoner has received some medical attention and the dispute is over the adequacy of the treatment,

federal courts are generally reluctant to second guess medical judgments and to constitutionalize

claims which sound in state tort law."  *Id.* (citing *Westlake v. Lucas*, 537 F.2d 857, 860 n. 5 (6th Cir.

1976)).  Furthermore, courts "disavow any attempt to second-guess the propriety or adequacy of a

particular course of treatment…[which] remains a question of sound professional judgment."

*Inmates of Allegheny Cty. Jail v. Pierce*, 612 F.2d 754, 762 (3d Cir. 1979) (quoting *Bowring v. Godwin*, 551

F.2d 44, 48 (4th Cir. 1977)) (alterations in original).

In the present case, the Amended Complaint acknowledges that Doe received extensive

medical care and treatment for the conditions and injuries associated with Doe's gender dysphoria,

which supports Defendants' argument that Doe's claim represents a mere disagreement over that

treatment.  For example, the Amended Complaint acknowledges that Doe received testosterone

injections but disputes that the dosages were appropriate.  The Amended Complaint concedes that

the Defendants performed repeated blood draws to check Doe's testosterone levels but asserts that

the timing of the blood tests deviated from the WPATH Standards of Care.  ECF No. 33, ¶¶ 74–76.

*See United States ex rel. Walker v. Fayette County*, 599 F.2d 573, 575 n. 2 (3d Cir. 1979) (where a prisoner

received some medical attention and the dispute is over the adequacy of the treatment, federal courts

are generally reluctant to second guess medical judgments and to constitutionalize claims which

sound in state tort law).  Similarly, Doe's allegations that the care provided by the Defendants fell

below the accepted standards of care adopted by WPATH indicates that Doe's claim is more akin to

state law medical malpractice claim than one sounding in federal constitutional law.  *See White v.*

*Napoleon*, 897 F.2d 103, 108–09 (3d Cir. 1990) (holding that "[m]ere medical malpractice cannot give

rise to a violation of the Eighth Amendment").

Nonetheless, as the Court of Appeals for the Third Circuit has made clear, the fact that

prison medical personnel have provided some medical care to an inmate does not preclude a finding

of deliberate indifference:

> [T]here are circumstances in which some care is provided yet
> it is insufficient to satisfy constitutional requirements. For
> instance, prison officials may not, with deliberate indifference
> to the serious medical needs of the inmate, opt for "an easier
> and less efficacious treatment" of the inmate's condition. *West*
> *v. Keve*, 571 F.2d 158, 162 (3d Cir. 1978) (quoting *Williams v.*

> *Vincent*, 508 F.2d 541, 544 (2d Cir. 1974)). Nor may "prison
> authorities deny reasonable requests for medical treatment ...
> [when] such denial exposes the inmate 'to undue suffering or
> the threat of tangible residual injury.'" *Monmouth County Corr.
> Inst. Inmates*, 834 F.2d at 346 (quoting *Westlake v. Lucas*, 537
> F.2d 857, 860 (6th Cir. 1976)).

*Palakovic v. Wetzel*, 854 F.3d 209, 228 (3d Cir. 2017).

The factual allegations of Doe's Amended Complaint, taken as a whole, and allowing Doe every reasonable inference that may be drawn from those facts, are sufficient to state an Eighth Amendment claim.  Doe's claim is premised on allegations that the Defendants engaged in a long-standing refusal to provide the treatments and therapies that Doe contends were mandated by accepted standards of care and necessary to prevent serious psychological and physical injuries. These include failing to appropriately monitor and increase Doe's hormone therapy despite a serious escalation in Doe's symptoms, repeatedly changing or entirely withholding Doe's testosterone dosage for non-medical reasons, and refusing to provide access to a transgender healthcare specialist to determine whether therapies such as hair removal and gender affirming surgery were necessary.[12] ECF No. 33, ¶¶ 81, 95, 96, 105.  The Amended Complaint alleges that the Defendants' denial of necessary care caused Doe to "engage[] in self-mutilation, including removing their nipples and acts of cutting, repeatedly experience[e] suicidal ideation, and … consider[ ] acts of genital mutilation as a response to their despair."  *Id.*, ¶ 30.  The Amended Complaint alleges that the Defendants knew of the substantial risk of harm caused by the denial of necessary care because the DSM-V and the WPATH Standards of Care documented that "people with gender dysphoria who do not receive appropriate medical treatment are at risk of depression, anxiety, suicide, and genital self-harm."  *Id.*,

