IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA
ERIE DIVISION

| | |
|---|---|
| SHANE DALY, | ) |
| | ) |
| Plaintiff | ) 1:20-CV-00023-SPB |
| | ) |
| vs. | ) RICHARD A. LANZILLO |
| | ) Chief United States Magistrate Judge |
| PENNSYLVANIA DEPARTMENT OF | ) |
| CORRECTIONS, JOHN WETZEL, | ) REPORT AND RECOMMENDATION ON |
| SECRETARY OF THE PENNSYLVANIA | ) PENDING MOTIONS FOR SUMMARY |
| DEPARTMENT OF CORRECTIONS; DR. | ) JUDGMENT |
| PAUL NOEL, CHIEF OF CLINICAL | ) |
| SERVICES; DR. LAWRENCE ALPERT, | ) IN RE: ECF NOS. 143. 147, 151 |
| FORMER MEDICAL DIRECTOR SCI | ) |
| CAMBRIDGE SPRINGS; DR. | ) |
| ALEXANDER, FORMER MEDICAL | ) |
| DIRECTOR SCI CAMBRIDGE SPRINGS; | ) |
| DR. OBENG, MEDICAL DIRECTOR SCI | ) |
| CAMBRIDGE SPRINGS; SHANNON | ) |
| ANDERSON, CORRECTIONS | ) |
| HEALTHCARE ADMINISTRATOR; AND | ) |
| PALUKI REDDY, | ) |
| | ) |
| Defendants | ) |

I.    Recommendation

Three motions for summary judgment pursuant to Fed. R. Civ. P. 56 are before the

Undersigned for Report and Recommendation pursuant to 28 U.S.C. § 636 *et seq*.:

- ECF No. 143 on behalf of Defendants Pennsylvania Department of Corrections ("DOC"), Shannon Anderson, Dr. Paul Noel, Dr. Paluki Reddy, and John Wetzel;

- ECF No. 147 on behalf of Defendant Dr. Michael Alexander; and

- ECF No. 151 on behalf of Defendants Dr. Lawrence Alpert and Dr. Simeon Obeng.

For the reasons explained herein, it is respectfully recommended that each motion be GRANTED

and that judgment be entered in favor of all Defendants and against Plaintiff Shane Daly.

II.    Report

    A. Procedural Background and Identification of Remaining Claims

Plaintiff Shane Daly ("Daly") is an inmate in the custody of the DOC.[1] Daly identifies as

non-binary but entered the Pennsylvania correctional system classified as a homosexual female.[2]

During his incarceration, Daly was diagnosed with gender dysphoria, a psychiatric condition that

involves a marked incongruence between one's experienced/expressed gender and assigned

gender.  Daly's Amended Complaint (ECF No. 33) asserted claims under federal and state law

based on allegations that DOC officials and Daly's treating physicians acted with deliberate

indifference to his gender dysphoria, failed to accommodate his disability, and violated his

privacy rights.  The Amended Complaint named thirteen defendants: the DOC and DOC

employees Shannon Anderson, Ms. Blakely, Dr. Paul Noel, Lonnie Oliver, Paluki Reddy, Debra

Rich, Ms. Wagner, and John Wetzel ("DOC Defendants"), and Drs. Kross, Michael Alexander,

Alpert, and Obeng. *Id.*

    The Amended Complaint asserted five causes of action: a claim under Americans with

Disabilities Act ("ADA"), 42 U.S.C. § 12101 et seq., against the DOC (Count I); a claim under

the Rehabilitation Act ("RA"), 29 U.S.C. § 701 et seq., against the DOC (Count II); an Eighth

Amendment deliberate indifference to medical needs claim against Defendants Wetzel, Noel,

Reddy, Alpert, Kross, Alexander, and Obeng (Count III); an intentional infliction of emotion

distress ("IIED") claim against Defendants Rich, Wagner, Oliver, Blakely, and Anderson (Count

---

[1] Daly was originally identified by the pseudonym "Sam Doe" based on his concerns for his personal privacy and safety.  *See* ECF No. 1, p. 1, n.1.  On October 4, 2023, Daly stipulated to a change in the caption to reflect his new name, Shane Daly. *See* ECF No. 139.

[2] In various court filings, Daly's counsel has alternated between the pronouns "they" and "he" to refer to Daly, while the Defendants have consistently used "he" or "him."  Daly's counsel recently informed the Court that either "they" or "he" is acceptable to the Plaintiff.  For consistency, masculine pronouns are used throughout this Report.

IV); and a Fourteenth Amendment claim for violation of Daly's right to privacy against Defendants Blakely and Anderson (Count V). Daly requested the following relief: 1) a declaratory judgment that the Defendants violated his rights under the ADA, RA, the Eighth Amendment, and the Fourteenth Amendment; 2) compensatory and punitive damages; 3) attorneys' fees and costs; and 4) injunctive relief consisting of Court-ordered access to an outside transgender specialist, additional medical care for his gender dysphoria, including permanent hair removal and gender affirming surgery, Court-mandated training on the Standards of Care for transgender individuals for all prison staff who provide medical or mental health treatment, and Court-mandated confidentiality regarding all conversations relating to Daly's hormone therapy, accommodations, and healthcare needs.

The DOC Defendants moved to dismiss the claims of the Amended Complaint against them (ECF No. 37) as did Defendants Alexander and Kross (ECF No. 40). Following a Report and Recommendation, the Court dismissed the claims against Defendants Kross, Oliver, Rich, Wagner, and Blakely, and the IIED claim against all Defendants. *See* ECF No. 51. Consequently, Kross, Oliver, Rich, Wagner, and Blakely were terminated as Defendants to this action.

A lengthy period of discovery followed. During discovery, the parties notified the Court that Daly had been scheduled for a surgical procedure ("top" surgery) that was expected to affect the claims and defenses in this action. On September 13, 2022, the Court administratively closed this case pending the completion of Daly's surgery. *See* ECF No. 115. On October 31, 2022, Daly notified the Court that his surgery had been completed and that he had been returned to SCI-Cambridge Springs. *See* ECF No. 116. This case was reopened the next day. ECF No. 117. Discovery continued until August 15, 2023. ECF No. 130.

3

All remaining Defendants filed motions for summary judgment pursuant to Fed. R. Civ. P. 56, each was motion accompanied by a concise statements of material facts. *See* ECF Nos, 143, 144 (remaining DOC Defendants); ECF Nos. 147, 154 (Defendant Alexander); and ECF Nos. 151, 152 (Defendants Alpert and Obeng). Daly filed a single brief in opposition to the three motions for summary judgment and a single responsive concise statement of material facts (ECF Nos. 161, 162). In his opposition brief, Daly conceded his ADA and RA claims against the DOC (Counts I and II) as well as the Eighth Amendment claim against Defendant Wetzel at Count III. Accordingly, summary judgment should be entered in favor of the DOC Defendants as to Counts I and II and in favor of Wetzel as to Count III. This leaves the following claims for consideration: Daly's Eighth Amendment claim pursuant to 42 U.S.C. § 1983 at Count III against Defendants Noel, Reddy, Alpert, Obeng, and Alexander based on their alleged deliberate indifference to his serious medical needs, and his Fourteenth Amendment invasion of privacy claim pursuant to § 1983 at Count V against Defendant Anderson.

  B. Material Facts

Except where noted, the following facts are undisputed and derived from the parties' concise statements of material facts.[3] Daly has been in the custody of the DOC since 2014 and is currently incarcerated at the State Correctional Institution at Muncy. The events and conduct relevant to this litigation, however, occurred between 2016 and 2023, when Daly was incarcerated at the State Correctional Institution at Cambridge Springs. During his incarceration at SCI-Cambridge Springs, Daly received regular medical examinations, testing, and treatment for a variety of needs, including gastro-intestinal problems, orthopedic injuries, and a thyroid

---

[3] Record citations are generally omitted except where record material is quoted or facts are disputed.

4

condition, as well as routine medical evaluations. The following facts relate solely to care for his gender dysphoria.

At all times relevant to this action, Dr. Noel was employed as the DOC's Chief of Clinical Services, Dr. Reddy as the DOC's Chief Psychiatrist, and Shannon Anderson as the Corrections Health Care Administrator ("CHCA") at SCI-Cambridge Springs. Drs. Alpert and Obeng are both physicians who provided medical services at SCI-Cambridge Springs. Dr. Alpert served as the Medical Director at SCI-Cambridge Springs from December 24, 2016 through October, 2017, and his involvement in Daly's care was limited to that period. Dr. Obeng first saw Daly as a patient on January 31, 2019, and according to Daly's medical records, Dr. Obeng last saw him on February 7, 2023. He too has no ongoing involvement in Daly's care or in the formulation of DOC policies or training procedures. During their tenures at SCI-Cambridge Springs, both Dr. Alpert and Dr. Obeng regularly provided medical care to Daly for a multitude of needs in addition to his gender dysphoria. Dr. Alexander provided medical coverage at SCI-Cambridge Springs from October of 2017 until April of 2018. During this time, he examined and treated Plaintiff on several occasions for a variety of issues, including gender dysphoria. Finally, Shannon Anderson served as the CHCA at SCI-Cambridge Springs while Daly was housed at the institution. "In early 2018," Daly had a conversation with Anderson about his gender dysphoria treatment while Anderson was at his cell door. *See* ECF No. 33, ¶ 114; ECF No. 161, p. 31. Daly claims that other inmates "could hear" details of his treatment because Anderson spoke in a loud voice.

Between May 23, 2016 through August 28, 2023, the DOC operated under a policy designated as no. 13.2.1, Section 19,"Diagnosis and Treatment of Gender Dysphoria," which established the Gender Dysphoria Treatment Review Committee ("Committee") to review

5

policy, review Individual Recovery Plans, assist the sites with managing treatment, consult outside experts as needed, and to review all requests for gender confirmation surgery.[4]  The Committee included Dr. Reddy as the DOC's Chief Psychiatrist, Dr. Noel as its Chief of Clinical Services, and the DOC's Licensed Psychological Director.  The contracted vendor State Chief Psychiatrist and State Medical Director also served on the Committee.  By 2017, decisions regarding treatment, including "the selection of medication, the dosages, the monitoring, obtaining blood levels," however, were being made at the correctional institutions.

The DOC contracts with outside vendors for medical providers—namely, WellPath for medical services and Centurion for psychiatry services.  Under the former policy, upon receipt of an inmate's request for a gender affirming surgical procedure, the Committee requested a psychiatric assessment of the inmate.  Centurion selected their Chief Psychiatrist, Dr. Ingrid Renberg, to conduct these psychiatric assessments.  Dr. Renberg is a board-certified psychiatrist and a WPATH-certified transgender healthcare provider.

Daly has been in the custody of the DOC since November of 2014.  He was housed at SCI-Cambridge Springs from November of 2014 until his transfer to the State Correctional Institution at Muncy ("SCI-Muncy") on October 19, 2023.  Daly first requested treatment for gender dysphoria in 2016.  Gender dysphoria is a condition "recognized by the American Psychiatric Association and included in the Diagnostic and Statistical Manual of Mental

---

[4] The DOC adopted the policy and established the Committee to ensure the provision of consistent and appropriate care for inmates diagnosed with gender dysphoria in accordance with the Endocrine Society guidelines. ECF No. 144, ¶ 30; ECF No. 163, ¶ 30.  When drafting its transgender healthcare policy, the DOC reviewed other states' and the Federal Bureau of Prisons' ("BOP") policies, the World Professional Association for Transgender Health ("WPATH") Standards of Care ("SOC"), UpToDate, and the Endocrine Society guidelines.  The DOC consulted with Dr. Rachel Levine, the then Physician General and current Assistant Secretary for Health for the U.S. Department of Health and Human Services, in the drafting its policy.  Dr. Levine is an openly transgender physician trained in pediatrics and psychiatry and has spent much of her career addressing health disparities in LGBTQ youth.  The current public version of policy 13.2.1, Section 19, "Transgender Health Care," was issued on August 28, 2023.