---

[12] Alexander and Kross also argue that they could not have acted with deliberate indifference to Doe's serious medical needs because they lacked final decision-making authority on many aspects of transgender healthcare.  *See* ECF No. 41. At this stage of the proceedings, however, the allegations of the Amended complaint are sufficient to demonstrate their personal involvement in the conduct upon which Doe's claims are based.  *See Rode v. Dellarciprete*, 845 F.2d 1195, 1207 (3d Cir. 1988) (holding that "[a] defendant in a civil rights action must have personal involvement in the alleged wrongs…").  Issues relating to the extent of their authority cannot be determined on the current record.

¶ 33.  In sum, these allegations support that Kross and Alexander denied reasonable requests for medical treatment when they knew that their denials exposed Doe to undue suffering and the threat of tangible residual injury.  This conclusion is consistent with the well-established principle that persistence in a course of treatment "in the face of resultant pain and risk of permanent injury" constitutes deliberate indifference.  *Rouse v. Plantier*, 182 F.3d 192, 197 (3d Cir. 1999) (quoting *White*, 897 F.2d at 109).  Thus, Doe's factual allegations are "enough to raise a right to relief above the speculative level."  *Twombly*, 550 U.S. at 556.   Accordingly, at this early stage of the proceedings, Doe's Eighth Amendment claim should survive dismissal.

Finally, the Court notes that the parties devote significant discussion to whether the refusal to provide gender reaffirming surgery can be considered an act of deliberate indifference under the Eighth Amendment.  As with many, if not most, of Doe's claims concerning necessary treatment, this issue cannot be resolved on a motion to dismiss.  As the decisions of other courts illustrate, this issue is fact-driven and complex.  In *Kosilek v. Spencer*, 774 F.3d 63, 91 (1st Cir. 2014), for example, a similar issue came before the Court of Appeals for the First Circuit on appeal from the district court's order granting the plaintiff-inmate's request for a mandatory injunction requiring the Massachusetts Department of Corrections to provide male-to-female sex reassignment surgery (SRS) as treatment for an inmate's gender identity disorder.  Reversing the district court's order, the Court of Appeals found that the Massachusetts DOC had not acted in deliberate indifference when it refused to provide the inmate with SRS.  The Court of Appeals did not hold, however, that the denial of SRS may never constitute an Eighth Amendment violation.  Rather, the Court based its holding on the detailed factual record developed during testimony over multiple hearing days.  This record demonstrated that the Massachusetts DOC had provided, and continued to provide, extensive ameliorative measures to address the inmate's gender identity disorder, in addition to antidepressants and psychotherapy and that the DOC had solicited and considered the opinions of

multiple medical professionals who supported the DOC's treatment decisions.  The Court also found that the record supported the reasonableness of DOC's concerns about safety and security, including provision of safe housing options for the inmate after SRS.  *Id.*