Disorders Fifth Edition ("DSM-V") [and] is defined as a marked incongruence between one's experienced/expressed gender and assigned gender." *See* ECF No. 144, ¶ 20; ECF No. 162, ¶ 20.  On December 1, 2016, Dr. William E. Goodpastor, a psychiatrist and non-party to his action, performed a Gender Dysphoria Psychiatric Assessment of Daly.  Dr. Goodpastor's notes record that Daly "has described herself to others as gay[,] however she reports that her gender preference is actually that of a male ... stating perhaps she can receive masculinizing hormone therapy only to change her appearance to that of a 15 year old boy rather than that of a man... [but] she does not have the desire to have a penis."  In his impressions and recommendations, Dr. Goodpastor opined that Daly met the DSM V criteria for a diagnosis of gender dysphoria. Daly had not been diagnosed with gender dysphoria prior to this date.  Dr. Goodpastor also noted that Daly expressed his desire for hormonal therapy but qualified that he preferred to have the characteristics of a "boy" rather than a man and believed that the hormonal therapy may need adjustment to accommodate this wish.  Considering this, Dr. Goodpastor recommended that Daly address the hormonal therapy with the medical department and further advised that supportive therapy was recommended.  About a month later, on January 4, 2017, Daly was seen by Dr. Goodpastor for a psychiatry contact.  Dr. Goodpastor's note from this contact is somewhat cryptic.  It recorded, "Alright," and referred to an inquiry about "the hormones."

In March of 2017, Daly was again seen by Dr. Goodpastor who noted that Daly "discussed committing suicide once all his appeals were turned down, reflecting his 'all or nothing thinking.'"  Then, in May of 2017, Defendant Dr. Alpert noted his belief that Daly "could benefit from masculinizing hormone therapy as well as continued psychological treatment."  Dr. Alpert cautioned, however, against doing "too much too fast ... due to some social stressors ... including [Daly's] incarceration."  Daly was subsequently prescribed

testosterone cypionate to be administered once per week and was informed of the side effects of this treatment, including increased hair growth. Hormone therapy treatment was initiated on May 23, 2017, with a dosing level of 25mg per week. On June 9, 2017, Dr. Alpert increased Daly's testosterone dosage to 50mg per week. On July 28, 2017, Daly's testosterone level was reported at 561.5ng/dL. On July 31, 2017, Dr. Alpert increased Daly's testosterone dosage to 75mg per week. On September 14, 2017, Daly's testosterone level was reported as 1070ng/dL. On October 18, 2017, Daly's testosterone level was reported as 669.2ng/dL. On October 24, 2017, Daly's "free testosterone" level was reported as 10.4ng/dL. This result was noted to be within normal limits and signed off by Dr. Alexander. This was Dr. Alexander's first involvement in Daly's medical care and treatment. Daly previously alleged that Drs. Alpert, Obeng, and Alexander erred in the dosages of hormone therapy they administered to him as well as the timing of blood draws to check testosterone levels. Daly's medical expert, Molly Ainsman Fisher, MD, MS, acknowledged, however, that these dosages and blood draws conformed to the accepted standard of care.

In late 2017 or early 2018, Daly requested gender affirming surgery[5] and laser hair removal. This request was repeated in 2018, and again in 2019. Daly's first request for surgery was sent to Dr. Alexander on January 18, 2018. Then, in April of 2018, after receiving testosterone injections for approximately ten months, Daly excised his own nipples.[6] On March 21, 2021, Daly was evaluated by Dr Renberg regarding his second request for surgery—

---

[5] The record reveals that Daly requested procedures including breast removal and clitoral release with metoidioplasty and urethral extension.

[6] In his Amended Complaint, Daly states that he undertook this action "as a result of the anguish of their gender dysphoria, which was exacerbated by their fluctuating [testosterone] levels and discriminatory medical care." ECF No. 33, ¶ 88. However, Daly also does not dispute the DOC Defendants' statement that "Daly indicated that he had requested sleeveless undershirts because 'his nipples would show when he was running.' When this request was denied, Daly recalled, 'I was like fuck it, I'll take them off myself." ECF No. 144, ¶ 146; ECF No. 162, ¶ 146.

which was limited to "top" surgery.  Dr. Renberg concluded that the distress Daly was experiencing "due to her [sic] gender dysphoria is to the level that further workup of surgical chest reduction by Medical should be considered."  ECF No. 144, ¶ 72.  The Committee approved the requested surgery—a bilateral mastectomy—based on Dr. Renberg's assessment. The surgery was performed in October of 2022.  Daly has not submitted any request for bottom surgery or any further requests for hair removal or other gender affirming procedures.  On December 21, 2022, Dr. Renberg again saw Daly and did not observe him to be suffering from any dysphoria and stated that Daly "is overall doing well."

     C.  Standard of Review

Federal Rule of Civil Procedure 56(a) requires the court to enter summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  Under this standard "the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986).  A disputed fact is "material" if proof of its existence or nonexistence would affect the outcome of the case under applicable substantive law. *Anderson*, 477 U.S. at 248; *Gray v. York Newspapers, Inc.*, 957 F.2d 1070, 1078 (3d Cir. 1992).  An issue of material fact is "genuine" if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. *Anderson*, 477 U.S. at 257; *Brenner v. Local 514, United Bhd. of Carpenters and Joiners of Am.*, 927 F.2d 1283, 1287-88 (3d Cir. 1991).

When determining whether a genuine issue of material fact remains for trial, the court must view the record and all reasonable inferences to be drawn therefrom in favor of the

nonmoving party. *Moore v. Tartler*, 986 F.2d 682 (3d Cir. 1993); *Clement v. Consol. Rail Corp.*, 963 F.2d 599, 600 (3d Cir. 1992); *White v. Westinghouse Electric Co.*, 862 F.2d 56, 59 (3d Cir. 1988). To avoid summary judgment, however, the nonmoving party may not rest on the unsubstantiated allegations of his or her pleadings. Instead, once the movant satisfies its burden of identifying evidence that demonstrates the absence of a genuine issue of material fact, the nonmoving party must go beyond his pleadings with affidavits, depositions, answers to interrogatories or other record evidence to demonstrate specific material facts that give rise to a genuine issue. *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986).

To facilitate the Court's ability to identify disputed and undisputed material facts, the Local Rules of the United States District Court for the Western District of Pennsylvania requires a party moving for summary judgment to file a concise statement of material facts setting forth in numbered paragraphs and with citation to proper evidentiary support each factual assertion that the movant contends is undisputed and material. *See* LCvR 56.C. The rule, in turn, requires the party opposing the motion for summary judgment to file a responsive concise statement of material facts which (1) admits or denies the facts asserted in each numbered paragraph of the movant's concise statement; (2) sets forth with appropriate citation to the record the basis for any denial of asserted fact; and (3) states, in separately numbered paragraphs, any additional material facts upon which the party relies in opposing the motion. *See* LCvR 56.C.1. Courts in the Western District of Pennsylvania require strict compliance with the provisions of Local Rule 56.[7] *See, e.g., Coleman v. Tice*, 2018 WL 5724125, at *2 n. 3 (W.D. Pa. Oct. 10, 2018), report and

---

[7] Daly has responded to several assertions of fact included in the DOC Defendants' Concise Statement of Material Facts with the phrase, "Denied as stated," without specifying any part of the assertion he disputes, and without citation to any portion of the record to challenge the assertion. *See e.g.* 162, ¶ 175. A response, "Denied as stated," does not comply with Local Rule 56.C and is deemed an admission for purposes of a motion for summary judgment. *See Bernard v. E. Stroudsburg Univ.*, 2014 WL 1454913, at *23 (M.D. Pa. Apr. 14, 2014), *aff'd*, 700 Fed. Appx. 159 (3d Cir. 2017). Accordingly, all such responses have been deemed admissions for purposes of the pending motions to dismiss.

recommendation adopted by 2018 WL 5722316 (W.D. Pa. Nov. 1, 2018); *First Guard Ins. Co. v. Bloom Services, Inc.*, 2018 WL 949224, at *2-3 (W.D. Pa. Feb. 16, 2018).

Further, under Rule 56, a defendant may seek summary judgment by pointing to the absence of a genuine fact issue on one or more essential elements of the plaintiff's claim. The Rule mandates summary judgment if the plaintiff then fails to make a sufficient showing on a challenged element. "[A] complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Celotex*, 477 U.S. at 323. *See Harter v. G.A.F. Corp.*, 967 F.2d 846, 851 (3d Cir. 1992).

    D.  Discussion and Analysis

        1.  Exhaustion and Mootness

The DOC Defendants and Drs. Alpert and Obeng have raised issues of exhaustion and mootness. *See, e.g.*, ECF No. 145, pp. 3. 21; ECF No. 153, p. 25. These are threshold and potentially dispositive issues the Court appropriately addresses before reaching the Defendants' merits-based arguments. *See Brown v. Sprenkle,* 827 Fed. Appx 229, 231 (3d Cir. 2020) (holding that the district court did not err in addressing exhaustion first as it is a threshold issue); *Colorado Wild Public Lands v. U.S. Forest Service*, 2024 WL 1555865, at *3 (Apr. 10, 2024) (recognizing that "the court cannot simply skip over the 'threshold' issues of mootness and pass judgment on stale disputes") (quoting *Southern Co. Servs. Inc. v. FERC*, 416 F.3d 39, 43 (D.C. Cir. 2005)).

        a.  Daly has not exhausted his claims for compensatory or punitive damages against any Defendant.

The DOC Defendants argue that they are entitled to judgment as a matter of law on Daly's claims for monetary damages (both compensatory and punitive) because he failed to

11

request such damages in his grievances as required by DOC policy. This omission, the DOC

Defendants contend, constitutes a procedural default and failure to exhaust administrative

remedies regarding his claim for monetary damages under the Prison Litigation Reform Act

("PLRA"), 42 U.S.C. §1997e(a). The DOC Defendants are correct.

The DOC's general grievance process is set forth in policy no. DC-ADM 804, which is

available at https://www.cor.pa.gov/About% 20Us/Documents/DOC% 20Policies/804%

20Inmate% 20Grievances.pdf (last viewed May 22, 2024). *See generally Moore v. Lamas*, 2023

WL 371397, at *2 (3d Cir. Jan. 24, 2023) ("DC-ADM 804 provides a general, though rigorous,

mechanism for inmate grievances."). The United States Court of Appeals for the Third Circuit

has summarized the policy's relevant procedures as follows:

> ADM 804 creates the three-step Inmate Grievance System. First,
> an inmate must submit a grievance to the Facility Grievance
> Coordinator. The grievance must include the relevant facts,
> individuals involved, claims alleged, and relief sought. A different
> official—the Grievance Officer—reviews the grievance and
> submits an initial response. The inmate may appeal the initial
> response to the Facility Manager, who reviews it and issues a
> decision. The inmate may file a final appeal to the Secretary of
> Corrections' Office of Inmate Grievances and Appeals .... ADM
> 804 requires an inmate to specify in his grievance any alleged
> violation of department regulations or other law as well as specify
> the compensation or legal relief the inmate desires.

*Prater v. Dep't of Corr.*, 76 F.4th 184, 203-04 (3d Cir. 2023). DC-ADM 804 "is the exclusive

means of exhaustion" as to most matters of prison life. *Id.* at 204. An inmate's failure to "follow

the full administrative review process under ADM 804" results in a failure to exhaust under the

PLRA. *Id.*

DC-ADM 804 specifically instructs that an inmate who seeks to recover "compensation

or other legal relief normally available from a court ... must request the specific relief sought in

his/her initial grievance." DC-ADM 804 § 1(A)(11)(d). This requirement is "mandatory."