Doe's case is before this Court in an entirely different posture.  Unlike the First Circuit in *Kosilek*, this Court does not have the benefit of a developed factual record regarding the decision-making process and considerations upon which the Defendants denied Doe's request for gender affirming surgery.  Indeed, several courts have allowed claims based on a denial of gender affirming or gender reaffirming surgery to proceed past a motion to dismiss.  *See, e.g., De'lonta v. Johnson*, 708 F.3d 520, 526, 526 n. 4 (4th Cir. 2013) (reversed district court's grant of a motion to dismiss inmate's claim that continued denial of consideration for sex reassignment surgery violated the Eighth Amendment, particularly when DOC refused to allow the plaintiff to be evaluated by a specialist); *Diamond v. Owens*, 131 F. Supp. 3d 1346, 1374 (M.D. Ga. 2015) (denying motion to dismiss when inmate claimed therapy and psychotropic medications were inadequate to treat her gender dysphoria); *Edmo v. Idaho Departmen of Corrections*, 358 F. Supp. 3d 1103 (D. Idaho 2018), *aff'd* 935 F.3d 757 (9th Cir. 2020); *Campbell v. Kallas*, 2020 WL 7230235 (W.D. Wis. Dec. 8 2020).  In *Edmo v. Corizon, Inc.*, a case involving extensive expert testimony and other medical evidence, the Ninth Circuit Court of Appeals upheld the district court's determination that gender confirmation surgery was medically necessary for a prisoner and entered an injunction ordering the defendants to provide the surgery.  935 F.3d 757 (9th Cir. 2020), *cert. denied sub. nom. ID DOC, et al. v. Edmo*, __ U.S. __141 S. Ct. 610 (2020).  Other courts have found plausible Eighth Amendment violations in cases where prisons have instituted a policy categorically banning gender reassignment surgery.  *See Fields v. Smith*, 653 F.3d 550 (7th Cir. 2011) (invalidated Wisconsin statute banning state funding for hormone therapy and gender reassignment surgery for inmates);  *Fisher v. Fed. Bureau of Prisons*, 2020 WL

5250438, at *15 (N.D. Ohio Sept. 3, 2020) (denying motion to dismiss when there was a blanket policy in place denying reassignment surgery to inmates with gender dysphoria).

For purposes of Kross and Alexander's motion to dismiss, the only factual record properly to be considered by the Court is Doe's Amended Complaint.  Construing the facts alleged in the Amended Complaint in the light most favorable to Doe, the Court cannot hold that the denial of gender affirming surgery was not the product of deliberate indifference on the part of Kross and Alexander or any other Defendant.

More importantly, the basis for Doe's Eighth Amendment claim is not limited to the denial of gender affirming surgery.  Far from it.  As noted, Doe's claim is premised on allegations that the Defendants engaged in a long-standing refusal to provide a multitude of treatments and therapies that Doe contends were mandated by accepted standards of care and necessary to prevent serious psychological and physical injuries.  The question on a motion to dismiss is not whether the plaintiff will ultimately prevail on his or her claim but "whether the plaintiff is entitled to offer evidence in support of his or her claims." *Swope v. City of Pittsburgh*, 90 F. Supp. 3d 400, 405 (W.D. Pa. 2014) (citing *Oatway v. Am. Int'l Grp., Inc.*, 325 F.3d 184, 187 (3d Cir. 2003)).  Determinations regarding whether any action or decision regarding Doe's care evinces or was the product of deliberate indifference must await a more developed record.

F.   Conclusion

For the foregoing reasons, it is respectfully recommended that the Court:

(1) grant in part, and deny in part, the DOC Defendants' partial Motion to Dismiss at ECF No. 37, as follows:

   a.   Deny the motion as to Count I (ADA) and Count II (Rehab Act),

      b.   Grant the motion in favor of all DOC Defendants as to Count IV (IIED) based on sovereign immunity, and

      c.   Grant the motion in favor of Defendant Blakely as to Count V (Fourteenth Amendment); and

(2)   deny the Motion to Dismiss and, alternatively, for Summary Judgment, at ECF No. 40, filed on behalf of Defendants Kross and Alexander.

III.    Notice

In accordance with 28 U.S.C. § 636(b)(1) and Fed. R. Civ. P. 72, any party may seek review by the district court by filing Objections to the Report and Recommendation within fourteen (14) days of the filing of this Report and Recommendation.  Any party opposing the objections shall have fourteen (14) days from the date of service of Objections to respond thereto.  *See* Fed. R. Civ. P. 72(b)(2).  Failure to file timely objections may constitute a waiver of appellate rights.  *See Brightwell v. Lehman*, 637 F.3d 187, 194 n. 7 (3d Cir. 2011); *Nara v. Frank*, 488 F.3d 187 (3d Cir. 2007).

 

RICHARD A. LANZILLO
United States Magistrate Judge

Dated: February 19, 2021