*Wright v. Sauers*, 729 Fed. Appx. 225, 227 (3d Cir. 2018). The DOC's approved grievance form also specifically instructs the inmate to "[s]tate all relief that you are seeking." DC-ADM 804, Attachment A. *See also Walker v. Little*, 2023 WL 2570562, at *2 (3d Cir. Mar. 20, 2023) (noting that "the instructions on the grievance form advise the inmate to '[s]tate all relief that you are seeking'"). "All relief" includes monetary damages, which must be requested in the inmate's initial grievance. *See Wright*, 729 Fed. Appx. at 227 ("the Prison's policy required [the plaintiff] to specifically request monetary relief in his initial grievance."). *See also Shorter v. Sorber*, 2024 WL 1442163, at *3 (E.D. Pa. Apr. 3, 2024) (citing *Wright*). A grievance need not "request a specific dollar amount," but it must include a request for monetary compensation if the inmate wishes to preserve such a claim for possible future litigation. *Sides v. Pennsylvania Dep't of Corr.*, 2020 WL 1493549, at *7 (W.D. Pa. Mar. 27, 2020). "An inmate procedurally defaults any claim for monetary relief if he d[oes] not seek such relief in his grievance." *Newsome v. Teagarden*, 2021 WL 1176102, at *8 (W.D. Pa, Mar. 29, 2021) (only relief requested was preservation of video evidence, not money). Such a default precludes the recovery of monetary relief in any subsequent litigation. *See Taylor v. Chesmer*, 2020 WL 5366055, at *5, *8-9 (W.D. Pa. 2020) (granting summary judgment against prisoner's claim for money damages where plaintiff's grievance requested no relief); *Sanders v. Beard*, 2013 WL 1703582, at *6 (M.D. Pa. Apr 19, 2013) (same); *Williams v. Overmyer*, 2019 WL 8989847, at *5 (W.D. Pa. Nov. 15, 2019) (slip copy) (same); *Wilson v. Miller*, 2020 WL 1289875, at *3-4 (W.D. Pa. Feb. 6, 2020) (inmate failed to request monetary relief in initial grievance or appeal), *report and recommendation adopted by*, 2020 WL 1286300 (W.D. Pa. Mar. 18, 2020).

Citing *Booth v. Churner*, 532 U.S. 731, 738-39 (2001), Daly notes that it is the "process that must be exhausted, even where the specific relief that was requested … was unavailable."

13

ECF No. 161, at p. 15. To the extent Daly contends that *Booth* excuses his procedural default

and authorizes the recovery of compensatory damages so long as he otherwise completed the

three-step grievance process, he misapprehends the holding of that case. In *Booth*, the Supreme

Court held that an inmate must exhaust the prison grievance process even if that process does not

authorize the remedy he seeks—in that case, money damages. *Booth*, 532 U.S. at 734. *See also*

*Woodford v. Ngo*, 548 U.S. 81 (2006) ("Indeed, as we held in *Booth*, a prisoner must now

exhaust administrative remedies even where the relief sought — monetary damages — cannot be

granted by the administrative process."). *Booth* does not negate a procedural requirement that

the inmate's grievance specify any requested "compensation or other legal relief normally

available from a court." Daly essentially argues that requesting monetary relief in his grievance

would have been futile and meaningless because the grievance process does not provide for the

recovery of such damages. But, as the district court in *Wright v. Sauers,* 2017 WL 3731957

(W.D. Pa. Aug. 30, 2017) explained, this requirement serves valid purposes even where the

requested remedy is unavailable in the administrative process:

> [A] requirement to set forth the compensation or legal relief
> requested places the agency on notice of the prisoner's
> demand or valuation of his or her claim, and furthers the
> PLRA's underlying litigation avoidance goals by
> supporting early settlement or accommodation. Proper
> exhaustion, including adherence to a requirement to
> delineate the relief requested, therefore promotes the
> efficiency recognized in Woodford, permitting claims to be
> "resolved much more quickly and economically in
> proceedings before an agency than in litigation in federal
> court." *Woodford* at 87, 126 S.Ct. 2378. Given the
> underlying goals of the PLRA, and the state of the law
> requiring adherence to clearly stated content requirements,
> this Court must conclude that the mandatory nature of the
> language at issue gives rise to procedural default as a result
> of Plaintiff's failure to set forth the desired monetary or
> other legal relief on his initial grievance form.

14

2017 WL 3731957 at 7-8, *aff'd*, 729 Fed. Appx. 225 (3d Cir. 2018). *See also Davis v. Wetzel,* 2022 WL 2513070, at *8 (M.D. Pa. July 6, 2022) ("Since '[i]t is the prison's requirements, and not the PLRA, that defines the boundaries of proper exhaustion,' a prisoner who fails to request monetary damages in the grievance process is barred from bringing a claim for monetary relief in federal court.") (*quoting Smith v. Sec'y of Pa. Dept. Corr.*, 747 Fed. Appx. 101, 103 (3d Cir. 2018)) (*citing Jones v. Bock*, 549 U.S. 199, 218 (2007)); *Cramer v. Bohinski*, 2024 WL 1557377, at *3 (M.D. Pa. Apr. 10, 2024).

Daly acknowledges that he did not request monetary relief in any grievance relating to his gender dysphoria treatment or the alleged disclosure of his confidential medical information. This admission is fatal to any claim he now asserts for compensatory or punitive damages. Daly's claims for compensatory and punitive damages should be dismissed with prejudice.

In contrast to the omission of any claim for monetary relief, Daly's grievances did request injunctive relief. Thus, Daly has complied with DC-ADM 804 § 1(A)(11)(d) as to his injunctive relief claims. *See Cunningham v. Zubsic*, 2019 WL 134209, at *5, *5 n.9 (W.D. Pa. Jan. 8, 2019) (granting summary judgment in defendant's favor on claims for money damages but allowing claim for equitable relief to proceed because plaintiff's grievance requested an outside referral to a dermatologist); *Tillery v. Wetzel*, 2019 WL 480485, at *6 (M.D. Pa. Feb. 7, 2019) (same). Daly has failed, however, to comply with other requirements of DC-ADM 804 as to *certain* Defendants, which failures preclude his injunctive relief claims against those Defendants.

> b. Daly has exhausted his injunctive relief claims against Dr. Alpert, but not against Dr. Obeng.

DC-ADM 804 provides that a grievance must "be legible [and] understandable"; it must "include a statement of the facts relevant to the claim" as well as "the date, approximate time,

and location of the event(s) that gave rise to the grievance"; it must "*identify individuals directly involved in the event(s)*" and "specifically state any claims [the inmate] wishes to make concerning violations of Department directives, regulations, court orders, or other law"; and, as previously discussed, it must identify "the specific relief sought," including "compensation or other legal relief normally available from a court." DC-ADM 804 § 1(A)(11) (emphasis supplied). *See also Edwards v. Rivello*, 2024 WL 2275249 (M.D. Pa. May 20, 2024). Thus, while the PLRA does not require an inmate-plaintiff to "name all defendants," DC-ADM 804 requires identification of individuals directly involved in the events at issue in the grievance. The Court of Appeals for the Third Circuit has held that "in the absence of any justifiable excuse, a Pennsylvania inmate's failure to properly identify a defendant constitute[s] a failure to properly exhaust his administrative remedies under the PLRA." *Williams v. Pa. Dep't of Corr.*, 146 Fed. Appx. 554, 557 (3d Cir. 2005); *see also Preziosi v. Morris*, 2022 WL 3586667, at *6 (W.D. Pa. Aug. 22, 2022) (inmate failed to exhaust against certain defendants where his grievance "failed to provide enough information indicating they were involved in the events about which he was complaining."). The purpose of this requirement is "to put the prison officials on notice of the persons claimed to be guilty of wrongdoing." *Spruill v. Gillis*, 372 F.3d 218, 234 (3d Cir. 2004).

Drs. Alpert and Obeng argue that Daly's Eighth Amendment claim against them is unexhausted because he failed to "make any mention and/or reference to Drs. Alpert and Obeng" in any relevant grievance. *See* ECF No. 153, p. 29. As Daly notes in his opposition brief, however, Grievance 706257 refers to Dr. Alpert, and Dr. Obeng is mentioned by name in several others. In their reply brief, Drs. Alpert and Obeng clarify their position. There, they contend that although they are mentioned by name in certain grievances, their respective conduct was not the subject of any complaints or concerns raised by Daly in those grievances.

16

As the Medical Defendants accurately note, Daly began Grievance 706257 by stating, "I am writing this grievance against the Medical Department, specifically Dr. Alexander, Ms. Anderson, and Ms. Belt because of the mistreatment I have received in attempting to get satisfactory treatment of my gender dysphoria over the past year." ECF No. 152-14, p. 6. He goes on to recount, "[t]he specific issue which triggered this grievance at this time occurred on 11/6/17. I was scheduled to see Dr. Alexander to have my testosterone dosage increased from 75 mg to 100 mg … ." *Id.* He continues, "I have written multiple requests to Ms. Belt, Ms. Anderson, and the previous 3 doctors (Dr. Alley, Dr. Alpert, and Dr. Alexander) trying to get them to listen to me and adhere to the standard of care in ordering me lab work at the appropriate intervals and adjusting my testosterone dose. At every turn, I have been met with resistance in terms of unnecessary delays in ordering medication, lab work, and appointments." *Id.* As to Dr. Alpert specifically, Daly stated that "I last saw Dr. Alpert on 10/10/17. Despite invalid lab work because it was drawn at an inappropriate time, he still refused to increase my dose. He told me that he would see me 'in the end of October' after my new lab work was back. I was never called down for results of my lab work, so I went to medical records myself and found my level of 668. I then found out Dr. Alpert had left the institution." *Id.*

The Medical Defendants argue that Daly's grievance limited his definition of the "Medical Department" to only those individuals specified in the grievance (Alexander, Anderson, and Belt), and that he further limited the scope of the grievance to a triggering event on November 6, 2017. *See* ECF No. 174, p. 11. They further argue that Daly did not file a specific grievance against Dr. Alpert based on his refusal to increase his testosterone dosage on October 10, 2017. Grievance 706257 was minimally sufficient, however, to put prison officials on notice that Dr. Alpert was involved in the events about which Daly was complaining. It

complained not only about the conduct of Alexander, Anderson, and Belt but also the alleged inadequacy of the medical department's treatment of his gender dysphoria, especially the department's testing of his hormone levels, "for the past year." ECF No. 152-14, p. 6. And Daly's grievance identified Alpert as one of the doctors who "refused to increase my testosterone dosage." *Id.* Because Grievance 706257 was sufficient to place prison officials on notice of Dr. Alpert's involvement in the subject matter of Daly's claim, it was adequate to satisfy the identification requirement of DC-ADM 804 § 1(A)(11). *See, e.g., In v. Stroup,* 2021 WL 5922331, at *6 (W.D. Pa. Dec. 15, 2021); *Merrit v. Fogel*, 2010 WL 3489152, at *3 (W.D. Pa. July 23, 2010), *report and recommendation adopted* 2010 WL 3448618 (W.D. Pa. Sept. 1, 2010). But this was not the case for Dr. Obeng.

Dr. Obeng did not begin working at SCI-Cambridge Springs until January of 2019, and he did not see Daly as a patient until January 31, 2019. *See* ECF No. 162, p. 36, ¶ 148. This was well after Daly filed Grievance 706257. And although the record includes grievances that specifically identify Dr. Obeng, those grievances are wholly unrelated to the claims at issue in this litigation. For example, Daly's Grievance 797249 dated April 15, 2019 complained about the "Medical Department's" "refusal to allow [him] to follow up with gastroenterology" and not anything related to his gender dysphoria treatment. *See ECF* No. 152-17, p. 6. Similarly, Daly's Grievance Nos. 952068 and 958525 against Dr. Obeng concerned Daly's complaints of "back pain" and Dr. Obeng's response to those complaints. *See* ECF No. 152-19. Neither grievance raised any concerns regarding Daly's gender dysphoria treatment. Because Daly never filed any grievance against Dr. Obeng relating to his gender dysphoria treatment, Daly's Eighth Amendment claim against Dr. Obeng should be dismissed as unexhausted.

18

     c.  Daly's claims for injunctive relief are moot and unsupported by the record.

  The DOC Defendants argue that Daly's various requests for injunctive relief have been rendered moot by changed circumstances, including the departure of Dr. Albert and Dr. Obeng from any role relative to Daly's care and Daly's having already obtained much of the requested relief. *See* ECF No. 145, p. 21. A claim for injunctive relief becomes moot when the underlying issue has been resolved or circumstances have changed such that there is no longer a need for the court to provide a remedy. In such situations, an active controversy no longer remains for the court to resolve, leaving no effective relief for the court to grant. *See, e.g. In re Garrett*, 736 Fed. Appx. 47, 48-49 (3d Cir. Aug. 29, 2018). *See, e.g., Lloyd v. Wetzel*, 2023 WL 4053870, at *7 (W.D. Pa. Mar. 30, 2023), *report and recommendation adopted*, 2023 WL 4053093 (W.D. Pa. June 16, 2023). The principle of mootness ensures that courts only address ongoing disputes and do not render advisory opinions on hypothetical or settled matters. *Denisova v. Mayorkas*, 2024 WL 2043664, at *3 (W.D. Pa. May 8, 2024) (citing *Zuch v. Commissioner of Internal Revenue*, 97 F.4th 81, 93 (3d Cir. 2024)). *See also Reid v. Wakefield*, 2008 WL 858993, at 2 (W.D. Pa. Mar. 31, 2008) (requested injunctive relief is moot where the prisoner obtained requested relief from prison officials).

  Daly's Amended Complaint broadly requests an injunction mandating that he be provided "necessary medical care" for his gender dysphoria. ECF No. 33, p. 24, ¶ C. Rule 65(d) requires, however, that "[e]very order granting an injunction and every restraining order must state its terms specifically" and "describe in reasonable detail ... the act or acts restrained or required." Fed. R. Civ. P. 65(d)(1)(B), (C). "These requirements are not mere technicalities. They 'relate[ ] to the court's awesome civil and criminal contempt powers. Persons may not be placed at risk of contempt unless they have been given specific notice of the norm to which they

must pattern their conduct.'" *Hope v. Warden of York Cty. Prison*, 972 F.3d 310, 321–22, (3d

Cir. 2020) (quoting *Inmates of Allegheny Cty. Jail v. Wecht*, 754 F.2d 120, 129 (3d Cir. 1985)).

The need to examine each specific request for injunctive relief is particularly important in the

prison context because the PLRA expressly mandates judicial restraint:

> Prospective relief in any civil action with respect to prison
> conditions shall extend no further than necessary to correct the
> violation of the Federal right of a particular plaintiff or plaintiffs.
> The court shall not grant or approve any prospective relief unless
> the court finds that such relief is narrowly drawn, extends no
> further than necessary to correct the violation of the Federal right,
> and is the least intrusive means necessary to correct the violation
> of the Federal right. The court shall give substantial weight to any
> adverse impact on public safety or the operation of a criminal
> justice system caused by the relief.

28 U.S.C. § 3626(a)(1)(A).

In this case, Daly seeks an injunction mandating: access to an outside transgender

specialist, permanent hair removal, gender affirming surgery, training of all prison staff who

provide medical or mental health treatment on the Standards of Care for transgender individuals,

and confidentiality regarding all conversations relating to Daly's hormone therapy,

accommodations, or healthcare needs. *Id.* The continued viability of each request is addressed

herein.[8]

---

[8] During the pendency of this action, Daly was transferred from SCI-Cambridge Springs to SCI-Muncy. The DOC Defendants maintain that this transfer moots certain of Daly's claims for injunctive relief. *See* ECF No. 145, pp. 17-18. The DOC Defendants focus on Daly's requests for access to male commissary items and certain gym/exercise equipment. *See id.* That relief was requested solely under Daly's ADA/RA claims, which Daly has abandoned. Accordingly, these claims for relief are no longer part of the case. To the extent Daly requests other forms of injunctive relief under his Eighth and Fourteenth Amendment claims, however, these requests remain pending. These are his requests for access to a transgender care specialist and hair removal. These requests for relief are also unaffected by Daly's transfer to a different correctional institution because they are not unique to SCI-Cambridge Springs but would apply wherever Daly may be housed within the DOC system. *See, e.g., Shoatz v. Wetzel*, 2016 WL 595337, at *13 (W.D. Pa. Feb. 12, 2016) (inmate's transfer to another prison within the system does not take him outside the control of the DOC Defendants); *Dantzler v. Beard*, 2010 WL 1008294, at *11 n.10 (W.D. Pa. Mar. 15, 2010) (holding inmate's claims for injunctive relief against DOC policies not mooted by internal transfer).

i.  Any request for injunctive relief against Dr. Alpert is moot.

As discussed, Daly did not exhaust his claims for compensatory or punitive damages against any Defendant or his claims from injunctive relief against Dr. Obeng. And while his Grievance 706257 sufficiently identified Dr. Alpert and exhausted his claim for injunctive relief against him, any such request is now moot because Dr. Alpert has no ongoing or future role or authority relative to Daly's medical care or DOC medical care policies. Daly acknowledges that he ceased to be under the care of Dr. Alpert when Dr. Alpert left SCI-Cambridge Springs. Indeed, Dr. Alpert is no longer employed by the DOC and has no role in providing medical care at SCI-Muncy, where Daly is currently incarcerated. Similarly, nothing in the record supports that Dr. Alpert has any involvement in DOC policymaking or training regarding gender dysphoria. Given these circumstances, any claim for injunctive relief against Dr. Alpert is moot and should be dismissed as such.

ii.  Daly's request for access to a transgender specialist is moot and unsupported by the record.

Daly's request for access to "an outside transgender specialist," *see* ECF No. 33, p. 24, ¶ B, is also moot because he has had access to Dr. Ingrid Renberg, a WPATH certified physician, since at least March 21, 2021. *See, e.g., Evans v. McKay*, 2021 WL 2682708, at *3 n.3 (D. Del. June 30, 2021) (prayer for injunctive relief became moot when plaintiff met with a specialist and had recommended surgery). Dr. Renberg is the physician who recommended Daly's "top" surgery, and Daly acknowledges that DOC officials have never denied Daly any treatment or procedure recommended by Dr. Renberg. To the extent Daly would prefer to have a specialist other than Dr. Renberg oversee his care, the Eighth Amendment, which prohibits cruel and unusual punishment, does not accommodate such preferences.

At all times relevant to this action, DOC policy has specified that "[i]t shall be the responsibility of the contracted medical and psychiatric service vendors to identify and consult with an appropriate sub-specialist" where the medical providers deem it necessary. *See* ECF No. 144, ¶ 77; ECF No. 162, ¶ 77. Thus, referral to a specialist is a treatment decision left to the medical providers, not DOC personnel. Daly acknowledges that Dr. Renberg has been specially trained and certified in the treatment of gender dysphoria. Daly was asked in his deposition, "And do you know if Dr. Renberg is a gender dysphoria specialist or has special training in gender dysphoria?" Daly answered, "I believe that she does in the sense that she did a WPATH training." ECF No. 163-2, p. 16. Daly subsequently clarified his belief that "receiving a certificate and being a specialist in medicine are widely different things." *Id.*, p. 26. Whatever Daly's notion or who qualifies as a "specialist," there can be no genuine dispute that Dr. Renberg has specialized training to treat his gender dysphoria. Prisoners "do not have a constitutional right to choose their own medical providers nor to obtain treatment of their own choosing." *Abdulrazzaq v. Trump*, 422 F. Supp. 3d 281, 291 (D.D.C. 2019) (citing *Roberts v. Spalding*, 783 F.2d 867, 870 (9th Cir. 1986) ("A prison inmate has no independent constitutional right to outside medical care additional and supplemental to the medical care provided by the prison staff within the institution."); *United States v. Rovetuso*, 768 F.2d 809, 825 (7th Cir. 1985) ("The Eighth Amendment guarantees a prisoner treatment of his serious medical needs, not a doctor of his own choosing."); *United States ex rel. Hyde v. McGinnis*, 429 F.2d 864, 867-68 (2d Cir. 1970) ("The prisoner's right is to medical care—not the type or scope of medical care which he personally desires. A difference of opinion between a physician and a patient does not give rise to a constitutional right ...")). *See also, Tenon v. Dreibelbis*, 2017 WL 1344643, at *10 (M.D. Pa. Apr. 12, 2017) (rejecting Plaintiff's argument that physician—an ear, nose, and throat

specialist—lacked qualifications to read a jaw x-ray as not alleging deliberate indifference but instead as an allegation of medical negligence). Accordingly, Daly's request for an injunction mandating that the DOC provide him with access to an outside transgender specialist should be dismissed as moot or, alternatively, as factually baseless.[9]

> iii. Daly's request for gender affirming surgery is moot or unsupported by the record.

The DOC Defendants argue that Daly's request for gender affirming surgery is moot because, after consultation with Dr. Renberg, he received the "top" surgery he had requested, and he has not requested "bottom" surgery or any other gender-affirming surgical procedure.[10] *See* ECF No. 145, p. 22. The DOC Defendants are correct. It is undisputed that Daly underwent top surgery in October 2022, and that he has never requested bottom surgery. Injunctive relief is appropriate only where "the injury or threat of injury [is] both real and immediate, not conjectural or hypothetical." *Brunner v. Little*, 2023 WL 3004852, at *1 (W.D. Pa. Apr. 19, 2023) (Baxter, J.) (citing *Martinez v. Rivello*, 2022 WL 3088092, at *4 (M.D. Pa. Aug. 3, 2022) (quoting *Golden v. Zwickler*, 394 U.S. 103, 109-110 (1969) (internal quotation marks omitted)). The possibility that Daly may change his mind in the future and request bottom surgery is speculative and hypothetical. In addition, the record includes no evidence, expert or otherwise, that bottom surgery is necessary or appropriate to treat Daly's gender dysphoria.

---

[9] To the extent Daly asserts that the DOC Defendants unduly delayed his access to Dr. Renberg, this allegation does not relate to his claim for injunctive relief. As previously discussed, Daly failed to exhaust his claims for monetary relief, precluding his recovery of such relief based on an alleged delay in access to Dr. Renberg. In addition, the record reflects that prior to the referral to Dr. Renberg, Daly was provided meaningful care for his gender dysphoria. He was evaluated by Dr. Goodpastor, and multiple physicians participated in or oversaw his hormone therapy and counseling.

[10] Daly's request for laser hair removal is addressed separately.

iv. Daly's request for laser hair removal is moot or unsupported by the record.

The DOC Defendants also argue that Daly's request for hair removal is moot based on his admission that he has not made any such request since receiving his top surgery. *See* ECF No. 144, ¶ 177; ECF No. 162, ¶ 177. It is thus unclear whether Daly continues to seek such treatment. To the extent he does not, the claim is obviously moot. To the extent he does not presently seek such treatment but believes he may in the future, the claim is speculative and hypothetical and, therefore, also inappropriate for injunctive relief. The dilemma facing the Court is that Daly's intentions with respect to this claim are unclear. While he admits that he has not requested hair removal since his top surgery in October 2022, his brief in opposition to the pending motions treats this request as active.

But even assuming that this request for relief is not moot, it nevertheless suffers from another fundamental deficiency—Daly has not demonstrated a prima facie entitlement to this relief. It is undisputed that medical personnel offered Daly options for addressing the increased body and facial hair growth that were a side effect of his testosterone treatments. These options were thioglycolic acid hair removal creams and razors. In addition, Daly was offered the option of reducing the dosage of his hormonal treatments to reduce unwanted hair growth. Daly has offered no evidence or authority to support that offering a gender-dysphoric inmate these options rather than laser hair removal represents deliberate indifference to the inmate's medical needs. The report of Daly's medical expert, Molly Ainsman Fisher, M.D, MS, addressed the issue of increased hair growth and hair removal as follows:

> Mx. Daly had increased body and facial hair growth from their testosterone. This is a known and expected side effect. Based on the records that I reviewed, Defendant Alpert, was aware of this as well and discussed this with them. This was a major source of dysphoria for Mx. Daly. Patients often take medications that have unwanted side effects, and those side effects are then addressed.

24

> This could have been addressed in two ways. One way would be
> through hair removal. According to the Standards of Care, hair
> removal is often a medically necessary part of gender affirming
> treatment. Hair removal can be with a razor, but commonly with
> electrolysis or laser hair removal. This is considered to be
> medically necessary and not cosmetic. The other way in which
> it could have been addressed is by significantly lowering their
> testosterone dose. Individuals who would like to be on
> masculinizing therapy but have a more androgynous look will
> often "microdose" or stay on lower levels testosterone. This is
> common in my practice. Since Mx. Daly wanted some of the
> effects of testosterone but not others, microdosing should have
> been offered as an option. This would have likely caused much
> less hair growth. Had they taken this route, they probably would
> have had more vaginal bleeding, but that could have been
> addressed in other ways discussed above.

ECF No. 163-8, p.11.

Dr. Fisher does not opine that hair removal by electrolysis is medically necessary to treat

Daly's gender dysphoria. In fact, she acknowledges that increased hair growth may be addressed

by other means, including a razor. In addition, Dr. Fisher acknowledges that Daly's desire for

"some of the effects of testosterone but not others" made microdosing an "option," but also one

that "likely would have resulted" in the side effect of increased vaginal bleeding. And her

comments about what "should have been offered" as additional options to address increased hair

growth represent, at most, a difference in medical opinion or medical negligence. Dr. Fisher's

comments fall well-short of asserting that Daly has an immediate medical need for electrolysis or

that any Defendant's failure to include electrolysis among the options offered to Daly for hair

removal rises to the level of deliberate indifference to Daly's medical needs. Accordingly, all

Defendants are entitled to summary judgment regarding this claim for relief.

     v. Daly's request for required training for DOC personnel and outside medical
      and mental healthcare providers is moot and unsupported by the record.

  Daly also asks the Court to enter injunctive relief mandating that the DOC Defendants

provide training on the standards of care for treating transgender inmates to all medical and

mental health personnel working in its institutions. *See* ECF No. 33, p. 25, ¶ D. This relief is

also moot because the DOC requires just that. Daly does not dispute that both prior and current

DOC policy (Section 19, 13.2.1) provide that "contracted medical and psychiatric vendors shall

be responsible for training their practitioners in Transgender Health Care." ECF No. 144, ¶ 79;

ECF No. 162, p. 8, ¶ 79. The DOC's updated policy further requires that the "Psychology Office

shall be responsible for training psychology staff in Transgender Health Care, consistent with

Department policy 13.8.1, Access to Mental Health Care, Section 1." ECF No. 143-3, p. 112.

  The record is also insufficient to support a finding that any alleged deficiency in training

threatens irreparable harm to Daly. The level of judicial management of prison medical

operations that Daly seeks by this request would violate the PLRA's direction that "[p]rospective

relief in any civil action with respect to prison conditions shall extend no further than necessary

to correct the violation of the Federal right of a particular plaintiff" and that "[t]he court shall not

grant or approve any prospective relief unless the court finds that such relief is narrowly drawn,

extends no further than necessary to correct the violation of the Federal right, and is the least

intrusive means necessary to correct the violation of the Federal right."[11] 28 U.S.C.

§ 3626(a)(1)(A).

---

[11] Daly contends that there is "plainly additional relief for the Court to grant." ECF No. 161, p. 24. Because he "will
continue to need hormone therapy," and because his gender dysphoria is an "ongoing" condition, Daly argues the
Court can order injunctive relief related to his condition. *See id.* For example, he points to his interest in being able
to urinate from a standing position which could be accomplished using a medical device and/or a surgical procedure.
*Id.* But in his deposition, Daly testified that he was hesitant to pursue such treatment. Daly stated that, although he'd
like to "pee standing up," he was not "sure right now," because he did not have sufficient information to request that
procedure and was concerned that he would have to be transferred to a men's prison should such surgery take place.
*See* ECF No. 163-2, p. 32. Daly's desire for such future procedures is hypothetical and purely speculative at this

vi. Daly's request for injunctive relief mandating that all discussions of Daly's treatment for gender dysphoria be conducted in situations that preserve Daly's confidentiality is moot and unsupported by the record.

Daly asks for injunctive relief requiring "all discussions and conversations" concerning his "hormone therapy, other transgender accommodations, or healthcare," or any mental health treatment to be conducted in such as manner as to preserve confidentiality." ECF No. 33, p. 25, ¶ E. This request is moot. Daly filed Grievance 706257 against Anderson, alleging that Anderson "came to my room on my housing unit and committed a HIPPA [sic] violation. When I told her I still had not been seen by medical to have my dosage increased, she loudly announced to me the details of my medical care." ECF No. 152-14, p. 6. Daly's grievance against Anderson was upheld on initial review, with Anderson agreeing she "will not allow for any similar situation to be repeated." *Id.*, p. 7. When appealing other aspects of this grievance, Daly specifically noted he was only "appealing the part that was denied" concerning "direct access to a doctor specializing in transgender medicine." *Id.*, pp. 8-9.

The relief that Daly seeks in this lawsuit was previously obtained in the DOC's resolution of his grievance, and nothing in the record supports that any threat of future disclosure of confidential information exists. The cell-side exchange between Daly and Anderson is the only instance of improper disclosure of confidential information that Daly alleges Anderson or any other SCI-Cambridge Springs staff member committed in this case, and no such disclosure is alleged to have occurred at SCI-Muncy. The record does not support a pattern or history of

---

point, and nothing in the record supports that any such procedure is medically necessary to treat his gender dysphoria. Nor is there any support in the record for any ongoing judicial oversight of Daly's hormone treatments. Daly essentially is asking the Court to mandate that prison officials provide him with whatever procedures and treatment he may desire in the future and to judicially oversee any ongoing treatment that may be prescribed or recommended by those responsible for his care. Nothing in the record or governing law supports such a sweeping injunction.

improper disclosure of confidential information or any threat of future disclosure at any DOC

correctional institution. Accordingly, no basis for injunctive relief exists.

    2. Defendants are entitled to judgment as a matter of law on Daly's claims for declaratory
       relief.

Daly's Amended Complaint also requests a declaration that the DOC violated his rights

under the ADA and the RA and that all remaining individual Defendants violated his Eighth and

Fourteenth Amendment rights. *See* ECF No. 33, p. 24. Daly does not oppose the DOC

Defendants' motion for summary judgment regarding his ADA and RA claims (Counts I and II).

Daly concedes: "In light of Mx. Daly's transfer to SCI Muncy, Plaintiff does not oppose the

DOC's motion for summary judgment with respect to their ADA and RA claims." ECF No. 161,

p. 1 n.1. As previously recommended, the DOC Defendants' motion for summary judgment

should be granted as to Counts I and II, and any related request for declaratory relief relating to

these Counts should be denied as moot.

Defendants Anderson and Dr. Alexander are also entitled to summary judgment on

Daly's claims for declaratory relief related to his Eighth and Fourteenth Amendment claims.

Daly's request for declaratory relief is based on the past conduct of these Defendants. *See* ECF

No. 33, p. 24 (Defendants "*violated*" Daly's rights) (emphasis added). "Declaratory judgment is

available to define the legal rights of the Parties; not to adjudicate past conduct." *Taggert v.*

*Saltz*, 855 Fed. Appx. 812, 815 (3d Cir. 2021). Declaratory relief is not "meant simply to

proclaim that one party is liable to another." *Corliss v. O'Brien*, 200 Fed. Appx. 80, 84 (3d Cir.

2006). Past injury is therefore not a basis for declaratory relief. *See Batchelor v. Spagnoletti*,

2024 WL 1660545 (E.D. Pa. Apr. 17, 2024); *Lee v. Fiscus*, 2024 WL 759083, at *1 n.2 (W.D.

Pa. Jan. 18, 2024), *report and recommendation adopted*, 2024 WL 757099 (W.D. Pa. Feb. 20,

2024). Because Daly's request for declaratory relief is based on the Defendants' alleged past

violations of his Eighth and Fourteenth Amendment rights, summary judgment should be granted

in their favor on these claims.

     3. Drs. Noel and Reddy are also entitled to judgment as a matter of law on Daly's Eighth
        Amendment claim based on the insufficiency of the record to support that they or any
        other Defendant acted with deliberate indifference.

As previously discussed, Daly has no viable compensatory or punitive damage claim

against any Defendant, including Drs. Noel and Reddy, because he failed to request such

damages during the administrative process.[12] In addition to this ground for dismissal of Daly's

claim against Drs. Noel and Reddy, his claim against them in their individual capacities fails

based on the insufficiency of the evidence to support that either acted with deliberate

indifference to his medical needs or adopted a policy that caused others to do so.

      Daly claims that Drs. Noel and Reddy violated his Eighth Amendment rights by denying

him the "informed care" that a transgender healthcare specialist could have provided.[13] To

proceed on a deliberate indifference claim, Daly must produce evidence sufficient to support a

finding that Drs. Noel and Reddy "engaged in action or omissions which indicate [they] knew of

and disregarded 'an excessive risk to inmate health or safety.'"[14] *Moses v. Sood*, 2024 WL

2291945, at *3 (D.N.J. May 20, 2024) (quoting *Natale v. Camden Cnty. Corr. Facility*, 318 F.3d

575, 582 (3d Cir. 2003)). The record does not support such a finding as to either Defendant.

The record demonstrates that Daly received regular care and treatment for his gender dysphoria

and that Drs. Noel and Reddy never denied Daly "any form of treatment that was recommended

---

[12] This failure also precludes "nominal damages" as a remedy. *See Mills v. Rogers*, 2024 WL 3034099, at *17 (M.D. Pa. June 17, 2024).

[13] Daly also asserted this claim against Defendant Wetzel, but Daly does not oppose the DOC Defendants' motion for summary judgment as to Wetzel.

[14] The record fully supports that Daly's medical needs were sufficiently serious. *See* ECF No. 167, p. 9; *Campbell v. Kallas*, 936 F.3d 536, 538 (7th Cir. 2019) (recognizing that gender dysphoria is a serious medical condition).

by Dr. Renberg or any other provider directly involved in his care."[15]  ECF No. 144, ¶ 175.  This

includes approving Daly for gender affirming surgery.  *Id.*

"Where a prisoner has received some medical attention and the dispute is over the

adequacy of treatment, federal courts are generally reluctant to second guess medical judgments

and constitutionalize claims which sound in state law." *Everett v. Nort*, 547 Fed. Appx. 117, 121

(3d Cir. 2013) (citation omitted).  "Prisoners do not have a constitutional right to limitless

medical care." *Winslow v. Prison Health Servs.*, 406 Fed. Appx. 671, 674 (3d Cir. 2011).

Furthermore, "prison authorities are accorded considerable latitude in the diagnosis and

treatment of prisoners." *Roman v. Little*, 2021 WL 794938, at *8 (E.D. Pa. Feb. 26, 2021)

(citation omitted).  Disagreement or dissatisfaction with a defendant's course of treatment or

action is not deliberate indifference. *See Hairston v. Director Bureau of Prisons*, 563 Fed. Appx.

893, 895 (3d Cir. 2014); *White v. Napoleon*, 897 F.2d 103, 110 (3d Cir. 1990).  In that regard,

"the Third Circuit has made clear that 'there is a critical distinction 'between cases where the

complaint alleges a complete denial of medical care and those alleging inadequate medical

treatment.'" *Plummer v. WellPath*, 2023 WL 2472502, at *7 (W.D. Pa. Mar. 13, 2023) (quoting

*Wisniewski v. Frommer*, 751 Fed. Appx. 192, 195-96 (3d Cir. Oct. 3, 2018)), *aff'd*, 2023 WL

4181620 (3d Cir. June 26, 2023), *cert. denied*, 144 S. Ct. 836 (2024).  The record reflects that

Daly received extensive medical care for his gender dysphoria.  What Daly challenges is the

adequacy of that care.

---

[15] Daly responded to the DOC Defendants' concise statement of material facts on this point, stating only that it was "Denied as stated" and without identifying what, if any, portion of the statement he disputed, and without identifying any evidence to contradict the assertion. ECF No. 162, ¶ 175.  As noted previously at footnote 7, this response constituted an admission of the DOC's statement of fact.

Citing *Clark v. Quiros*, 693 F. Supp.3d 254 (D. Conn. 2023), Daly claims that the delay in referring him to a specialist in gender dysphoria deprived him, at least temporarily, of "informed care." In *Clark*, however, the district court addressed a vastly different record than the one presented here. There, the plaintiff was largely denied any meaningful care for her gender dysphoria. In *Clark*,

> [i]t took years and [the pending] litigation for [Connecticut] DOC officials to refer Ms. Clark to see someone with experience and expertise in treating gender dysphoria. It took over ten months after her self-castration attempt to receive any care aside from a referral to a mental health provider that had no experience or expertise in treating patients with gender dysphoria.

693 F. Supp.3d at 287. After Clark belatedly received the hormone treatment recommended by a specialist, the Connecticut DOC failed to "follow medical protocol prescribed by that specialist and ignored multiple test results which reflected an increasing need to follow the protocol or of any documentary scheduling or other impediments to following protocol." *Id.* The Court concluded that because Clark had barely received *any* care, and because the prison physician "entirely refused to provide any treatment for almost a year, and then provided severely inadequate partial treatment for three years," she was denied informed care which "obviously contributed to Ms. Clark's suffering." *Id.* at 292.

The record in *Clark* materially contrasts to the facts of this case. Here, there is no evidence in the record that any Defendant materially deviated from any prescribed treatment for Daly, including his hormone therapy. Dr. Alpert approved Daly for masculinizing hormone therapy while cautioning him against doing "too much too fast ... due to some social stressors." Daly promptly received that therapy, and the record belies a finding that any Defendant deviated from prescribed or medically accepted protocols when administering that therapy. Daly's desire

31

to be seen by a transgender specialist earlier in his treatment is also not a basis for an Eighth

Amendment claim.  *See, e.g., Thompson v. Lanigan*, 2019 WL 34213585 at *6 (D.N.J. July 30,

2019) (citing *Lasko v. Watts*, 373 Fed. Appx. 196, 203 (3d Cir. 2010) (explaining that a "prisoner

does not have the right to choose a specific form of medical treatment")); *Winslow v. Prison

Health Servs.*, 406 Fed. Appx. 671, 674 (3d Cir. 2011) ("[P]risoners do not have a constitutional

right to limitless medical care ...").  That is, the "refusal to summon the medical specialist of the

inmate's choice ... does not amount to cruel and unusual punishment."  *Roman v. Little*, 2021

WL 794938, at *8 (E.D. Pa. Feb. 26, 2021).  *See also Williams v. Kort*, 223 Fed. Appx 95 (3d

Cir. 2007) (affirming grant of summary judgment where prison doctor saw prisoner for medical

complaints but did not refer inmate to specialist).

     In any case, Daly was provided with access to Dr. Renberg, a WPATH-certified

physician/board-certified psychiatrist.  Daly does not allege that any care provided or prescribed

by Dr. Renberg was deficient, let alone deliberately indifferent to his medical needs.  Instead, his

claim is based on his preference for a referral to a specialist other than Dr. Renberg.  This is

nothing more than a disagreement with the type or nature of the treatment he received and not

"probative summary judgment evidence of deliberate indifference."  *Perkins v. Townsend*, 2024

WL 460252, at *12 (S.D. Tex. Jan. 31, 2014) (citing *Davis v. Lumpkin*, 35 F.4th 958, 963 (5th Cir.

2022)).  *See also Ledoux v. Davies*, 961 F.2d 1536, 1537 (10th Cir. 1992) (holding that

"Plaintiff's belief that he needed additional medication, other than that prescribed by the treating

physician, as well as his contention that he was denied treatment by a specialist is ... insufficient

to establish a constitutional violation").

     To the extent Daly asserts his claim against Drs. Noel and Reddy based on their positions

or responsibilities as policymakers or supervisors, his claim also fails.  Daly argues that Drs.

Noel and Reddy, as members of the Committee, were deliberately indifferent in "the development and implementation of Section 19," which resulted in him receiving uninformed care. *Id.* DOC Policy Statement 13.2.1 §19 has consistently provided that "[i]t shall be the responsibility of the contracted medical and psychiatric service vendors to identify and consult with an appropriate sub-specialist if the medical provider deems it necessary." ECF No. 144, ¶ 77; ECF No. 162, ¶ 77. Although the prior policy gave overall responsibility for the medical treatment of inmates diagnosed with gender dysphoria to the Chief of Clinical Services and overall responsibility for the mental health diagnosis and treatment of inmates diagnosed with gender dysphoria to the DOC's Chief Psychiatrist, nothing in the record supports that any procedure or treatment recommended for Daly was denied or delayed for nonmedical reasons.

Any claim of supervisor or policymaker liability fails in this case because the record does not support that any employee or agent violated Daly's constitutional rights pursuant to a policy of deliberate indifference to Daly's medical needs or due to a lack of supervision or training. The absence of an underlying constitutional violation precludes a viable supervisor or policymaker liability claim under 42 U.S.C. § 1983. *See Talley v. Varner,* 786 Fed. Appx. 326, 329 (3d Cir. 2019) (holding that claims of supervisory liability failed because the record did not support any underlying constitutional violation); *Santiago v. Warminster Township,* 629 F.3d 121, 130 (3d Cir. 2010) (reasoning that a claim for supervisory liability "necessarily includes as an element an actual violation at the hands of subordinates").

Daly's claim against Drs. Noel and Reddy is essentially a challenge to their decision to manage his gender dysphoria care internally for a period following his initial diagnosis rather than immediately refer him to a specialist in transgender care. This is not deliberate indifference

33

but instead a disagreement over the adequacy of the extensive care Daly received. As such, it fails as a matter of law.

> 4. Dr. Alpert is also entitled to judgment as a matter of law on Daly's Eighth Amendment claim based on the insufficiency of the record to support his deliberate indifference.

Again, as noted, Daly has no viable claim for compensatory, nominal, or punitive damages against any Defendant, including Dr. Alpert, because he did not request such damages during the administrative process. Like his claim against Drs. Noel and Reddy, his claim against Dr. Alpert in his individual capacity also fails based on the insufficiency of the evidence to support that he acted with deliberate indifference to Daly's medical needs.

Daly contends that Dr. Alpert acted with deliberate indifference to his serious medical need by failing to commence his hormone treatment earlier than he did and by not sending him to see a transgender healthcare specialist sooner. *See* ECF No. 161, pp. 8-13. A prison official can be deliberately indifferent when they intentionally deny or delay access to medical care. *See White v. Napoleon*, 897 F.2d 103, 108 (3d Cir 1990); *Natale v. Camden Cnty. Corr. Facility*, 318 F.3d 575, 582 (3d Cir. 2003) (explaining that courts have "found deliberate indifference in situations where necessary medical treatment is delayed for non-medical reasons") (cleaned up). A medical provider who delays or denies necessary medical care for non-medical reasons rather than based on medical judgment may be found to have acted with deliberate indifference to the individual's medical needs. *See Pearson v. Prison Health Serv.*, 850 F.3d 526, 537 (3d Cir. 2017). Here, however, the record includes no evidence upon which a reasonable jury could find that Dr. Alpert or any other Defendant delayed or denied any necessary medical care to Daly for nonmedical reasons.

After Daly was found to have met the criteria for a diagnosis of gender dysphoria, he continued to meet with SCI-Cambridge Springs' psychiatric services over the next several

months.  Dr. Alpert saw Daly on May 8, 2017.  ECF No. 152, ¶ 40.  The medical records from

this consultation reveal that although Alpert concluded that "transgender assignment via a

medical approach" was warranted, he recommended a "cautious approach" to ensure a

"successful transition" given the "social stressors [Daly] has had to endure, including

incarceration, feelings of sadness and guilt."  *Id*. at ¶ 41.  Although Dr. Alpert recommended

hormone therapy and continued psychological/psychiatric care, he also cautioned Daly about

proceeding with "too much too fast."  *Id*.  Daly acknowledged that his hormone treatment would

not begin immediately.  In his deposition testimony, Daly stated that Dr. Alpert told him there

was "a big process I had to go through."  ECF No. 162-2, p. 6.  And Daly supported a cautious

approach: "I remember telling [Dr. Alpert] I wasn't sure what to expect, and so I wanted to start

gradually."  *Id*. at p. 7.  Daly started hormone treatment in the "Spring of 2017."  *Id*., at p. 6.  His

medical records indicate that Daly's testosterone injections commenced on May 23, 2017.  *See*

ECF No. 152-1, p. 31.  Dr. Alpert ordered Daly to see him for follow-up appointments in July.

*Id*., p. 8.  By October of that year, Daly's testosterone dosage had been increased to 100mg.  *Id.*,

p. 10.

> The record is devoid of evidence from which a reasonable jury could conclude that Dr.

Alpert delayed his hormone treatment or any other treatment for non-medical reasons.  Indeed,

the record does not demonstrate that Dr. Alpert delayed treatment for any reason.  "[I]t is well

established that as long as a physician exercises professional judgment his behavior will not

violate a prisoner's constitutional rights."  *Brown v. Borough of Chambersburg*, 903 F.2d 274,

278 (3d Cir. 1990) (citing *Youngberg v. Romeo*, 457 U.S. 307, 322–23 (1982)).  Dr. Alpert

explained to Daly the medical reasons to proceed with hormone therapy cautiously and

incrementally.  Dr. Alpert also explained that he was subject to a process for obtaining approval

of this treatment. Nothing in the record supports that Dr. Alpert failed to seek and obtain this approval in a timely manner. Indeed, Daly began receiving his hormone treatments within weeks of his initial consultation with Dr. Alpert. Dr. Alpert is entitled to judgment as a matter of law on Daly's Eighth Amendment deliberate indifference claim.

> 5. Dr. Alexander is entitled to judgment as a matter of law on Daly's Eighth Amendment claim based on the insufficiency of the record to support that he acted with deliberate indifference.

Dr. Alexander is a physician who provided medical services to the inmates at SCI-Cambridge Springs between October of 2017 and April of 2018. ECF No. 149, ¶ 4. Daly claims that Dr. Alexander acted with deliberate indifference to his serious medical needs by failing to provide him with access to a transgender healthcare specialist, gender-affirming surgery, and other necessary healthcare. *See* ECF No. 33, ¶ 177. Daly also contends that Dr. Alexander acted with deliberate indifference by adjusting his testosterone dosage and by monitoring his testosterone levels at incorrect time intervals. *Id.*, ¶ 81-87.

As noted in Daly's medical records, on October 24, 2017, Dr. Alexander signed off on Daly's lab results indicating that Daly's free testosterone rate was 10.4 pg/mL. *See* ECF No. 172-10, p. 1. Alexander reviewed Daly's lab results again on November 28, 2017. ECF No. 154, ¶ 20. Then, on November 30, 2017, Alexander increased Daly's testosterone dosage from 75mg to 100mg per week.[16] *Id.*, ¶ 21. Alexander then decreased the dosage to 75 mg on January 16, 2018. *Id.*, ¶ 27. In April of 2018, Alexander decreased Daly's testosterone dosage to 60 mg. *Id.*, ¶ 41. Then, on April 19, 2018, after Daly's complaints of angina, Alexander ordered him to undergo diagnostic imaging of his chest. *Id.*, ¶ 43. Alexander stopped working at

---

[16] Daly's response to this assertion is non-responsive. Daly's responsive concise statement of material facts on this point references a lab report and Dr. Alexander's review of the findings, but that is not responsive to Paragraph 21 of Alexander's concise statement. *See* ECF No. 162, p. 57, ¶ 21.

SCI-Cambridge Springs in April of 2018. *Id.*, ¶ 48. Each adjustment Dr. Alexander made in

Daly's testosterone dosage was based on his lab results and Dr. Alexander's medical judgment.

The record includes no evidence to the contrary. Indeed, Daly's own expert, Dr. Fisher, negates

his claims against Dr. Alexander. Daly's expert testified that 1) Alexander never withheld or

refused testosterone treatment for a nonmedical reason; 2) Alexander adjusted Daly's dosage

based on elevated blood test levels that were not within therapeutic range and based on Daly's

own cardiac complaints; and 3) Alexander did raise Daly's dosage to 100mg as he requested

when it was deems safe to do so. *See* ECF No. 154-45, at pp. 90-93 (Fisher Deposition).

Daly's contention that Dr. Alexander was deliberately indifferent for failing to order

blood samples to be taken at certain time throughout the week is also meritless. He argues that

because his blood was not drawn "at a proper time in the cycle, they are misrepresenting the

data." ECF No. 154-2, p. 38-39 (Daly Deposition). Daly offered his lay option that "if you draw

[a blood sample] early, it's going to disproportionately high … [s]o then, when they draw too

soon, say, look, your levels are too high, we're going to drop your dose." *Id.* Daly's position

reflects a difference in medical opinion, not deliberate indifference. And Daly's position is just

plain wrong. It was rejected by his own expert. When Dr. Fisher was asked at her deposition

whether Daly's opinion that the blood sample should coincide with a "trough level," Dr. Fisher

responded that the standards of care "do not necessarily specify when blood should be draw … it

does not have to be a trough." ECF No. 154-54, p. 57. When counsel then inquired, "so [Daly

was] wrong about that?"—to which query, Dr. Fisher answered: "correct." *Id.* Thus, not only is

there an absence of evidence to support that Dr. Alexander was deliberately indifferent in

managing Daly's testosterone dosage and hormone testing levels, but Daly's own expert

evidence belies such a finding.

Daly's other broad and conclusory allegations against Dr. Alexander also have no support in the record. They repeat the same unsupported assertions that already have been found to be without merit against Drs. Alpert, Reddy, and Noel. The record includes no support that Dr. Alexander caused Daly to be denied or delayed access to a competent transgender specialist or that he denied him any treatment that he, in his medical judgment, believed was necessary and appropriate or that another medical provider recommended or prescribed. Dr. Alexander is also entitled to judgment in his favor as a matter of law.

6. CHCA Anderson is entitled to judgment as a matter of law on Daly's Fourteenth Amendment invasion of privacy claim based on the insufficiency of the record to support that she intentionally disclosed confidential medical information.

Daly asserts that CHCA Anderson, an employee of the DOC, violated his rights to privacy under the Fourteenth Amendment.[17] *See* ECF No. 33, p. 24 (Count V). As previously discussed, Daly cannot recover monetary relief for this claim because he failed to ask for this relief in the relevant grievance. *See* ECF No. 152-14, p. 6 (Grievance no. 706257). And his request for a declaration that Anderson's actions violated his Fourteenth Amendment right to privacy is likewise unavailable. Such relief is unavailable solely to declare that one's rights have been violated in the past, which is what Daly requests. *See Cotton v. McCaffry*, 2024 WL 2723874, at *1 (E.D. Pa. May 28, 2024) (citing *Corliss v. O'Brien*, 200 Fed. Appx. 80, 84 (3d Cir. 2006)). Daly's requested injunctive relief against Anderson, namely that "all discussions or conversations relating to [Daly's] hormone therapy … or healthcare … only occur in situations that preserve confidentiality of this information from non-medical staff and other incarcerated

---

[17] In his responsive concise statement of material facts, Daly asserts that the Defendants violated his rights under the Health Insurance Portability and Accountability Act of 1996 ("HIPAA"), 42 U.S.C. § 1320d-1, *et seq*. The Amended Complaint specifically grounded Daly's privacy claim in the Fourteenth Amendment and did not raise a HIPAA violation or claim. *See* ECF No. 33, ¶¶ 180-81 (Count V). And in any event, HIPAA does not provide for a private right of action. *See Byrne v. Berks Cnty. Jail*, 2024 WL 2794446, at *1 (3d Cir. May 31, 2024) (holding that the District Court correctly concluded that HIPAA does not provide a private right of action); *Johnson v. WPIC*, 782 Fed. Appx. 169, 170-71 (3d Cir. 2019); *Hatfield v. Berube*, 714 Fed. Appx. 99, 105-106 (3d Cir. 2017).

persons," is moot due to his transfer to SCI-Muncy. *Sutton v. Rasheed*, 323 F.3d 236, 248 (3d Cir. 2003) (noting that "[a]n inmate's transfer from the facility complained of generally moots the equitable and declaratory claims"); *See also Carter v. Commonwealth of Pennsylvania*, 2024 WL 2889953, at *2 (W.D. Pa. June 10, 2024).

Although the Amended Complaint broadly requested injunctive relief against the "Defendants," Daly has clarified that his Fourteenth Amendment claim is based on a discussion he had "with CHCA Anderson in early 2018" regarding his gender dysphoria treatment. Daly alleges that this discussion took place while Anderson was standing outside his cell where other inmates "could hear" details of his treatment. *See* ECF No. 144, ¶ 118; ECF No. 161, p. 31. Given Daly's transfer from SCI-Cambridge Springs to SCI-Muncy, any claim for injunctive relief against Anderson is moot.

In addition to the unavailability of monetary relief due to a failure to exhaust and the unavailability of injunctive relief due to mootness, Daly's Fourteenth Amendment privacy claim also fails due to the insufficiency of the record to support an essential element of the claim. The Court of Appeals for the Third Circuit has recognized that "the constitutional right to privacy in one's medical information exists in prison." *Doe v. Delie*, 257 F.3d 309, 317 (3d Cir. 2001); *see also Payne v. Gourley*, 2023 WL 9059512, at *3 (M.D. Pa. Dec. 12, 2023), *report and recommendation adopted*, 2024 WL 23157 (M.D. Pa. Jan. 2, 2024). However, "a prisoner does not enjoy a right of privacy in his medical information to the same extent as a free citizen ... [A prisoner's] constitutional right is subject to substantial restrictions and limitations in order for correctional officials to achieve legitimate correctional goals and maintain institutional security." *Castillo v. O'Haine*, 2023 WL 8359878, at *4 (M.D. Pa. Dec. 1, 2023) (quoting *Delie*, 257 F.3d at 317). That is, a prisoner retains only "those rights that are not inconsistent with their status as

prisoners or with the legitimate penological objectives of the corrections system." *Id.* at 315

(citing *Pell v. Procunier*, 417 U.S. 817, 822 (1974)). Daly's "privacy right" is thus a narrow one

that applies only "in the case of an unusual medical condition which, if disclosed unnecessarily,

would likely expose the inmate to ridicule, discrimination, or even potential violence and harm,

particularly when word of the condition is likely to spread through 'rumor or gossip.'" *Medina*

*v. Little*, 2023 WL 8027154, at *12 (E.D. Pa. Nov. 20, 2023) (citing *Smith v. Hayman*, 2012 WL

1079634, at *18 (D.N.J. Mar. 30, 2012), *aff'd*, 489 Fed. Appx. 544 (3d Cir. 2012)). This narrow

right applies to inmates with gender dysphoria. As the Court of Appeals for the Second Circuit

noted in *Powell v. Schriver*, "individuals who have chosen to abandon one gender in favor of

another understandably might desire to conduct their affairs as if such a transition was never

necessary." 175 F.3d 107, 111 (2d Cir. 1999). "That interest in privacy, like the privacy interest

of persons who are HIV positive, is particularly compelling." *Id*. But such concerns for an

inmate's medical privacy are implicated only when there has been some "purposeful

dissemination of intensely private medical information." *Betrand v. Pa. Dep't Corr.*, 2008 WL

744817, at *4 (M.D. Pa. Mar. 18, 2008) (citing *Braxton v. Webster*, 2007 WL 3091555, at *2

(S.D. Ind. Oct. 19, 2007) and *Delie*, 257 F.3d at 315). "[I]nadvertent or negligent disclosure of

an inmate's confidential medical information does not violate an inmate's right to privacy."

*Hampton v. Shea*, 2022 WL 2906821, at *3 (D. Conn. July 22, 2022) (citing *Williams v. Miller*,

2019 WL 4645509, at *4 (N.D.N.Y. Aug. 28, 2019), *report and recommendation adopted*, 2019

WL 4643787 (N.D.N.Y. Sept. 24, 2019); *Levola v. Fischer*, 2010 WL 11602538, at *18

(N.D.N.Y. Sept. 29, 2010) (holding that "an instance of inadvertent disclosure of plaintiff's

medical records ... are not sufficient to state a claim for the violation of plaintiff's privacy rights

which is cognizable under § 1983."). *See also Doe v. Beard*, 2014 WL 3507196, at *6 (C.D. Cal.

July 14, 2014) (dismissing claim for disclosure of medical records because inmate alleged only negligent conduct by defendants); *accord Warwick v. Doe*, 2020 WL 2768804, at *6 (D. Conn. May 27, 2020) (simple negligence of prison personnel does not support a deliberate indifference claim).

The record in this case includes no evidence from which a reasonable jury could reasonably find that Anderson intentionally divulged Daly's private medical information to any person not involved in his care. A prison official's discussion of medical information in a public setting (here, outside an inmate's cell door) does not alone violate an inmate's right to confidentiality. *See Ibrahim v. DeFilippo*, 2022 WL 16821503, at *7 (D.N.J. Nov. 8, 2022) (finding no privacy violation where inmate agreed to speak to prison official at his cell door in front of cellmate); *Braxton v. Webster*, 2007 WL 3091555 at *2 (S.D. Ind. Oct. 19, 2007) (concluding that prison inmates "cannot enjoy greater privacy protection than individuals in free society, and some amount of sharing of medical information in areas where it might be overheard by others—*e.g.* in hospital emergency rooms, school infirmaries, and the waiting room of a doctor's office—is commonplace"); *Smith v. Hayman,* 2012 WL 1089634, at *23, n.6 (D.N.J. Mar. 30, 2012) (citation omitted). Moreover, by participating in the conversation with Anderson at his cell door, Daly would have been aware that other inmates might overhear the conversation.

Daly and Anderson disagree on who initiated the discussion, and Anderson does not dispute that—at one point in their conversation—Daly asked Anderson to lower her voice. These facts remain insufficient to raise a genuine issue of material fact, however, especially given that Daly elected to continue the conversation with Anderson. There is no evidence that after Daly ascertained that the other unidentified inmates were close enough to potentially overhear the conversation, he sought to discontinue the conversation or move it to a more private

41

setting. When asked at his deposition if he asked Anderson whether they could "speak privately about the issues she brought up," Daly answered, "I can't recall." ECF No. 162-2, p. 34. In contrast, Anderson's sworn declaration attests that Daly "did not request to speak to me privately regarding these matters … [and] if [Daly] had asked to speak privately, I would have accommodated this request and arranged for us to do so." ECF No. 143-4, pp. 18-19.

The record supports that any potential disclosure of information concerning Daly's treatment that may have occurred during the cell-side discussion was inadvertent or negligent, neither of which states of mind can support a violation of Daly's Fourteenth Amendment privacy rights. *See Resto v. Weissmane*, 2008 WL 5191733, at *4 & n.3 (N.D.N.Y. Dec. 10, 2008) (holding that "[t]o the extent that Plaintiff's breach-of-privacy claim arose out of an incident when a medical staff member negligently spoke so loudly during a sick call visit to Plaintiff that one or more nearby correctional officers … overheard Plaintiff's medical condition, such negligence (whether it is the subject of a claim asserted under the Fourteenth Amendment or the Fourth Amendment) is not actionable under 42 U.S.C. § 1983"). To create a triable issue of fact, Daly needed to produce evidence that Anderson intentionally disclosed his confidential information. *See Williams v. Miller,* 2019 WL 4645509, at *4 (N.D.N.Y. Aug. 28, 2019), *report and recommendation adopted*, 2019 WL 4643787 (N.D.N.Y. Sept. 24, 2019). He has failed to do so.

Anderson is entitled to judgment as a matter of law on Daly's First Amendment claim based on his failure to exhaust a damages remedy, the mootness of any claim for injunctive or declaratory relief, and the insufficiency of the evidence to support an essential element of the claim.

      7. Dr. Noel, Dr. Reddy, and CHCA Anderson are also entitled to qualified immunity as an alternative ground for judgment in their favor.[18]

The remaining DOC-employed Defendants Dr. Noel, Dr. Reddy, and CHCA Anderson, argue, in the alternative, that they are entitled to qualified immunity on Daly's constitutional claims.[19] Qualified immunity shields government officials performing discretionary functions "from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Sharrar v. Felsing*, 128 F.3d 810, 826 (3d Cir. 1997) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). The qualified immunity defense is traditionally analyzed in two prongs: (1) whether the facts alleged, taken in the light most favorable to the plaintiff, make out the violation of a constitutional or statutory right; and whether the right at issue was "clearly established" at the time of the challenged conduct. *Saucier v. Katz*, 533 U.S. 194, 201 (2001). The two prongs to the qualified immunity inquiry need not be analyzed in sequential order; courts have discretion to decide which of the two prongs to tackle first. *Ashcroft v. al–Kidd*, 563 U.S. 731, 735 (2011); *Pearson v. Callahan*, 555 U.S. 223, 236 (2009). "The burden of establishing qualified immunity falls to the official claiming it as a defense." *Burns v. PA Dep't of Corr.*, 642 F.3d 163, 176 (3d Cir. 2011). *See also*, *Harris v. Kellogg, Brown & Root Servs., Inc.*, 2016 WL 4720058, at *1 (W.D. Pa. Sept. 9, 2016) (noting that the defendant "has the burden of proof on its affirmative defense of qualified immunity"); *Pruchnic v. Wright*, 2016 WL 1267812, at *10 (W.D. Pa. Mar. 30, 2016) (same); *Figueroa v. Mazza*, 825 F.3d 89, 113 (2d Cir. 2016) (same).[20]

      As discussed above, Daly has failed to establish a prima facie case to support either his Eighth Amendment claim against Dr. Noel or Dr. Reddy or his Fourteenth Amendment claim

---

[18] If the Court agrees with the recommendations for dismissal previously addressed in this Report and Recommendation, it need not reach the defense of qualified immunity. *See Gannaway v. Karetas*, 438 Fed. Appx. 61,

against CHCA Anderson. As to Anderson, the right of an inmate not to have his highly sensitive

confidential medical information *intentionally* disclosed was clearly established at the time she

met with Daly at his cell door. Daly simply failed to produce evidence to support a prima facie

case that Anderson violated that right.

As to Dr. Noel and Dr. Reddy, their entitlement to qualified immunity arises under both

prongs of the analysis—the absence of a prima facie case of a violation of a constitutional right,

and, alternatively, the absence of clearly established law placing them on notice of the

unlawfulness of their conduct. "'Clearly established' means that, at the time of the officer's

conduct, the law was 'sufficiently clear' that every 'reasonable official would understand that

what he is doing' is unlawful." *D.C. v. Wesby*, 138 S. Ct. 577, 589 (2018) (cleaned up) (citations

omitted). "In other words, existing law must have placed the constitutionality of the officer's

conduct 'beyond debate.'" *Id.* (quoting *Ashcroft v. al–Kidd*, 563 U.S. 731, 741 (2011)). "In

determining whether a right is clearly established, [however,] it is not necessary that the exact set

of factual circumstances has been considered previously." *Kelly v. Borough of Carlisle*, 622

F.3d 248, 259–60 (3d Cir. 2010) (citing *Hope v. Pelzer*, 536 U.S. 730, 739 (2002). Even where

---

67 (3d Cir. 2011) (holding that absent a constitutional violation, the court "need not engage in an analysis of qualified immunity"); *Vallecorsa v. Allegheny Cnty.*, 2022 WL 16950446, at *10 (W.D. Pa. Nov. 15, 2022) (same).

[19] The private non-DOC employed Defendants have not raised qualified immunity as a ground for summary judgment. This is likely due to the weight of authority within this Circuit and elsewhere rejecting the availability of qualified immunity to private parties providing services to prisoners under contract. *See Hasher v. Hayman*, 2013 WL 1288205, at *9 (D.N.J. Mar. 27, 2013) (medical doctors); *McCullum v. Tepe*, 693 F.3d 696 (6th Cir.2012) (rejecting qualified immunity for private psychiatrist providing services to inmates as employee of a private entity); *Tapp v. Proto*, 718 F. Supp. 2d 598, 612 n.10 (E.D. Pa. 2010) (food services staff). *See also Richardson v. McKnight*, 521 U.S. 399 (1997) (finding that private prison guards do not enjoy qualified immunity from § 1983 suits because they have not historically enjoyed such immunity, are not covered by the purpose of such immunity, and are subject to ordinary market pressures that relieve the need for such immunity).

[20] *Compare, Stanton v. Elliott*, 25 F.4th 227, 233 (4th Cir. 2022) ("In the Fourth Circuit, we have a split burden of proof for the qualified-immunity defense. The plaintiff bears the burden on the first prong, and the officer bears the burden on the second prong."); *Craig v. Martin*, 49 F.4th 404, 409 (5th Cir. 2022) ("Once a defendant properly pleads qualified immunity, the burden of proof shifts to the plaintiffs to negate the defense."); *Wellington v. Daza*, 2022 WL 3041100, at *5 (10th Cir. Aug. 2, 2022) (same).

44

the official faces novel circumstances, qualified immunity may be denied "as long as the law gave the defendant [] 'fair warning' that his conduct was unconstitutional." *Id*. (quoting *Kopec v. Tate*, 361 F.3d 772, 778 (3d Cir. 2004)). But "[t]he rule's contours must be so well defined that it is 'clear to a reasonable officer that his conduct was unlawful in the situation he confronted.'" *Wesby*, 138 S. Ct. at 590 (citing *Saucier v. Katz*, 533 U.S. 194, 202 (2001)); *see also Reichle v. Howards*, 566 U.S. 658, 664 (2012) (To be "clearly established," a right must be sufficiently clear such that a reasonable official in the position of the defendant would have known that his conduct was unlawful.).

"A Government official's conduct violates clearly established law when, at the time of the challenged conduct, '[t]he contours of [a] right [are] sufficiently clear' that every 'reasonable official would [have understood] that what he is doing violates that right.'" *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011) (quoting *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)). "This inquiry 'must be undertaken in light of the specific context of the case, not as a broad general proposition.'" *Rivas-Villegas v. Cortesluna*, 142 S. Ct. 4, 8 (2021) (emphasis supplied) (quoting *Brosseau v. Haugen*, 543 U.S. 194, 198 (2004) (per curiam)) (internal quotation marks omitted). Therefore, in this case, the Court may not define the right in broad terms, such as "a right to adequate medical care" or "a right not to be subjected to deliberately indifferent medical care." "Rather, the right at issue must be framed 'in a more particularized, and hence more relevant, sense.'" *Estep v. Mackey*, 639 Fed. Appx. 870, 873 (3d Cir. 2016) (quoting *Spady v. Bethlehem Area Sch. Dist.*, 800 F.3d 633, 638 (3d Cir. 2015)); *Wilson v. Layne*, 526 U.S. 603, 615 (1999) (the court must first identify the right "at the appropriate level of specificity"). In other words, the right must be defined based on the facts and circumstances faced by the government official as alleged by the plaintiff. *See Rivas-Villegas*, 142 S. Ct. at 8; *al-Kidd*, 563 U.S. at 742; *Estep*,

45

639 Fed. Appx. at 873. Doing so is particularly important "in this fact-intensive area of constitutional law" regarding treatment of gender dysphoria because "a broader formulation would violate the Supreme Court's instruction that the specific contours of the right must be 'sufficiently definite that any reasonable official ... would have understood that he was violating it.'" *Campbell v. Kallas*, 936 F.3d 536, 545 (7th Cir. 2019) (citing *Plumhoff v. Rickard*, 572 U.S. 765, 779 (2014)). "The Supreme Court's message is unmistakable: Frame the constitutional right in terms granular enough to provide fair notice because qualified immunity 'protects all but the plainly incompetent or those who knowingly violate the law.'" *Id.* at 546 (citing *Kisela v. Hughes*, —— U.S. ——, 138 S. Ct. 1148, 1152–53 (2018)).

Daly's asserted rights have been fully elucidated by a factual record developed through extensive discovery, which distinguishes this case from those cases that have denied motions to dismiss complaints based on qualified immunity. *See Doe v. Pennsylvania Dep't of Corr.*, 2021 WL 1583556, at *24 (W.D. Pa. Feb. 19, 2021), *report and recommendation adopted,* 2021 WL 1115373 (W.D. Pa. Mar. 24, 2021); *Guthrie v. Wetzel*, 2022 WL 122372, at *6 (M.D. Pa. Jan. 12, 2022). Daly asserts the following particularized rights: (1) a right to access to an outside transgender specialist where multiple other physicians have provided care for his gender dysphoria, (2) a right to permanent hair removal where other means of hair removal such as razor have been offered, and (3) and a right to gender affirming surgery sooner than when it was provided in this case.

Once the court has identified the asserted right or rights at the appropriate level of specificity, it then looks first to Supreme Court decisions to determine whether the right was clearly established at the time of the conduct at issue. *See Mammaro v. N.J. Div. of Child Protection and Permanency*, 814 F.3d 164, 169 (3d Cir. 2016). Absent factually similar

46

Supreme Court precedent, a court may rely on a "'robust consensus of cases of persuasive authority' in the Court[s] of Appeals." *Taylor v. Barkes*, 575 U.S. 822, 826 (2015) (per curiam). Because district court decisions are "not binding precedent in either a different judicial district, the same judicial district, or even upon the same judge in a different case," they are generally insufficient to support a clearly established right in the qualified immunity context. Camreta v. Greene, 563 U.S. 692, 708 n.7 (2011) (quoting 18 J. Moore et al., Moore's Federal Practice § 134.02[1] [d], p. 134–26 (3d ed.2011)); *Booker v. S.C. Dep't of Corr.*, 855 F.3d 533, 538 n.1 (4th Cir. 2017).

Here, at the time Dr. Noel and Dr. Reddy were involved in Daly's care, no Supreme Court precedent or consensus of federal appellate authority involving a claim with sufficient factual similarity to Daly's claims existed such that the rights asserted by Daly could be considered to have been clearly established at the time of their medical decisions. *See, e.g.*, *Campbell*, 936 F.3d at 545-49 (7th Cir. 2019) (holding that then-existing caselaw did not clearly establish a constitutional right to gender-dysphoria treatment beyond hormone therapy). Given this state of the law, qualified immunity provides Dr. Noel and Dr. Reddy with a further alternative ground for judgment in their favor as a matter of law.

E. Conclusion

For the foregoing reasons, it is respectfully recommended that:

- the motion for summary judgment on behalf of Defendants Pennsylvania Department of Corrections ("DOC"), Shannon Anderson, Dr. Paul Noel, Dr. Paluki Reddy, and John Wetzel (ECF No. 143) be GRANTED;

- the motion for summary judgment on behalf of Defendant Dr. Michael Alexander (ECF No. 147) be GRANTED; and

- the motion for summary judgment on behalf of Defendants Dr. Lawrence Alpert and Dr. Simeon Obeng (ECF No. 151) be GRANTED.

No genuine issue of material fact remains for trial, and each of the remaining Defendants is entitled to judgment as a matter of law.

III.    Notice to the Parties Concerning Objections

In accordance with the Magistrate Judges Act, 28 U.S.C. § 636(b)(1), Fed. R. Civ. P. 72((b)(2), and Local Rule 72(D)(2), the parties are permitted to file written objections in accordance with the schedule established in the docket entry reflecting the filing of this Report and Recommendation.  Failure to timely file objections will waive the right to appeal. *Brightwell v. Lehman,* 637 F.3d 187, 193 n. 7 (3d Cir. 2011).  Any party opposing objections may file their response to the objections within fourteen (14) days thereafter in accordance with Local Civil Rule 72(D)(2).

DATED this 7th day of August, 2024.

BY THE COURT:

RICHARD A. LANZILLO
CHIEF UNITED STATES MAGISTRATE JUDGE